**WENOKUR RIORDAN, PLLC**
**600 Stewart Street, #1300**
**Seattle, WA 98101**
**206-903-0401**
**Faye C. Rasch**
**faye@wrlawgroup.com**

## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | Chapter 11 |
| FLAGSHIP RESORT DEVELOPMENT CORPORATION, | Case No. 25-15047 (JNP) |
| Debtor. | Honorable Jerrold N. Poslusny, Jr. U.S.B.J. |
| In re: | |
| LAWSUIT PLAINTIFFS, | |
| Plaintiffs, | Adv. Pro. No. 25-01379-JNP |
| v. | |
| FLAGSHIP RESORT DEVELOPMENT CORPORATION, | |
| Defendant. | |

## <u>DECLARATION IN SUPPORT OF ENTRY OF ORDER TO SHOW CAUSE WITH TEMPORARY RESTRAINTS</u>

I, Faye C. Rasch, of full age, declares as follows:

1

1.      I am an attorney with Wenokur Riordan, PLLC in Seattle, Washington.  I represent the Lawsuit Plaintiffs[1] in the above-captioned adversary proceeding. I make this declaration in support of Plaintiffs' application for entry of an Order to Show Cause with Temporary Restraints. I have personal knowledge of the facts stated herein, and if called to testify, I could and would testify competently thereto.

2.      Attached hereto as **Exhibit A** is a true and correct copy of the Sale Order entered by the Court on August 11, 2025.

I declare under penalty of perjury that the information contained in this declaration is true to the best of my knowledge.

Date: September 26, 2025                    _/s/ Faye C. Rasch_
                                            Faye C. Rasch, NJSB #43552002

---

[1] The Lawsuit Plaintiffs are comprised of three groups of timeshare owners as follows: (i) the 19 plaintiffs in the Keona Palmer, et al, vs. Flagship Resort Development Corporation, Docket No. ATL-1515-19 ("Palmer Plaintiffs"), (ii) the 17 plaintiffs in the Alicia Castellanos vs. Flagship Resort Development Corporation, Docket No. ATL-L-379-23 ("Castellanos Plaintiffs"), and (iii) the over 10,700 plaintiff class members who have been certified as a class in the Michael Lantych, Sherman and Dorothy Norman v. Flagship Resort Development Corporation, Docket No. ATL-L-744-23 ("Lantych Plaintiffs"), collectively referred to herein as the "Lawsuit Plaintiffs."

**EXHIBIT A**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
**Caption in Compliance with D.N.J. LBR 9004-1**

**PORZIO, BROMBERG & NEWMAN, P.C.**
100 Southgate Parkway
P.O. Box 1997
Morristown, New Jersey 07962
(973) 538-4006
(973) 538-5146 Facsimile
Warren J. Martin, Jr., Esq. wjmartin@pbnlaw.com)
Rachel A. Parisi, Esq. (raparisi@pbnlaw.com)
Christopher P. Mazza, Esq. (cpmazza@pbnlaw.com)

*Counsel to Debtor and Debtor-In-Possession*

Order Filed on August 11, 2025
by Clerk
U.S. Bankruptcy Court
District of New Jersey

| | |
|---|---|
| In re: | Chapter: 11 |
| FLAGSHIP RESORT DEVELOPMENT CORPORATION,[1] | Case No.: 25-15047 (JNP) |
| Debtor. | |

**ORDER (A) AUTHORIZING THE DEBTOR TO ENTER INTO AN ASSET PURCHASE AGREEMENT, (B) APPROVING THE ASSET PURCHASE AGREEMENT, AND (C) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF THE ASSUMED CONTRACTS**

The relief set forth on the following pages, numbered two (2) through thirty-six (36), is **ORDERED**.

**DATED: August 11, 2025**

Honorable Jerrold N. Poslusny, Jr.
United States Bankruptcy Court

---

[1] The Debtor in this case, along with the last four digits of the Debtor's federal tax identification number is: Flagship Resort Development Corporation, a New Jersey corporation (1067). The location of the Debtor's service address is: 60 North Maine Avenue, Atlantic City, NJ 08401.

(Page | 2)

| | |
|---|---|
| Debtor: | FLAGSHIP RESORT DEVELOPMENT CORPORATION |
| Case No.: | 25-15047 (JNP) |
| Caption of Order: | ORDER (A) AUTHORIZING THE DEBTOR TO ENTER INTO AN ASSET PURCHASE AGREEMENT, (B) APPROVING THE ASSET PURCHASE AGREEMENT, AND (C) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF THE ASSUMED CONTRACTS |

---

Upon consideration of the *Debtor's Motion for Entry of Orders (I) (A) Approving Bidding Procedures For the Sale of Substantially All of the Debtor's Assets, (B) Approving Stalking Horse Purchase Agreement, (C) Scheduling an Auction and a Sale Hearing, (D) Approving the Form and Manner of Notice Thereof, (E) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, and (F) Granting Related Relief, and (II) (A) Authorizing the Debtor to Enter Into an Asset Purchase Agreement, (B) Approving the Asset Purchase Agreement, and (C) Authorizing the Assumption and Assignment of the Assumed Contracts* [Docket No. 13] (the "Motion"),[2] filed by the above-captioned debtor and debtor in possession (the "Debtor"), and the *Amended Order (A) Approving Bidding Procedures For the Sale of Substantially All of the Debtor's Assets, (B) Approving Stalking Horse Purchase Agreement, (C) Scheduling an Auction and a Sale Hearing, (D) Approving the Form and Manner of Notice Thereof, (E) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, and (F) Granting Related Relief* [Docket No. 125] (the "Bidding Procedures Order"), which authorized and approved, among other things, the Sale of the Purchased Assets, on an "as is, where is" basis, free and clear of all liens, claims, encumbrances, and interests; and selected AC Boardwalk Investments LLC (the "Purchaser") as the Successful Bidder and entered into the Asset Purchase Agreement, dated May [●], 2025, which was amended on August 7, 2025, annexed together with

---

[2] All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion, Bidding Procedures Order, or Asset Purchase Agreement, as applicable.

(Page | 3)
Debtor:               FLAGSHIP RESORT DEVELOPMENT CORPORATION
Case No.:             25-15047 (JNP)
Caption of Order:     ORDER (A) AUTHORIZING THE DEBTOR TO ENTER INTO AN
                      ASSET PURCHASE AGREEMENT, (B) APPROVING THE ASSET
                      PURCHASE AGREEMENT, AND (C) AUTHORIZING THE
                      ASSUMPTION AND ASSIGNMENT OF THE ASSUMED
                      CONTRACTS

---

all its exhibits hereto as **Exhibit 1** (the "Asset Purchase Agreement"); and upon the First Day

Declaration, the *Declaration of Cherie Parks in Support of Entry of an Order Approving the Sale*

*of the Debtor's Assets to the Stalking Horse Bidder* [Docket No. 255], *Declaration of Christopher*

*Saitta in Support of Entry of an Order Approving the Sale of the Debtor's Assets to the Stalking*

*Horse Bidder* [Docket No. 257], and *Declaration of Kevin Jones in Support of Entry of an Order*

*Approving the Sale of the Debtor's Assets to the Stalking Horse Bidder* [Docket No. 256]

(collectively, the "Supporting Declarations"); and this Court having reviewed the Motion, the

Bidding Procedures Order and the Supporting Declarations; and this Court having determined that

the Debtor has complied with the Bidding Procedures Order, and that the Debtor's entry into the

Asset Purchase Agreement is in the best interest of the Debtor and its estate and provides for the

highest or best bid for the Purchased Assets; and upon all of the proceedings had before the Court

and after due deliberation and sufficient cause appearing therefor, it is hereby

**FOUND AND DETERMINED THAT**:

A.      Findings and Conclusions. The findings and conclusions set forth herein constitute

the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made

applicable to this proceeding pursuant to Bankruptcy Rule 9014.

B.      Jurisdiction and Venue. This Court has jurisdiction to consider the Motion pursuant

to 28 U.S.C. §§ 1334 and 157 and the *Standing Order of Reference to the Bankruptcy Court Under*

*Title 11* of the United States District Court for the District of New Jersey, dated September 18,

2012 (Simandle, C.J.). This is a core matter pursuant to 28 U.S.C. § 157(b)(2), and this Court may

(Page | 4)

| | |
|---|---|
| Debtor: | FLAGSHIP RESORT DEVELOPMENT CORPORATION |
| Case No.: | 25-15047 (JNP) |
| Caption of Order: | ORDER (A) AUTHORIZING THE DEBTOR TO ENTER INTO AN ASSET PURCHASE AGREEMENT, (B) APPROVING THE ASSET PURCHASE AGREEMENT, AND (C) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF THE ASSUMED CONTRACTS |

enter a final order consistent with Article III of the United States Constitution. Venue of the Chapter 11 Case and of the Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C.    Final Order. This Sale Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a). Time is of the essence in closing the Sale referenced herein, the Debtor and the Purchaser intend to close the Sale as soon as practicable, and there is no just reason for delay in the implementation of this Sale Order. Specifically, the Sale must be approved and consummated promptly in order to preserve the viability of the business in the hands of the Purchaser as a going concern, and to maximize the value to the Debtor, its estate, creditors, and all other parties-in-interest. Accordingly, there is cause to lift the stay contemplated by Bankruptcy Rules 6004(h) and 6006(d).

D.    Statutory Predicates. The statutory predicates for the relief sought in the Motion are sections 105, 363, 364, 365, and 541 of the Bankruptcy Code, Rules 2002, 6004, 6006 and 9007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 6004-1 and 6004-2 of the Local Rules of the United States Bankruptcy Court for the District of New Jersey (the "Local Rules").

E.    Notice.  As evidenced by the certifications of service previously filed with the Court, and based on the representations of counsel at the Sale Hearing, proper, timely, adequate and sufficient notice of the Motion, the Asset Purchase Agreement, this Sale Order and the Sale Hearing, have been provided in accordance with the Bidding Procedures Order, sections 102(1), 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006 and 9014 and the

8176078

Debtor:                    FLAGSHIP RESORT DEVELOPMENT CORPORATION
Case No.:                  25-15047 (JNP)
Caption of Order:          ORDER (A) AUTHORIZING THE DEBTOR TO ENTER INTO AN
                           ASSET PURCHASE AGREEMENT, (B) APPROVING THE ASSET
                           PURCHASE AGREEMENT, AND (C) AUTHORIZING THE
                           ASSUMPTION AND ASSIGNMENT OF THE ASSUMED
                           CONTRACTS

---

Bidding Procedures Order. Such notice was good and sufficient and appropriate under the particular circumstances and all known creditors of the Debtor and other parties-in-interest in the Chapter 11 Case were offered a reasonable opportunity to object and be heard. No other or further notice of the Motion, including, without limitation, the Asset Purchase Agreement, the assumption and assignment of the Assumed Contracts (as defined below) (and proposed Cure Costs related thereto), the Sale Hearing, or of the entry of this Sale Order was or is necessary or shall be required.

F.      <u>Best Interests and Business Justification</u>.  The relief requested in the Motion is in the best interests of the Debtor, its estate, creditors, and other parties in interest.  The Debtor has demonstrated a sufficient basis and compelling circumstances to sell the Purchased Assets to the Purchaser, and to assume and assign the Assumed Contracts to the Purchaser pursuant to the terms and conditions of the Asset Purchase Agreement, including the assumption of the Sale Effective Date Assumed Liabilities and the Assumed Liabilities. Such action is an appropriate exercise of the Debtor's business judgment and in the best interest of the Debtor, its estate and creditors.

G.      <u>Opportunity to Bid</u>. The Debtor and its professionals marketed the Purchased Assets appropriately and conducted the marketing and sale process as set forth in the Motion in good faith without collusion and in accordance with the Bidding Procedures and the Bidding Procedures Order. The marketing process set forth in the Bidding Procedures and the Bidding Procedures Order was fair in substance and procedure and afforded a full and fair opportunity for any party to make a higher or otherwise better offer to purchase the Purchased Assets. Based upon the record of these proceedings, all creditors of the Debtor, other parties-in-interest in the Chapter

(Page | 6)

| | |
|---|---|
| Debtor: | FLAGSHIP RESORT DEVELOPMENT CORPORATION |
| Case No.: | 25-15047 (JNP) |
| Caption of Order: | ORDER (A) AUTHORIZING THE DEBTOR TO ENTER INTO AN ASSET PURCHASE AGREEMENT, (B) APPROVING THE ASSET PURCHASE AGREEMENT, AND (C) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF THE ASSUMED CONTRACTS |

---

11 Case, and all prospective bidders have been afforded a reasonable and fair opportunity to bid for the Purchased Assets.

H.    <u>No Auction</u>. The Debtor did not receive any Qualified Bids (other than the Qualified Bid submitted by the Stalking Horse Bidder pursuant to the Stalking Horse APA) prior to the Bid Deadline.    Accordingly, in accordance with the Bid Procedures Order, the Debtor cancelled the Auction and designated the Stalking Horse Bidder as the Purchaser. *See Notice of Cancellation of Auction and Designation of Stalking Horse Bidder as the Purchaser,* Docket No. 242.

I.    <u>Highest or Otherwise Best Offer</u>. The total consideration provided by the Purchaser for the Purchased Assets is the highest or otherwise best offer for the Purchased Assets received by the Debtor. Thus, after the consultation required by the Bidding Procedures, the Debtor declared the Purchaser the Successful Bidder for the Purchased Assets set forth in the Asset Purchase Agreement in accordance with the Bidding Procedures, the Bidding Procedures Order and the Asset Purchase Agreement, and such determination constitutes the valid and sound exercise of the Debtor's business judgment. The Debtor, the Purchaser, as the Successful Bidder, and their respective agents and representatives, have complied in all respects with the Bidding Procedures and Bidding Procedures Order.

J.    <u>Good Faith Purchaser</u>. The Asset Purchase Agreement and the Sale have been negotiated by the Debtor and the Purchaser, and its respective agents and representatives, in good faith, at arms' length, and without collusion or fraud. The terms and conditions of the Asset

8176078

(Page | 7)

| | |
|---|---|
| Debtor: | FLAGSHIP RESORT DEVELOPMENT CORPORATION |
| Case No.: | 25-15047 (JNP) |
| Caption of Order: | ORDER (A) AUTHORIZING THE DEBTOR TO ENTER INTO AN ASSET PURCHASE AGREEMENT, (B) APPROVING THE ASSET PURCHASE AGREEMENT, AND (C) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF THE ASSUMED CONTRACTS |

---

Purchase Agreement, including the consideration to be paid by the Purchaser to the Debtor pursuant to the Asset Purchase Agreement, which includes the assumption of the Sale Effective Date Assumed Liabilities and the Assumed Liabilities, for the Purchased Assets identified in such agreement, are fair and reasonable, and the Sale, including each part thereof with respect to the Purchaser, is in the best interest of the Debtor, its estate, and creditors. The Purchaser is a "good faith purchaser" entitled to the full benefits and protections of section 363(m) of the Bankruptcy Code and any other applicable bankruptcy or non-bankruptcy law with respect to the sale and assignment of the Purchased Assets and Assumed Contracts that the Purchaser is acquiring pursuant to the Asset Purchase Agreement.

K.     _Cure/Adequate Assurance_.  The Debtor has met all of the requirements of section 365(b) of the Bankruptcy Code for each of the Assumed Contracts. Through, among other things, the filing and service of the _Notice of Proposed (I) Assumption and Assignment of Designated Executory Contracts and (II) Rejection of Contracts_ on June 30, 2025 [Docket No. 170] (the "Assigned Contracts Schedule"), the Debtor has provided adequate assurance of cure of any default existing prior to the Closing Date under any of the Assumed Contracts, within the meaning of section 365(b)(1)(A) of the Bankruptcy Code, and provided adequate assurance of compensation to any party for any actual pecuniary loss to such party resulting from such default under any of the Assumed Contracts within the meaning of section 365(b)(1)(B) of the Bankruptcy Code. The Purchaser is obligated to pay any and all Cure Costs with respect to the Assumed Contracts, in cash on the Closing Date in the amount specified on the Assigned Contracts Schedule,

(Page | 8)

| | |
|---|---|
| Debtor: | FLAGSHIP RESORT DEVELOPMENT CORPORATION |
| Case No.: | 25-15047 (JNP) |
| Caption of Order: | ORDER (A) AUTHORIZING THE DEBTOR TO ENTER INTO AN ASSET PURCHASE AGREEMENT, (B) APPROVING THE ASSET PURCHASE AGREEMENT, AND (C) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF THE ASSUMED CONTRACTS |

---

or in such other manner as agreed to by the Purchaser and the counterparty to an Assumed Contract. Notwithstanding anything to the contrary, the Debtor's estate shall not be responsible for the payment of any Cure Costs and the Purchaser's payment of any Cure Costs shall not (i) be deemed a purchase price adjustment that reduces the overall consideration received by the Debtor's estate, or (ii) reduce the amount of the cash and contingent consideration that is otherwise payable by Purchaser under the Asset Purchase Agreement (as applicable). The Purchaser has provided adequate assurance of its future performance of and under the Assumed Contracts, within the meaning of section 365(b)(1)(C) and 365(b)(3) (to the extent applicable) of the Bankruptcy Code. The counterparties to the Assumed Contracts (a "Contract Counterparty" and, collectively, the "Contract Counterparties") were each given adequate notice and the opportunity to object to the Assigned Contracts Schedule and are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code; any such objection filed by a Contract Counterparty that has not been withdrawn is hereby overruled.[1] Except as expressly set forth in the Asset Purchase Agreement including with respect to the Sale Effective Date Assumed Liabilities and the Assumed Liabilities, the Assumed Contracts will not subject the Purchaser to any liability whatsoever relating to any period prior to the Closing Date whether arising before or after such Closing Date, or by reason of

---

[1] The Debtor is in discussions with Concord Servicing, LLC to resolve the *Objection of Concord Servicing, LLC to Cure and Reservation of Rights* [Docket No. 202] (the "Concord Objection"). For the avoidance of doubt, the Sale Order does not overrule or sustain the Concord Objection and all parties rights are reserved with respect thereto.

Debtor:              FLAGSHIP RESORT DEVELOPMENT CORPORATION
Case No.:            25-15047 (JNP)
Caption of Order:    ORDER (A) AUTHORIZING THE DEBTOR TO ENTER INTO AN
                     ASSET PURCHASE AGREEMENT, (B) APPROVING THE ASSET
                     PURCHASE AGREEMENT, AND (C) AUTHORIZING THE
                     ASSUMPTION AND ASSIGNMENT OF THE ASSUMED
                     CONTRACTS

---

such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based, in whole or in part, on any theory of law or equity.

L.    <u>Adequate Consideration</u>.  The consideration provided by the Purchaser to the Debtor for the Purchased Assets, which includes a cash Purchase Price of $5,602,000 plus any outstanding fees and interest under the DIP Loan Facility and the assumption of the Sale Effective Date Assumed Liabilities and the Assumed Liabilities, (i) is fair and reasonable, (ii) is the highest or best offer for the Purchased Assets, (iii) will provide a greater recovery for the Debtor's creditors than would be provided by any other available alternative, and (iv) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, or possession.

M.    <u>Satisfaction of 363(f) Standards</u>.  The Debtor may sell and assign the Purchased Assets free and clear of all Liens, Claims and Excluded Liabilities, as applicable, because, with respect to each creditor asserting a Lien, Claim or Excluded Liability (each as defined in the Asset Purchase Agreement), one or more of the standards set forth in sections 363(f)(1)-(5) of the Bankruptcy Code have been satisfied. Those holders of Liens, Claims or Excluded Liabilities who did not object or who withdrew their objections to this Sale Order are deemed to have consented to the Motion and the sale and assignment of the Purchased Assets to the Purchaser pursuant to section 363(f)(2) of the Bankruptcy Code. Those holders of Liens, Claims, or Excluded Liabilities who did object fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are adequately protected by having their Liens, Claims or Excluded Liabilities, if any,

| Debtor: | FLAGSHIP RESORT DEVELOPMENT CORPORATION |
| Case No.: | 25-15047 (JNP) |
| Caption of Order: | ORDER (A) AUTHORIZING THE DEBTOR TO ENTER INTO AN ASSET PURCHASE AGREEMENT, (B) APPROVING THE ASSET PURCHASE AGREEMENT, AND (C) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF THE ASSUMED CONTRACTS |

attach to the proceeds of the Sale ultimately attributable to the Purchased Assets in which such holders allege a Lien, Claim or Excluded Liability in the same order of priority, with the same validity, force and effect that such holder had prior to such Sale, and subject to any claims and defenses the Debtor and its estate may possess with respect thereto.

N.    <u>No Successor Liability</u>. The transactions contemplated under the Asset Purchase Agreement do not amount to a consolidation, merger, or de facto merger of the Purchaser with the Debtor and/or the Debtor's estate, there is not substantial continuity between the Debtor and the Purchaser, there is no common identity between the Debtor and the Purchaser, there is no continuity of enterprise between the Debtor and the Purchaser, the Purchaser is not a mere continuation of the Debtor or its estate, and the Purchaser does not constitute a successor to the Debtor or its estate in any way. The Purchaser would not have acquired the Purchased Assets but for the foregoing protections against potential claims based upon "successor liability" or similar theories.

O.    <u>Releases</u>. The Purchaser would not have acquired the Purchased Assets but for the releases provided for herein, whereby the Debtor is releasing the Purchaser, Kevin Jones, Roxanne Passarella, and the Management Company (as defined below) from all causes of action, claims and liabilities as of the Closing Date of the Sale in exchange for the Purchaser Contribution (as defined below).

P.    <u>No Fraudulent Transfer</u>. The Sale is not for the purpose of hindering, delaying or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state,

Debtor:                    FLAGSHIP RESORT DEVELOPMENT CORPORATION
Case No.:                  25-15047 (JNP)
Caption of Order:          ORDER (A) AUTHORIZING THE DEBTOR TO ENTER INTO AN
                           ASSET PURCHASE AGREEMENT, (B) APPROVING THE ASSET
                           PURCHASE AGREEMENT, AND (C) AUTHORIZING THE
                           ASSUMPTION AND ASSIGNMENT OF THE ASSUMED
                           CONTRACTS

---

territory, or possession or the District of Columbia. Neither the Debtor nor the Purchaser has

entered into the Asset Purchase Agreement or is consummating the Sale with any fraudulent or

otherwise improper purpose.

Q. _Compliance with Bankruptcy Code_. The consummation of the Sale is legal, valid,

and properly authorized under all applicable provisions of the Bankruptcy Code, including without

limitation sections 105(a), 363(b), 363(f), 363(k), 363(m), 365(b) and 365(f) of the Bankruptcy

Code and all of the applicable requirements of such sections have been or will be complied with

in respect to the Sale as of the Closing Date.

R. _Sale Transaction Not a Sub Rosa Plan_. The sale and assignment of the Purchased

Assets, Sale Effective Date Assumed Liabilities, and Assumed Liabilities, as applicable, outside

of a plan pursuant to the Asset Purchase Agreement neither impermissibly restructures the rights

of the Debtor's creditors nor impermissibly dictates the terms of a liquidating plan for the Debtor.

The Sale does not constitute a _sub rosa_ chapter 11 plan.

S. The Sale contemplated by the Asset Purchase Agreement is in the best interest of

the Debtor, its estate, creditors, interest holders and all other parties-in-interest in the Chapter 11

Case.

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT**:

1. _Relief Granted_.  The relief requested in the Motion is hereby granted in its entirety.

2. _Objections Overruled_. All objections and responses to the Motion, this Sale Order

or the relief granted herein (including all reservations of rights included therein) that have not been

Debtor:           FLAGSHIP RESORT DEVELOPMENT CORPORATION
Case No.:         25-15047 (JNP)
Caption of Order:  ORDER (A) AUTHORIZING THE DEBTOR TO ENTER INTO AN
                      ASSET PURCHASE AGREEMENT, (B) APPROVING THE ASSET
                      PURCHASE AGREEMENT, AND (C) AUTHORIZING THE
                      ASSUMPTION AND ASSIGNMENT OF THE ASSUMED
                      CONTRACTS

---

overruled, withdrawn, waived, settled, or otherwise resolved, are hereby overruled and denied on the merits with prejudice.

3.     <u>Notice</u>. Notice of the Motion, and the assumption and assignment of the Assumed Contracts (including proposed Cure Costs related thereto), the Sale Hearing and the Sale was reasonable, sufficient, fair and equitable under the circumstances and complied in all respects with the Bidding Procedures, sections 102(1), 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9006, 9007 and 9008 and Local Rule 6004-1.

4.     <u>Prior Findings of Fact and Conclusions of Law</u>. The Court's findings of fact and conclusions of law in the Bidding Procedures Order shall remain in full force and effect.

5.     <u>Approval</u>. The Asset Purchase Agreement, annexed hereto as **Exhibit 1**, and all ancillary documents related thereto are hereby approved and authorized in all respects and shall be deemed in full force and effect, and the Debtor and the Purchaser are hereby authorized, empowered and directed to fully perform under, consummate, and implement the terms of the Asset Purchase Agreement and to execute, deliver and perform under, any and all additional instruments and documents that may be reasonably necessary or desirable to implement and effectuate the terms of Asset Purchase Agreement and this Sale Order, including, without limitation, deeds, assignments, patents, stock powers, transfers of membership interests and other instruments of transfer, and to take all further actions as may reasonably be requested by the Debtor or the Purchaser for the purpose of assigning, transferring, granting, conveying, and conferring to the Purchaser or reducing to possession any or all of the Purchased Assets, as may be necessary or

(Page | 13)

| | |
|---|---|
| Debtor: | FLAGSHIP RESORT DEVELOPMENT CORPORATION |
| Case No.: | 25-15047 (JNP) |
| Caption of Order: | ORDER (A) AUTHORIZING THE DEBTOR TO ENTER INTO AN ASSET PURCHASE AGREEMENT, (B) APPROVING THE ASSET PURCHASE AGREEMENT, AND (C) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF THE ASSUMED CONTRACTS |

---

appropriate to the performance of the Debtor's obligations as contemplated by the Asset Purchase

Agreement, without any further corporate action or orders of the Court. Notwithstanding anything

set forth in this Sale Order to the contrary, all rights, duties and obligations of the Purchaser may

be assigned to a designee (including an Affiliate) of the Purchaser in accordance with the Asset

Purchase Agreement; provided, that the Purchaser is, and shall remain, primarily and irrevocably

responsible for the full performance of the Purchaser's duties and obligations under the Asset

Purchase Agreement, including with respect to the Sale Effective Date Assumed Liabilities and

Assumed Liabilities, notwithstanding any such designation or the terms thereof.

6.      <u>Good Faith</u>. The Purchaser is a good faith purchaser of the Purchased Assets set

forth in the Asset Purchase Agreement and is hereby granted and entitled to all of the protections

provided to a good faith purchaser under section 363(m) of the Bankruptcy Code. Pursuant to

section 363(m) of the Bankruptcy Code, neither the reversal nor modification on appeal of this

Sale Order under section 363(b) or (c) of the Bankruptcy Code shall affect the validity of the sale

of the Purchased Assets under this Sale Order to the Purchaser, which purchased the Purchased

Assets in good faith, whether or not the Purchaser knew of the pendency of the appeal unless this

Sale Order and the sale of the Purchased Assets were stayed pending appeal prior to Closing.

7.      <u>Section 363(n) of the Bankruptcy Code</u>. The Sale approved by this Sale Order is

not subject to avoidance or any recovery or damages pursuant to section 363(n) or any other section

of the Bankruptcy Code.

8176078

(Page | 14)

Debtor:  FLAGSHIP RESORT DEVELOPMENT CORPORATION

Case No.:  25-15047 (JNP)

Caption of Order:  ORDER (A) AUTHORIZING THE DEBTOR TO ENTER INTO AN ASSET PURCHASE AGREEMENT, (B) APPROVING THE ASSET PURCHASE AGREEMENT, AND (C) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF THE ASSUMED CONTRACTS

---

8.    Purchaser Contribution/Releases. On the Closing Date of the Sale, Kevin Jones, Roxanne Passarella, and the Management Company shall contribute a total of $150,000.00 in cash (the "Purchaser Contribution") to the Plan Administrator Wind-Down and Expense Reserve (as defined in the *Plan of Liquidation of Flagship Resort Development Corporation Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 175], as amended, modified, or supplemented from time to time (the "Plan")), which Purchaser Contribution shall be in addition to the Purchase Price. The Debtor releases of the Purchaser, Kevin Jones, Roxane Passarella, and the Management Company from all causes of action, claims and liabilities as of the Closing Date of the Sale are hereby approved; *provided however*, that such releases, as and when approved by the Court, shall not become effective until the Purchaser Contribution has been funded.

9.    Documentation. The Debtor is authorized and empowered to cause to be filed with the secretary of state of any state or other applicable officials of any applicable governmental units, any and all certificates, agreements, or amendments necessary or appropriate to effectuate the Sale contemplated by the Asset Purchase Agreement, any related agreements and this Sale Order, including amended and restated certificates or articles of incorporation, by-laws, or certificates or articles of amendment, and all such other actions, filings, or recordings as may be required under appropriate provisions of the applicable laws of all applicable governmental units or as any of the officers of the Debtor may determine are necessary or appropriate, and all such officials are hereby authorized to accept the foregoing. The execution of any such document or the taking of any such

| | |
|---|---|
| Debtor: | FLAGSHIP RESORT DEVELOPMENT CORPORATION |
| Case No.: | 25-15047 (JNP) |
| Caption of Order: | ORDER (A) AUTHORIZING THE DEBTOR TO ENTER INTO AN ASSET PURCHASE AGREEMENT, (B) APPROVING THE ASSET PURCHASE AGREEMENT, AND (C) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF THE ASSUMED CONTRACTS |

---

action shall be, and hereby is, deemed conclusive evidence of the authority of such person to so act.

10.     <u>Cooperation</u>. The Debtor is hereby authorized and directed to cooperate with the Purchaser as reasonably requested by the Purchaser and take all actions and execute all documents which the Purchaser reasonably and in good faith determines is necessary or desirable to ensure that the Sale to the Purchaser is consummated in accordance with the Asset Purchase Agreement, and the Debtor is authorized to make such modifications or supplements reasonably acceptable to the Debtor and the Purchaser to any bill of sale or other document or instrument executed or to be executed in connection with the Closing to the Purchaser to facilitate such consummation as contemplated by the Asset Purchase Agreement. For the avoidance of doubt, any modifications or supplements to documents related to the Receivables Facilities must be satisfactory to the Receivables Lenders in their sole discretion.

11.     <u>Duty to Close</u>. Neither the Debtor nor the Purchaser shall have any obligation to proceed with the Closing to the Purchaser until all conditions precedent to its respective obligations to proceed have been met, satisfied or waived in accordance with the terms of the Asset Purchase Agreement.

12.     <u>Sale Effective Date Assumed Liabilities</u>.  On and after August 17, 2025 (the "<u>Sale Effective Date</u>"), and prior to Closing, the Purchaser shall (i) assume and satisfy all costs and expenses incurred by the Debtor's estate not contemplated in the Amended DIP Budget (as defined in, and attached to, the Term Sheet), including but not limited to operational costs, U.S. Trustee

Debtor:                FLAGSHIP RESORT DEVELOPMENT CORPORATION
Case No.:              25-15047 (JNP)
Caption of Order:      ORDER (A) AUTHORIZING THE DEBTOR TO ENTER INTO AN
                       ASSET PURCHASE AGREEMENT, (B) APPROVING THE ASSET
                       PURCHASE AGREEMENT, AND (C) AUTHORIZING THE
                       ASSUMPTION AND ASSIGNMENT OF THE ASSUMED
                       CONTRACTS

---

fees, and interest and fees under the DIP Facility, and (ii) realize any benefit from the Seller's operations (the "Sale Effective Date Assumed Liabilities").  Boardwalk Management LLC, and its affiliates, Marina Title Corp., First Resorts Management Company, BKRP LLC, and Fantasea Resorts Management Company, Inc. (collectively, the "Management Company") shall guaranty the Purchaser's obligations on account of the Sale Effective Date Assumed Liabilities after the Sale Effective Date.

13.     Excluded Assets.  For the avoidance of doubt, Excluded Assets under Section 1.2 of the Asset Purchase Agreement shall include, among the other Excluded Assets set forth in Section 1.2 of the Asset Purchase Agreement:[2]  (i) Avoidance Actions, (ii) Commercial Tort Claims, (iii) the Palmer Litigation Bond, and (iv) Claims and Causes of Action against the Excluded Parties.

14.     Valid Transfer. Effective as of the Closing of the Sale and with respect to the Sale, (i) the sale and assignment of the Purchased Assets and the Assumed Contracts, as applicable, by the Debtor to the Purchaser pursuant to the terms of the Asset Purchase Agreement shall constitute a legal, valid and effective transfer of the Purchased Assets and the Assumed Contracts, as applicable, notwithstanding any requirement for approval or consent by any person, and shall vest the Purchaser with all right, title, and interest of the Debtor in and to the Purchased Assets and

---

[2] All of the defined terms set forth in paragraph 13 of this Sale Order shall have the same meanings ascribed to them in the Plan.

Debtor:          FLAGSHIP RESORT DEVELOPMENT CORPORATION
Case No.:        25-15047 (JNP)
Caption of Order: ORDER (A) AUTHORIZING THE DEBTOR TO ENTER INTO AN
ASSET PURCHASE AGREEMENT, (B) APPROVING THE ASSET
PURCHASE AGREEMENT, AND (C) AUTHORIZING THE
ASSUMPTION AND ASSIGNMENT OF THE ASSUMED
CONTRACTS

---

Assumed Contracts, free and clear of all Liens, Claims and Excluded Liabilities, as applicable

(other than the Sale Effective Date Assumed Liabilities and Assumed Liabilities) pursuant to

section 363(f) of the Bankruptcy Code, and (ii) the assumption of the Assumed Contracts and all

Sale Effective Date Assumed Liabilities and Assumed Liabilities by the Purchaser constitutes a

legal, valid, and effective assignment and delegation of any and all obligations, liabilities, and

claims in respect thereof to the Purchaser and, other than to the extent expressly provided in this

Sale Order and/or constituting Excluded Liabilities under the Asset Purchase Agreement, as

applicable, divests the Debtor of all right, title and interest in, and all obligations and liability with

respect to, the Assumed Contracts and such Sale Effective Date Assumed Liabilities and Assumed

Liabilities. Upon the occurrence of the Closing, this Sale Order shall be considered and constitute,

for any and all purposes, a full and complete general assignment, conveyance, and transfer of the

Purchased Assets (including the Assumed Contracts, as applicable), Sale Effective Date Assumed

Liabilities , and Assumed Liabilities to the Purchaser pursuant to the Asset Purchase Agreement

and/or a bill of sale or assignment transferring indefeasible right, title and interest in the Purchased

Assets set forth in the Asset Purchase Agreement, including the Assumed Contracts, as applicable,

and all other rights and interests associated with or appurtenant to the Purchased Assets, including,

without limitation, warranty rights, intellectual property rights (including, without limitation,

rights to all associated patents, regulatory approvals, permits, and registrations) and other non-

executory contract rights, to the Purchaser all to the extent set forth in the Asset Purchase

Agreement.

(Page | 18)

| | |
|---|---|
| Debtor: | FLAGSHIP RESORT DEVELOPMENT CORPORATION |
| Case No.: | 25-15047 (JNP) |
| Caption of Order: | ORDER (A) AUTHORIZING THE DEBTOR TO ENTER INTO AN ASSET PURCHASE AGREEMENT, (B) APPROVING THE ASSET PURCHASE AGREEMENT, AND (C) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF THE ASSUMED CONTRACTS |

---

15.    <u>Free and Clear</u>. Upon the occurrence of a Closing under the Asset Purchase Agreement, the Debtor shall be, and hereby is, authorized, empowered, and directed, pursuant to sections 105, 363(b) and 363(f) of the Bankruptcy Code, to sell, assign, convey, and transfer the Purchased Assets under the Asset Purchase Agreement to the Purchaser and assign the Assumed Contracts to the Purchaser, as applicable. Except, and solely, to the extent specifically provided in the Asset Purchase Agreement or this Sale Order, the sale and assignment of the Purchased Assets and the assignment of the Assumed Contracts, as applicable, to the Purchaser pursuant to the Asset Purchase Agreement vests the Purchaser with all right, title and interest of the Debtor in and to its Purchased Assets, free and clear of any and all Liens, Claims, Excluded Liabilities, as applicable, and other liabilities of any kind or nature whatsoever (except for Sale Effective Date Assumed Liabilities and Assumed Liabilities), whether known or unknown as of the Closing Date, now existing or hereafter arising, legal or equitable, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, whether imposed by agreement, understanding, law, equity, or otherwise, with all such Liens, Claims and Excluded Liabilities, as applicable, to attach only to the proceeds of the sale and assignment of the Purchased Assets with the same priority, validity, force, and effect as they now have in or against the Purchased Assets. The Motion shall be deemed to have provided sufficient notice as to the sale and assignment of the Purchased Assets free and clear of all Liens, Claims and Excluded Liabilities. Following a Closing, no holder of any Lien or Claim on any of the Purchased Assets subject to such Closing, except for holders of Sale Effective Date Assumed Liabilities and Assumed Liabilities in accordance with the terms governing such

(Page | 19)

| | |
|---|---|
| Debtor: | FLAGSHIP RESORT DEVELOPMENT CORPORATION |
| Case No.: | 25-15047 (JNP) |
| Caption of Order: | ORDER (A) AUTHORIZING THE DEBTOR TO ENTER INTO AN ASSET PURCHASE AGREEMENT, (B) APPROVING THE ASSET PURCHASE AGREEMENT, AND (C) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF THE ASSUMED CONTRACTS |

Sale Effective Date Assumed Liabilities and Assumed Liabilities (including the terms of the Receivables Facilities), may interfere with the Purchaser's enjoyment of the Purchased Assets, as applicable, based on or related to such Lien or Claim, or any actions that the Debtor may take or fail to take in the Chapter 11 Case and no interested party may take any action to prevent, interfere with or otherwise enjoin consummation of the Sale.

16.    The provisions of this Sale Order authorizing the sale and assignment of the Purchased Assets free and clear of Liens, Claims and Excluded Liabilities (other than Sale Effective Date Assumed Liabilities and Assumed Liabilities), as applicable, shall be self-executing, and neither the Debtor nor the Purchaser shall be required to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate, and implement the provisions of this Sale Order.

17.    With regard to the forms of, timing, and other terms concerning the consideration to be provided by the Purchaser to the Debtor as set forth in the Asset Purchase Agreement, the Purchaser is directed to comply with its respective obligations thereunder, and the Debtor, any liquidating trustee appointed in the Chapter 11 Case, and its successors and assigns, are hereby authorized to enforce all such provisions. As further set forth in paragraph 44 hereof, the Court shall retain jurisdiction with regard to any and all issues, disputes, controversies, causes of action, and/or claims with regard to, or arising under, such provisions, including, without limitation, the enforcement thereof.

8176078

(Page | 20)

| | |
|---|---|
| Debtor: | FLAGSHIP RESORT DEVELOPMENT CORPORATION |
| Case No.: | 25-15047 (JNP) |
| Caption of Order: | ORDER (A) AUTHORIZING THE DEBTOR TO ENTER INTO AN ASSET PURCHASE AGREEMENT, (B) APPROVING THE ASSET PURCHASE AGREEMENT, AND (C) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF THE ASSUMED CONTRACTS |

18. <u>Authorization to Creditors</u>. On and after a Closing Date, the Debtor's creditors are authorized to execute such documents and take all other actions as may be reasonably necessary to release its Liens, if any, in the Purchased Assets subject to such Sale, other than Liens associated with the Sale Effective Date Assumed Liabilities and Assumed Liabilities, as such Liens may otherwise exist. If any person or entity that has filed financing statements, mortgages, mechanics liens, lis pendens or other documents, instruments, notices or agreements evidencing any Lien against or in the Purchased Assets shall not have delivered to the Debtor before such Closing, in proper form for filing and executed by the appropriate parties, termination statements, releases or instruments of satisfaction that the person or entity has with respect to the Purchased Assets subject to such Sale, then with regard to the Purchased Assets, (i) each of the Debtor and the Purchaser is authorized and directed to execute and file such termination statements, releases, instruments of satisfaction or other documents on behalf of the person or entity with respect to the Purchased Assets and (ii) each of the Debtor or the Purchaser, as applicable, is authorized and directed to file, register or otherwise record a certified copy of this Sale Order which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Liens against the Purchased Assets.

19. <u>Authorization to Government Agencies</u>. Each and every Governmental Authority (as defined in the Asset Purchase Agreement), filing agent, filing officer, title agent, recording agency, governmental department, secretary of state, federal, state, and local official, and any other persons and entity who may be required by operation of law, the duties of their office or contract,

| Debtor: | FLAGSHIP RESORT DEVELOPMENT CORPORATION |
| Case No.: | 25-15047 (JNP) |
| Caption of Order: | ORDER (A) AUTHORIZING THE DEBTOR TO ENTER INTO AN ASSET PURCHASE AGREEMENT, (B) APPROVING THE ASSET PURCHASE AGREEMENT, AND (C) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF THE ASSUMED CONTRACTS |

to accept, file, register, or otherwise record or release any documents or instruments or who may be required to report or insure any title in or to the Purchased Assets, is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the Sale contemplated by the Asset Purchase Agreement or this Sale Order. All such entities described above in this paragraph are authorized to strike all recorded Liens against the Purchased Assets, other than Liens associated with Sale Effective Date Assumed Liabilities and Assumed Liabilities, from their records, official and otherwise.

20.    <u>Direction to Surrender Possession or Control</u>. All persons or entities, presently or on or after a Closing Date, in possession or control of some or all of the Purchased Assets subject to a Sale, are directed to surrender possession or control of the Purchased Assets to the Purchaser on the Closing Date of the Sale or at such time thereafter as the Purchaser may request; *provided, however*, that the foregoing shall not apply to Acquired Accounts Receivable which serve as collateral for the Receivables Facilities, which shall continue to be maintained by (i) the Custodian (as defined in the BOC Receivables Facility) pursuant to the terms of the BOC Receivables Facility or (ii) Colebrook and/or the custodian presently holding the Acquired Accounts Receivable for Colebrook pursuant to the Colebrook Receivables Facility, as well as any custodian which Colebrook may select in the future.

21.    <u>Licenses and Permits</u>. To the extent provided in the Asset Purchase Agreement and available under applicable law, the Purchaser shall be authorized, as of the applicable Closing Date, to operate under any Governmental Authorization, rights granted in respect of any Acquired

| Debtor: | FLAGSHIP RESORT DEVELOPMENT CORPORATION |
|---|---|
| Case No.: | 25-15047 (JNP) |
| Caption of Order: | ORDER (A) AUTHORIZING THE DEBTOR TO ENTER INTO AN ASSET PURCHASE AGREEMENT, (B) APPROVING THE ASSET PURCHASE AGREEMENT, AND (C) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF THE ASSUMED CONTRACTS |

Intellectual Property (as defined in the Asset Purchase Agreement), constituting part of the Purchased Assets, and any other license, permit, registration, and any other governmental approval of the Debtor with respect to the Purchased Assets and the Assumed Contracts, as applicable, and all such licenses, permits, registrations, and Governmental Authorizations, Intellectual Property, and any other approvals are deemed to have been, and hereby are, directed to be transferred to the Purchaser as of such Closing Date. To the extent any license or permit necessary for the operation of the business of the Debtor is determined not to be an executory contract assumable and assignable under section 365 of the Bankruptcy Code, the Purchaser shall apply for and obtain any necessary license or permit promptly after the Closing Date and the Debtor is hereby authorized and directed to use commercially reasonable efforts to cooperate with the Purchaser in connection with any such application as the Purchaser deems reasonably necessary or desirable, subject to the provisions of the Asset Purchase Agreement.

22. <u>No Successor Liability</u>. Except as is expressly set forth in the Asset Purchase Agreement or this Sale Order, the Purchaser and its affiliates, predecessors, successors, assigns, members, partners, directors, officers, principals and shareholders (or equivalent) are not and shall not be (i) deemed a "successor" in any respect to the Debtor and its estate as a result of the consummation of the Sale contemplated the Asset Purchase Agreement or any other event occurring in the Chapter 11 Case under any theory of law or equity (other than with respect to Sale Effective Date Assumed Liabilities and Assumed Liabilities assumed by the Purchaser under the Asset Purchase Agreement), (ii) deemed to have, de facto or otherwise, merged, or consolidated

Debtor:            FLAGSHIP RESORT DEVELOPMENT CORPORATION
Case No.:          25-15047 (JNP)
Caption of Order:  ORDER (A) AUTHORIZING THE DEBTOR TO ENTER INTO AN
                   ASSET PURCHASE AGREEMENT, (B) APPROVING THE ASSET
                   PURCHASE AGREEMENT, AND (C) AUTHORIZING THE
                   ASSUMPTION AND ASSIGNMENT OF THE ASSUMED
                   CONTRACTS

---

with or into the Debtor or its estate, (iii) deemed to have a common identity with the Debtor, (iv)

deemed to have a continuity of enterprise with the Debtor, or (v) deemed to be a continuation or

substantial continuation of the Debtor or any enterprise of the Debtor. Except for the Sale Effective

Date Assumed Liabilities and Assumed Liabilities or as otherwise expressly provided in this Sale

Order and/or the Asset Purchase Agreement, the transfer of the Purchased Assets and the Assumed

Contracts, as applicable, to the Purchaser under the Asset Purchase Agreement shall not result in

the Purchaser or its affiliates, predecessors, successors, assigns, members, partners, directors,

officers, or principals and shareholders (or equivalent) (i) having any liability or responsibility for

any Claim against the Debtor or against an insider of the Debtor (including, without limitation, for

any Excluded Liabilities, as applicable), (ii) having any liability whatsoever with respect to or be

required to satisfy in any manner, whether at law or in equity, whether by payment, setoff or

otherwise, directly or indirectly, any Lien or Excluded Liability, as applicable, or (iii) having any

liability or responsibility to the Debtor, including in the case of each of (i-iii), without limitation

(x) within the meaning of any foreign, federal, state or local revenue law, pension law, the

Employee Retirement Income Security Act, the Consolidated Omnibus Budget Reconciliation Act,

the WARN Act (29 U.S.C. §§ 2101 et seq.) ("WARN"), Comprehensive Environmental Response

Compensation and Liability Act ("CERCLA"), the Fair Labor Standard Act, Title VII of the Civil

Rights Act of 1964 (as amended), the Age Discrimination and Employment Act of 1967 (as

amended), the Federal Rehabilitation Act of 1973 (as amended), the National Labor Relations Act,

29 U.S.C. § 151, et seq. or (y) in respect of (i) any environmental liabilities, debts, claims or

Debtor:                 FLAGSHIP RESORT DEVELOPMENT CORPORATION
Case No.:               25-15047 (JNP)
Caption of Order:       ORDER (A) AUTHORIZING THE DEBTOR TO ENTER INTO AN
                        ASSET PURCHASE AGREEMENT, (B) APPROVING THE ASSET
                        PURCHASE AGREEMENT, AND (C) AUTHORIZING THE
                        ASSUMPTION AND ASSIGNMENT OF THE ASSUMED
                        CONTRACTS

---

obligations arising from conditions first existing on or prior to the Closing Date (including, without

limitation, the presence of hazardous, toxic, polluting, or contaminating substances or wastes),

which may be asserted on any basis, including, without limitation, under CERCLA, (ii) any

liabilities, penalties, costs, debts or obligations of or required to be paid by the Debtor for any taxes

of any kind for any period, labor, employment, or other law, rule or regulation (including, without

limitation, filing requirements under any such laws, rules or regulations), (iii) any products liability

law or doctrine with respect to the Debtor's liability under such law, rule or regulation or doctrine

or (iv) any consumer protection law or doctrine, including but not limited to the New Jersey Real

Estate Timeshare Act and the New Jersey Consumer Fraud Act, with respect to the Debtor's

liability under such law, rule or regulation or doctrine, including, without limitation, any liabilities,

penalties, costs, debts or obligations imposed by the Federal Trade Commission and/or Bureau of

Consumer Protection required to be paid by the Debtor. The Purchaser shall not assume, nor be

deemed to assume, or in any way be responsible for any liability or obligation described in the

foregoing sentence (other than with respect to the Sale Effective Date Assumed Liabilities and

Assumed Liabilities), and the Motion shall be deemed to have provided sufficient notice as to the

Sale and assignment of the applicable Purchased Assets free and clear of all such liabilities and

obligations.

     23.    <u>Examples of No Successor Liability</u>. Without limiting the generality, effect or

scope of the foregoing, as a result of and following the Closing of the Sale to the Purchaser, the

Purchaser and its affiliates, predecessors, successors, assigns, members, partners, directors,

| Debtor: | FLAGSHIP RESORT DEVELOPMENT CORPORATION |
|---|---|
| Case No.: | 25-15047 (JNP) |
| Caption of Order: | ORDER (A) AUTHORIZING THE DEBTOR TO ENTER INTO AN ASSET PURCHASE AGREEMENT, (B) APPROVING THE ASSET PURCHASE AGREEMENT, AND (C) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF THE ASSUMED CONTRACTS |

officers, principals and shareholders (or equivalent) shall have no successor or vicarious liabilities of any kind or character, including, without limitation, any theory of antitrust, environmental, transferee liability, continuity of enterprise, mere continuation, consumer protection, labor law, bulk sales law, employment or benefits law, alter ego, veil piercing, escheat, de facto merger or substantial continuity, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether legal or equitable, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, whether imposed by agreement, understanding, law, equity or otherwise with respect to the Debtor or any obligations of the Debtor relating to the period prior to the Closing Date to the Purchaser whether arising before or after such Closing Date, including, without limitation, United States or foreign pension liabilities or liabilities on account of any federal, state or other taxes arising, accruing or payable under, out of, in connection with, or in any way relating to or calculated or determined with respect to or based in whole or in any part upon the operation of the Purchased Assets or the Assumed Contracts, as applicable, on or prior to such Closing Date or any taxes in connection with, or in any way related to, the cancellation of debt of the Debtor. The consideration given by the Purchaser, including the cash portion of the Purchase Price of $5,602,000 plus any outstanding interest and fees under the DIP Loan Facility, the assumption of the Sale Effective Date Assumed Liabilities and Assumed Liabilities and the Purchaser Contribution (which Purchaser Contribution is in addition to the Purchase Price), shall constitute valid and valuable consideration for the releases, including the release of any potential claims of successor liability against the Purchaser which releases shall be deemed to have been given in

Debtor:            FLAGSHIP RESORT DEVELOPMENT CORPORATION
Case No.:          25-15047 (JNP)
Caption of Order:  ORDER (A) AUTHORIZING THE DEBTOR TO ENTER INTO AN
                   ASSET PURCHASE AGREEMENT, (B) APPROVING THE ASSET
                   PURCHASE AGREEMENT, AND (C) AUTHORIZING THE
                   ASSUMPTION AND ASSIGNMENT OF THE ASSUMED
                   CONTRACTS

---

favor of the Purchaser by all holders of Liens, Claims and Excluded Liabilities (other than Sale

Effective Date Assumed Liabilities and Assumed Liabilities), as applicable, against the Debtor or

the Purchased Assets.

24.     Injunction. Except to the extent included in the Sale Effective Date Assumed

Liabilities and Assumed Liabilities, all persons and entities, including, but not limited to, the

Debtor, employees, former employees, all debt security holders, equity holders, licensors,

administrative agencies, governmental units (as defined in section 101(27) of the Bankruptcy

Code), tax and regulatory authorities, secretaries of state, federal, state, and local officials, lenders,

contract parties, bidders, lessors, other parties-in-possession of any of the Purchased Assets at any

time, trade creditors, holders of rejection damages claims, and all other creditors holding any

Liens, Claims or Excluded Liabilities of any kind or nature whatsoever against or in the Debtor or

in the Debtor's interests in the Purchased Assets (whether known or unknown as of the Closing

Date, now existing or hereafter arising, legal or equitable, matured or unmatured, contingent or

noncontingent, liquidated or unliquidated, whether imposed by agreement, understanding, law,

equity, or otherwise), arising under or out of, in connection with, or in any way relating to, the

Debtor, the Purchased Assets, the Assumed Contracts, the operation of the Debtor's business, on

or prior to the Closing Date, the Sale (other than the Purchaser's obligations under this Sale Order

and the Purchase Agreement (including the Sale Effective Date Assumed Liabilities and Assumed

Liabilities)), and all other ancillary agreements, documents or instruments entered into in

connection with the Asset Purchase Agreement), or the transfer of the Purchased Assets or the

Debtor:                    FLAGSHIP RESORT DEVELOPMENT CORPORATION
Case No.:                  25-15047 (JNP)
Caption of Order:          ORDER (A) AUTHORIZING THE DEBTOR TO ENTER INTO AN
                           ASSET PURCHASE AGREEMENT, (B) APPROVING THE ASSET
                           PURCHASE AGREEMENT, AND (C) AUTHORIZING THE
                           ASSUMPTION AND ASSIGNMENT OF THE ASSUMED
                           CONTRACTS

---

Assumed Contracts, as applicable, to the Purchaser shall be and hereby are forever barred, estopped and permanently enjoined from asserting, prosecuting, commencing, continuing, or otherwise pursuing in any manner any action, claim or other proceeding of any kind, directly or indirectly, against the Purchaser or any of its respective affiliates, predecessors, successors, or assigns or any of its respective current and former members, officers, directors, managed funds, investment advisors, attorneys, employees, partners, principals, affiliates, shareholders (or equivalent), financial advisors and representatives (each of the foregoing in their individual capacity), its property or the applicable Purchased Assets. In connection with the foregoing, actions that are barred hereby include, without limitation: (i) the commencement or continuation of any action or other proceeding, (ii) the enforcement, attachment, collection, or recovery of any judgment, award, decree or order, (iii) the creation, perfection, or enforcement of any Lien, Claim, interest, or encumbrance, (iv) the assertion of any right of setoff, subrogation, recoupment, reversion, assignment or specific performance of any kind, (v) the commencement or continuation of any action that does not comply with, or is inconsistent with, the provisions of this Sale Order, any actions contemplated or taken in respect hereof, or the Asset Purchase Agreement, and (vi) the revocation, termination or failure or refusal to renew any Governmental Authorization or other license, permit, registration, or governmental authorization or approval to operate any of the Purchased Assets or conduct the businesses associated with the Purchased Assets. Following the Closing Date, except in connection with Assumed Liabilities, no Person that was the holder of a Lien on, in or against any of Purchased Assets prior to the Closing Date shall interfere with the

| | |
|---|---|
| Debtor: | FLAGSHIP RESORT DEVELOPMENT CORPORATION |
| Case No.: | 25-15047 (JNP) |
| Caption of Order: | ORDER (A) AUTHORIZING THE DEBTOR TO ENTER INTO AN ASSET PURCHASE AGREEMENT, (B) APPROVING THE ASSET PURCHASE AGREEMENT, AND (C) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF THE ASSUMED CONTRACTS |

Purchaser's title to, license of, or use and enjoyment of the Purchased Assets based on or related to such Lien, or any actions that the Debtor may take in the Debtor's case.

25.     No Bulk Sales; No Brokers. No bulk sales law or any similar law of any state or other jurisdiction shall apply in any way to the Sale or the other transactions contemplated the Asset Purchase Agreement or this Sale Order. The Purchaser is not and will not become obligated to pay any fee or commission or like payment to any broker, finder, or financial advisor as a result of the consummation of the Sale or the other transactions based upon any arrangement made by or on behalf of the Debtor.

26.     Fees and Expenses; Indemnity. Any amounts payable or otherwise reimbursable by the Debtor under the Asset Purchase Agreement (if applicable) or any of the documents delivered by the Debtor in connection with the Asset Purchase Agreement, including without limitation (i) any allowed claims for breach thereof, and (ii) any purchase price or other adjustments, shall be paid under the terms of and in the manner provided in the Asset Purchase Agreement without further order of the Court, as an allowed administrative claim in an amount equal to such payment in accordance with sections 503(b) and 507(a)(2) of the Bankruptcy Code, and shall not be discharged, modified, or otherwise affected by any plan for the Debtor, except by written agreement with the Purchaser or its successors or assigns (such agreement to be provided in the Purchaser's or its successor's or assign's respective sole discretion).

27.     Assumption and Assignment of Assumed Contracts. Under sections 105(a), 363 and 365 of the Bankruptcy Code, and subject to and conditioned upon the Closing, the Debtor's

(Page | 29)

| | |
|---|---|
| Debtor: | FLAGSHIP RESORT DEVELOPMENT CORPORATION |
| Case No.: | 25-15047 (JNP) |
| Caption of Order: | ORDER (A) AUTHORIZING THE DEBTOR TO ENTER INTO AN ASSET PURCHASE AGREEMENT, (B) APPROVING THE ASSET PURCHASE AGREEMENT, AND (C) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF THE ASSUMED CONTRACTS |

---

assumption of the Assumed Contracts and assignment thereof to the Purchaser, free and clear of all Liens, Claims and Excluded Liabilities (other than Sale Effective Date Assumed Liabilities and Assumed Liabilities) pursuant to the terms set forth in the Asset Purchase Agreement is hereby approved, and the requirements of sections 365(b)(1) and 365(f)(2) (including section 365(b)(3) to the extent applicable) of the Bankruptcy Code with respect thereto are hereby deemed satisfied. Each of the Contract Counterparties is hereby forever barred, estopped and permanently enjoined from raising or asserting against the Debtor or the property of any of such parties, any assignment fee, default, breach, claim, pecuniary loss, liability, or obligation (whether known or unknown as of the Closing Date, now existing or hereafter arising, legal or equitable, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, whether imposed by agreement, understanding, law, equity, or otherwise) arising under or out of, in connection with, or in any way related to the Assumed Contracts existing as of the Closing Date or arising by reason of the assumption, assignment and/or such Closing except to the extent constituting an Excluded Liability under the Asset Purchase Agreement (other than the Sale Effective Date Assumed Liabilities and Assumed Liabilities). Notwithstanding the foregoing, pursuant to the terms of the Asset Purchase Agreement, the Purchaser shall be liable for all obligations and liabilities arising after and relating to the period following the Closing Date under the Assumed Contracts, all of which shall constitute Assumed Liabilities, and the Debtor shall not be liable for any such obligations or liabilities.

28.     Each of the Assumed Contracts shall be deemed to be valid and binding and in full force and effect and enforceable in accordance with its terms as of the date of this Sale Order,

Debtor:            FLAGSHIP RESORT DEVELOPMENT CORPORATION
Case No.:          25-15047 (JNP)
Caption of Order:  ORDER (A) AUTHORIZING THE DEBTOR TO ENTER INTO AN
                   ASSET PURCHASE AGREEMENT, (B) APPROVING THE ASSET
                   PURCHASE AGREEMENT, AND (C) AUTHORIZING THE
                   ASSUMPTION AND ASSIGNMENT OF THE ASSUMED
                   CONTRACTS

---

subject to any amendments or modifications agreed to between a Contract Counterparty and the

Purchaser. Upon Closing, in accordance with sections 363 and 365 of the Bankruptcy Code, the

Purchaser shall be fully and irrevocably vested with all right, title and interest of the Debtor under

the applicable Assumed Contracts. The assignment of each of the Assumed Contracts is deemed

to be made in good faith under, and is entitled to the protections of, section 363(m) of the

Bankruptcy Code.

29.     <u>Adequate Assurance</u>. The Purchaser has provided adequate assurance of its future

performance under the relevant Assumed Contracts within the meaning of sections 365(b)(1)(C)

and 365(f)(2)(B) of the Bankruptcy Code (including section 365(b)(3) to the extent applicable).

All other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the

assumption by the Debtor and assignment to the Purchaser of the Assumed Contracts have been

satisfied.

30.     <u>Anti-Assignment Provisions Unenforceable</u>. No sections or provisions of the

Assumed Contracts that purport to (i) prohibit, restrict, or condition the Debtor's assignment of

the Assumed Contracts, including, but not limited to, the conditioning of such assignment on the

consent of the Contract Counterparties; (ii) authorize the termination, cancellation, or modification

of the Assumed Contracts based on the filing of a bankruptcy case, the financial condition of the

Debtor or similar circumstances; (iii) declare a breach or default as a result of a change in control

in respect of the Debtor; or (iv) provide for additional payments, penalties, conditions, renewals,

extensions, charges, other financial accommodations in favor of the non-Debtor third party to the

Debtor:          FLAGSHIP RESORT DEVELOPMENT CORPORATION
Case No.:        25-15047 (JNP)
Caption of Order:    ORDER (A) AUTHORIZING THE DEBTOR TO ENTER INTO AN
                 ASSET PURCHASE AGREEMENT, (B) APPROVING THE ASSET
                 PURCHASE AGREEMENT, AND (C) AUTHORIZING THE
                 ASSUMPTION AND ASSIGNMENT OF THE ASSUMED
                 CONTRACTS

---

Assumed Contracts, or modification of any term or condition upon the assignment of an Assumed

Contract or the occurrence of the conditions set forth in subsection (ii) above, shall have any force

and effect, and such provisions constitute unenforceable anti-assignment provisions under section

365(f) of the Bankruptcy Code and/or are otherwise unenforceable under section 365(e). The entry

of this Sale Order constitutes the consent of the Contract Counterparties to the assumption and

assignment of such agreements without the necessity of obtaining such party's consent, written or

otherwise, to such assumption or assignment. All Assumed Contracts shall remain in full force and

effect, without existing default(s), subject only to payment of the applicable Cure Costs in

accordance with the Asset Purchase Agreement, and to any amendments or modifications agreed

to between a Contract Counterparty and the Purchaser.

31.     No Fees for Assumption and Assignment. Other than Sale Effective Date Assumed

Liabilities and Assumed Liabilities, there shall be no rent accelerations, penalties, assignment fees,

increases or any other fees charged to the Purchaser, its successors or assigns, or the Debtor as a

result of the assumption and assignment of the Assumed Contracts.

32.     Cure Costs. Payment of the Cure Costs by Purchaser as set forth on the Assigned

Contracts Schedule (or such other amount or such other terms as may be agreed to by the Purchaser

and the Contract Counterparties to the applicable Assumed Contract) in accordance with the Asset

Purchase Agreement is hereby authorized and directed. All defaults or other obligations shall be

deemed cured and shall no longer exist upon the payment or other satisfaction by the Debtor of

such Cure Costs against which no timely objections have been properly filed and served (or if filed

(Page | 32)

| | |
|---|---|
| Debtor: | FLAGSHIP RESORT DEVELOPMENT CORPORATION |
| Case No.: | 25-15047 (JNP) |
| Caption of Order: | ORDER (A) AUTHORIZING THE DEBTOR TO ENTER INTO AN ASSET PURCHASE AGREEMENT, (B) APPROVING THE ASSET PURCHASE AGREEMENT, AND (C) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF THE ASSUMED CONTRACTS |

and served, overruled) in accordance with the Assigned Contracts Schedule (or such other amount or such other terms as may be agreed to by the Purchaser and the Contract Counterparties to the applicable Assumed Contract or otherwise ordered by the Court) and, for the avoidance of doubt, no Contract Counterparty shall be entitled to a claim against the Debtor or the Debtor's estate for any such default. Except for the Cure Costs for Assumed Contracts set forth on the Assigned Contracts Schedule that was filed and served, there are no defaults existing under the Assumed Contracts, nor shall there exist any event or condition existing on the Closing Date which, with the passage of time or giving of notice, or both, would constitute such a default. For the avoidance of doubt, and notwithstanding anything to the contrary in the Asset Purchase Agreement, the Debtor's estate shall not be responsible for the payment of any Cure Costs and the Purchaser's payment of Cure Costs shall not (i) be deemed a purchase price adjustment that reduces the overall consideration received by the Debtor's estate, or (ii) reduce the amount of the cash and contingent consideration that is otherwise payable by the Purchaser under the Asset Purchase Agreement.

33.    <u>Notice of Assumption and Assignment</u>. The Debtor has filed and served the Assigned Contracts Schedule with the Court and on all of the Contract Counterparties identified on the schedule attached thereto. No other or further notice is required. Any Contract Counterparties to an Assumed Contract who have not timely filed and served an objection shall be barred from objecting, or asserting monetary or non-monetary defaults, with respect to any such Assumed Contract, and such Assumed Contract shall be deemed assumed by the Debtor and assigned to the Purchaser on the Closing Date pursuant to this Sale Order. All Claims of a

| | |
|---|---|
| Debtor: | FLAGSHIP RESORT DEVELOPMENT CORPORATION |
| Case No.: | 25-15047 (JNP) |
| Caption of Order: | ORDER (A) AUTHORIZING THE DEBTOR TO ENTER INTO AN ASSET PURCHASE AGREEMENT, (B) APPROVING THE ASSET PURCHASE AGREEMENT, AND (C) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF THE ASSUMED CONTRACTS |

---

counterparty to an Assumed Contract that is assumed by the Purchaser which arise from or are related to such counterparty's Assumed Contract shall be void, and all proofs of claim filed by such counterparty, whether filed prior to or after the date of entry of this Sale Order, asserting a claim that arises from or is related to such counterparty's Assumed Contract, shall be deemed automatically expunged from the Debtor's registry of claims without the need for any further action.

34.    The Assigned Contracts Schedule may be supplemented or revised by the Purchaser until two (2) days prior to the date of the Closing.  Any contracts or leases that are not set forth on the Assigned Contracts Schedule shall be deemed to be Excluded Contracts.

35.    In the event of an objection by the Contract Counterparty to the Cure Costs asserted by Debtor with regard to any Assumed Contract (such contract, a "Disputed Contract"), the Debtor, with the consent of Purchaser, shall either settle the objection of such party or shall litigate such objection under procedures as the Bankruptcy Court shall approve and proscribe; provided, that the Purchaser shall pay to the Debtor on a current basis any post-petition administrative expense arising under such Disputed Contract, pending the determination whether such Disputed Contracts will be assumed and assigned or rejected. In no event shall any Debtor settle a Cure Costs objection with regard to any Assumed Contract without the express written consent of Purchaser (with an email consent being sufficient). In the event that a dispute regarding the Cure Costs with respect to an Assumed Contract has not been resolved as of the Closing Date, the Debtor and Purchaser shall nonetheless remain obligated to consummate the transactions contemplated by the Asset

Debtor:                FLAGSHIP RESORT DEVELOPMENT CORPORATION
Case No.:              25-15047 (JNP)
Caption of Order:      ORDER (A) AUTHORIZING THE DEBTOR TO ENTER INTO AN
                       ASSET PURCHASE AGREEMENT, (B) APPROVING THE ASSET
                       PURCHASE AGREEMENT, AND (C) AUTHORIZING THE
                       ASSUMPTION AND ASSIGNMENT OF THE ASSUMED
                       CONTRACTS

---

Purchase Agreement. Upon entry of an order of this Court determining any Cure Costs regarding any Disputed Contract after the Closing (the "Disputed Contract Order"), Purchaser shall have the option to designate the Disputed Contract as an Excluded Contract regardless of whether such Disputed Contract was set forth on the Assigned Contract Schedule, in which case, for the avoidance of doubt, Purchaser shall not assume the Disputed Contract and shall not be responsible for the associated Cure Costs (if any) with such Disputed Contract, other than administrative expenses under such Contract); provided, however, that if Purchaser does not designate such Disputed Contract as an Excluded Contract within five (5) days after the date of the Disputed Contract Order (or such later date as agreed by the Debtor and the Purchaser), such Disputed Contract shall automatically be deemed to be an Assumed Contract for all purposes under this Order and the Asset Purchase Agreement and the Purchaser shall be obligated to pay any Cure Costs associated with such Disputed Contract within five (5) Business Days of such Disputed Contract being deemed a an Assumed Contract, as applicable.

36.     The (i) Revolving Credit Period, with respect to the BOC Receivables Facility, and (ii) Advance Period, with respect to the Colebrook Receivables Facility, are deemed extended through and including September 8, 2025, with documentation memorializing such extensions to be executed by the Debtor and the applicable Receivables Lender within five (5) business days of entry of this Sale Order.  The other terms of the Receivables Facilities are otherwise unaffected, except as modified by the Asset Purchase Agreement.  The Debtor and the Receivables Lenders

| Debtor: | FLAGSHIP RESORT DEVELOPMENT CORPORATION |
|---|---|
| Case No.: | 25-15047 (JNP) |
| Caption of Order: | ORDER (A) AUTHORIZING THE DEBTOR TO ENTER INTO AN ASSET PURCHASE AGREEMENT, (B) APPROVING THE ASSET PURCHASE AGREEMENT, AND (C) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF THE ASSUMED CONTRACTS |

are authorized to further extend the Revolving Credit Period or Advance Period, as applicable, of the Receivables Facilities by agreement without further order of the Court.

37.     <u>Direction to Contract Counterparties</u>. All Contract Counterparties shall cooperate and expeditiously execute and deliver, upon the reasonable request of the Debtor, and shall not charge the Debtor or the Purchaser for, any instruments, applications, consents, or other documents which may be required or requested by any public or quasi-public authority or other party or entity to effectuate the applicable transfers in connection with the Sale involving the Purchaser.

38.     Nothing in this Sale Order, the Motion, the Assigned Contracts Schedule (as amended from time to time), or any notice or any other document is or shall be deemed an admission by the Debtor that any contract is an executory contract or, unless otherwise specified in the Asset Purchase Agreement, must be assumed and assigned pursuant to the Asset Purchase Agreement, in order to consummate the Sale.

39.     <u>Failure to Specify Provisions</u>. The failure specifically to include any particular provisions of the Asset Purchase Agreement or any related agreements in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court, the Debtor and the Purchaser that the Asset Purchase Agreement and any related agreements are authorized and approved in their entirety with such amendments thereto as may be made by the parties in accordance with this Sale Order. Likewise, all of the provisions of this Sale Order are non-severable and mutually dependent.

8176078

Debtor:            FLAGSHIP RESORT DEVELOPMENT CORPORATION
Case No.:          25-15047 (JNP)
Caption of Order:  ORDER (A) AUTHORIZING THE DEBTOR TO ENTER INTO AN
                   ASSET PURCHASE AGREEMENT, (B) APPROVING THE ASSET
                   PURCHASE AGREEMENT, AND (C) AUTHORIZING THE
                   ASSUMPTION AND ASSIGNMENT OF THE ASSUMED
                   CONTRACTS

---

40.     <u>Failure to Enforce Purchased Contracts</u>. The failure of the Debtor or the Purchaser

at any time to enforce one or more terms or conditions of any Assumed Contract shall not constitute

a waiver of any such terms or conditions, or of the Debtor's or the Purchaser's rights to enforce

every term and condition of the Assumed Contracts.

41.     <u>Binding Order</u>. This Sale Order shall be binding upon and govern the acts of all

persons and entities, including, without limitation, the Debtor, the Purchaser, and their respective

successors and permitted assigns, including, without limitation, any chapter 11 trustee hereinafter

appointed for the Debtor's estate or any trustee appointed in a chapter 7 case if any of these cases

is converted from chapter 11, all creditors of the Debtor (whether known or unknown), all non-

Debtor parties to any Assumed Contracts, all Governmental Authorities, filing agents, filing

officers, title agents, recording agencies, governmental departments, secretaries of state, federal,

state, and local officials, and all other persons and entities who may be required by operation of

law, the duties of their office or contract, to accept, file, register, or otherwise record or release

any documents or instruments or who may be required to report or insure any title in or to the

Purchased Assets. The Asset Purchase Agreement and the Sale shall not be subject to rejection or

avoidance under any circumstances. This Sale Order and the Asset Purchase Agreement shall inure

to the benefit of the Debtor, its estate, creditors, the Purchaser and their respective successors and

assigns.

42.     <u>No Stay of Order</u>. The provisions of Bankruptcy Rules 6004 and 6006, and to the

extent applicable under Bankruptcy Rules, Rules 54(b) and 62(a) of the Federal Rules of Civil

Debtor:           FLAGSHIP RESORT DEVELOPMENT CORPORATION
Case No.:         25-15047 (JNP)
Caption of Order: ORDER (A) AUTHORIZING THE DEBTOR TO ENTER INTO AN
                  ASSET PURCHASE AGREEMENT, (B) APPROVING THE ASSET
                  PURCHASE AGREEMENT, AND (C) AUTHORIZING THE
                  ASSUMPTION AND ASSIGNMENT OF THE ASSUMED
                  CONTRACTS

---

Procedure, staying the effectiveness of this Sale Order for fourteen (14) days are hereby waived, and this Sale Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing. Any party desiring to appeal this Sale Order must exercise due diligence in filing an appeal, pursuing a stay and obtaining a stay prior to the Closing, or risk its appeal being foreclosed as moot.

43.     <u>Lift of Automatic Stay</u>. The automatic stay pursuant to section 362 of the Bankruptcy Code is hereby lifted with respect to the Debtor to the extent necessary, without further order of the Court, to allow the Purchaser to deliver any notice provided for in the Asset Purchase Agreement and allow the Purchaser to take any and all actions permitted under the Asset Purchase Agreement, as applicable.

44.     <u>Retention of Jurisdiction</u>. The Court shall retain jurisdiction to (i) interpret, implement and enforce the terms and provisions of this Sale Order, the Bidding Procedures Order, and the Asset Purchase Agreement, including all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith, in all respects, (ii) decide any disputes concerning this Sale Order, the Asset Purchase Agreement or the rights and duties of the parties hereunder or thereunder or any issues relating to the Asset Purchase Agreement and this Sale Order including, but not limited to, the interpretation of the terms, conditions, and provisions hereof and thereof, the status, nature, and extent of the Purchased Assets and any Assumed Contracts and all issues and disputes arising in connection with the relief

Debtor: FLAGSHIP RESORT DEVELOPMENT CORPORATION
Case No.: 25-15047 (JNP)
Caption of Order: ORDER (A) AUTHORIZING THE DEBTOR TO ENTER INTO AN ASSET PURCHASE AGREEMENT, (B) APPROVING THE ASSET PURCHASE AGREEMENT, AND (C) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF THE ASSUMED CONTRACTS

---

authorized herein, inclusive of those concerning the transfer of the Purchased Assets free and clear of all Liens, and (iii) enforce the injunctions set forth herein.

45. _Subsequent Plan Provisions._ Unless otherwise provided herein, nothing contained in any chapter 11 plan confirmed in the Debtor's case or any order confirming any such plan or any other order in the Debtor's case (including any order entered after any conversion of any of these cases into a case under chapter 7 of the Bankruptcy Code) shall alter, conflict with, or derogate from, the provisions of the Asset Purchase Agreement or this Sale Order and, to the extent of any such conflict, subject to this paragraph, the terms of this Sale Order and the Asset Purchase Agreement shall control. Notwithstanding the foregoing, to the extent the _Settlement Term Sheet_ [Docket No. 249, _Exhibit 1_] (the "_Term Sheet_") is inconsistent with (i) this Sale Order, (ii) the Sale, or (iii) the Asset Purchase Agreement, the Term Sheet shall control and govern.

46. _Further Assurances._ From time to time, as and when requested by the other, the Debtor and the Purchaser, as the case may be, shall execute and deliver, or cause to be executed and delivered, all such documents and instruments and shall take, or cause to be taken, all such further or other actions as such other party may reasonably deem necessary or desirable to consummate the Sale with respect to the Purchaser, including, such actions as may be necessary to vest, perfect or confirm, or record or otherwise, in the Purchaser its right, title and interest in and to the Purchased Assets and the Assumed Contracts, as applicable, subject to the provisions of the Asset Purchase Agreement.

| | |
|---|---|
| Debtor: | FLAGSHIP RESORT DEVELOPMENT CORPORATION |
| Case No.: | 25-15047 (JNP) |
| Caption of Order: | ORDER (A) AUTHORIZING THE DEBTOR TO ENTER INTO AN ASSET PURCHASE AGREEMENT, (B) APPROVING THE ASSET PURCHASE AGREEMENT, AND (C) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF THE ASSUMED CONTRACTS |

47.    <u>Governing Terms</u>. Unless otherwise provided herein, to the extent this Sale Order

is inconsistent with the terms of the Asset Purchase Agreement (including all ancillary documents

executed in connection with the Asset Purchase Agreement), this Sale Order shall govern.

48.    <u>Headings</u>. The headings in this Sale Order are for purposes of reference only and

shall not limit or otherwise affect the meaning of the Sale Order.

## **Exhibit 1**

Asset Purchase Agreement

Execution Version

ASSET PURCHASE AGREEMENT

by and among

FLAGSHIP RESORT DEVELOPMENT CORPORATION

("Seller")

and

AC BOARDWALK INVESTMENTS LLC

("Purchaser")

May [•], 2025

**TABLE OF CONTENTS**

[●]

<u>Stand-Alone Schedules</u>

[●]

<u>Exhibits</u>

[●]

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT ("Agreement") is made as of May [●], 2025 (the "Execution Date"), by and between **Flagship Resort Development Corporation**, a New Jersey corporation ("Seller" or the "Debtor"), and **AC Boardwalk Investments LLC**, a New Jersey limited liability company ("Purchaser"). Seller and Purchaser are each sometimes referred to individually in this Agreement as a "Party" and collectively as the "Parties." Capitalized terms used herein and not otherwise defined shall have the meanings set forth in Article 12 hereof.

### Preliminary Statements

A.  On May 10, 2025 (the "Petition Date"), Seller filed a voluntary petition (the "Petition") for relief commencing cases under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court" and such case, the "Bankruptcy Case").

B.  Seller is headquartered in Atlantic City, New Jersey and is the owner and developer of three timeshare resorts: the 32-story Flagship Resort and 31-story Atlantic Palace, both located in Atlantic City, and the 5-story La Sammana, located in Brigantine, New Jersey (each a "Resort" and collectively the "Resorts"). Seller's primary function is the development, marketing, and management of resort properties and vacation ownership programs in the Atlantic City area. Seller's portfolio includes 774 Living Units, which translate into approximately 33,000 sold and deeded Timeshare Intervals owned by individuals and families and spread among the three Resorts, plus more than 4,000 Timeshare Intervals currently available for sale.

C.  Seller continues to operate its timeshare business and related activities with respect to the Resorts and otherwise (collectively, the "Business") and manage its assets as a debtor in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

D.  Upon the terms and subject to the conditions set forth herein and as authorized under Sections 105, 363 and 365 of the Bankruptcy Code, Seller desires to sell to Purchaser the Acquired Assets, and Purchaser desires to purchase from Seller the Acquired Assets and assume the Assumed Liabilities, upon the terms and conditions set forth herein (the "Sale").

E.  The execution and delivery of this Agreement and Parties' ability to consummate the transactions set forth in this Agreement are subject to, among other things, the entry of the Sale Order.

### Agreement

NOW, THEREFORE, in consideration of the mutual promises, covenants and agreements herein contained, intending to be legally bound, and other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, the Parties agree as follows:

## Article 1    PURCHASE AND SALE OF ASSETS

1.1.  **Acquired Assets.** Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, on the terms and subject to the conditions set forth in this Agreement and the Sale Order and to the extent permitted and transferable by Law, at the Closing, Seller agrees to sell, transfer, assign, convey and deliver to Purchaser, and Purchaser agrees to accept all of Seller' right, title and interest in and to the following (collectively the "Acquired Assets"), in each case free and clear of all Encumbrances (except for Permitted Encumbrances), and other than any Excluded Assets held by Seller:

(a)      the Timeshare Inventory as is described in Schedule 1.1(a);

(b)      all of its accounts and notes receivable, unpaid drafts or checks, letters of credit and other rights to receive payments, including, without limitation all Purchase Money Notes, inclusive of all notes and mortgages assigned or pledged as collateral in favor of the Receivables Lenders pursuant to the Receivables Facilities (including, without limitation, the Purchase Money Notes set forth on Schedule 1.1(b)) (collectively,

the "Acquired Accounts Receivable"), subject in each case to the prior pledge of such Purchase Money Notes in favor of the Receivables Lenders;

(c)      all of its furniture, furnishings, appliances, equipment, equipment manuals, vehicles (passenger, delivery and other), point of sale equipment, telephone numbers, websites, two-way security radios and base station, maintenance equipment, tools, signs and signage, supplies, linens (sheets, towels, blankets, napkins), uniforms and all other personal property owned (the "Owned Personal Property") or leased by Seller (the "Leased Personal Property") immediately prior to the Closing (the Owned Personal Property and Leased Personal Property, collectively, the "Personal Property");

(d)      to the extent assignable or transferrable under applicable Law, all of its rights in and to Seller Intellectual Property that is either owned by or licensed to Seller, and including rights to sue, causes of action and other claims for and/or remedies against past, present and future infringements, dilutions, misappropriations, and other violations thereof, rights of priority and protection of interests therein under the Laws of any jurisdiction worldwide and all tangible embodiments thereof (collectively, the "Acquired Intellectual Property");

(e)      all service contracts, product/appliance warranties, equipment leases, leases with respect to Personal Property, Acquired Intellectual Property license agreements, Lease Documents, the Labor Agreements and such other Contracts to which Seller is a Party and are related to the Business as are set forth on Schedule 1.1(e) (to the extent not otherwise specifically assumed pursuant to this Agreement), other than the Excluded Contracts (collectively, the "Acquired Contracts");

(f)      all of its rights, privileges, claims, causes of action and demands in respect of prepayments, refunds, warranty claims, indemnification agreements in favor of Seller with, and indemnification and similar rights against, third parties, *except for*: (i) the claims and causes of action that are Excluded Assets under section 1.2 of this Agreement, and (ii) commercial tort claims and rights, privileges, claims, causes of action and demands in respect of the matter of *Palmer v. Flagship Resort Development Corp. d/b/a Fantasea Resorts*, No. A-3287-22 (N.J. Super. Ct. App. Div.) (the "Acquired Claims");

(g)      all of its sales and business records, files, databases, audits, books of account, rent rolls, customer, owner, prospect and supplier lists and records, books and records related to Taxes, correspondence, architecture, engineering, maintenance, operating records, advertising, sales and marketing materials, cost and pricing information, business plans, quality control records and manuals, blueprints, architectural, landscape, construction and engineering plans, research and development files, credit records of customers and other books and records, manuals and other materials (in any form or medium), other than any materials that Seller is required by Law to maintain in its possession (collectively, the "Acquired Books and Records"), provided that Seller, as well as any liquidating trust, plan administrator, or other construct created under Seller's bankruptcy plan incident to the Bankruptcy Case shall have full access to the Acquired Books and Records for the purposes of fulfilling the requirements of the bankruptcy plan, including without limitation pursuing claims on behalf of creditors and amending prior tax returns, if necessary to pursue a refund, or otherwise;

(h)      all of the goodwill related to the Business and the Business as a going concern, other than goodwill arising out of or related to the Excluded Assets;

(i)      all of Seller's Permits (to the extent assignable or transferrable under applicable Law);

(j)      all of its computers and automatic machinery, application systems, servers, and systems hardware and networking and communications equipment and assets;

(k)      all of its rebates, discounts and credits performance and other bonds, security and other deposits, advance payments, prepaid expenses and prepaid rents in favor of Seller to the extent relating to the Acquired Assets or the Assumed Liabilities;

- 2 -

(l)    all of its rights or interests relating to the Assumed Benefit Plans and all assets of the Assumed Benefit Plans, including, without limitation, any assets held in trust (including any rabbi trust and/or secular trust), as corporate-owned life insurance, trust-owned life insurance or otherwise;

(m)    all of its other tangible and intangible assets owned by Seller (other than any Excluded Assets);

(n)    all of developer's/declarant rights under the applicable Resort condominium and timeshare declarations;

(o)    Seller's statutory right of designation of Purchaser's designee(s) as officers and directors of the timeshare associations and condominium boards for the Resorts to replace Seller's existing appointed timeshare association and condominium board officers and directors;

(p)    all executory agreements of sale and ancillary documents, including without limitation those subject to a statutory rescission right, relating to any Timeshare Inventory or Timeshare Intervals; and

(q)    the Sale Effective Date Cash (as defined in and subject to the terms of Section 1.3).

1.2.  **Excluded Assets**. Notwithstanding anything to the contrary, the Acquired Assets shall not include all of Seller's right, title and interest in and to the following, which are to be retained by Seller and not sold or assigned to Purchaser (collectively, the "Excluded Assets"):[1]

(a)    any Contracts set forth on Schedule 1.2(b), and any Contracts of Seller that exclusively relate to the Excluded Assets (collectively, the "Excluded Contracts");

(b)    Acquired Contracts which cannot be assumed and assigned pursuant to the terms of Bankruptcy Code Section 365, by virtue of their being non-executory in nature or non-assignable under the terms of such Bankruptcy Code section;

(c)    all cash and cash equivalents;

(d)    claims by Seller under this Agreement or agreements to be entered into by Seller pursuant to this Agreement;

(e)    any rights, claims and credits (including all guarantees, indemnities, warranties and similar rights) in favor of Seller or any of its Affiliates to the extent primarily relating to (i) any Excluded Assets or (ii) any Excluded Liability (the "Excluded Claims");

(f)    all Avoidance Actions that Seller or any of their Affiliates may have against any Person and all proceeds thereof;

(g)    minute books, stock books and corporate seals;

(h)    the stock or other equity interests in Seller;

(i)    all of Seller's Insurance Policies, and all rights under any Insurance Policy or contract of insurance or indemnity (or similar agreement) under which Seller is an insured (including, without limitation, all rights to proceeds thereunder), named as an additional insured or is otherwise a beneficiary, and all proceeds realized in connection therewith;

(j)    any rights or interest of Seller relating to any Retained Benefit Plan and all assets of any such Retained Benefit Plan;

---

[1] Any defined terms used in this Section 1.2 but not defined shall have the meanings ascribed to them in the Plan (as defined herein).

- 3 -

Case 25-01343-JNP Doc 72-1 Filed 08/01/25 Entered 08/01/25 23:37:01 Desc Main
Certification of Doreen Rash Page 49 of 87
Case 25-01743-TWP Doc 29-1 Filed 08/04/25 Entered 08/04/25 08:23:23 Desc Main Document Page 546 of 84 Page 49 of 87

(k)        any of Seller's director and officer insurance policies, fiduciary policies or employment practices policies (in each case of the foregoing, including any tail policies or coverage thereon), and any of Seller's rights, claims, demands, proceedings, causes of action or rights of set off thereunder;

(l)        the Purchase Price (other than the Assumed Liabilities);

(m)        assets or rights relating to an Excluded Liability and set forth on Schedule 1.2(b);

(n)        Avoidance Actions;

(o)        Commercial Tort Claims;

(p)        the Palmer Litigation Bond; and

(q)        Claims and Causes of Action against the Excluded Parties.

1.3.  **Assumed Liabilities**. Subject to the terms and conditions set forth in this Agreement, on the Sale Effective Date, the Purchaser shall (i) be responsible to assume and satisfy any shortfall in costs and expenses incurred by the Debtor's estate not contemplated in the Amended DIP Budget (as defined in, and attached to, the Term Sheet), including but not limited to go forward operational costs, U.S. Trustee fees, and interest and fees under the DIP Facility (the "Sale Effective Date Assumed Liabilities"), and (ii) realize any benefit from the Seller's operations.  For the avoidance of doubt, the Purchaser shall be entitled to satisfy all Sale Effective Date Assumed Liabilities incurred by the Debtor's estate not contemplated in the Amended DIP Budget from the Sale Effective Date through the Closing Date with cash flow from Seller's operations. To the extent that there is cash flow that exceeds the Sale Effective Date Assumed Liabilities from the Sale Effective Date through the Closing Date, such cash shall be acquired by the Purchaser (the "Sale Effective Date Cash").  The Management Company shall guaranty the Purchaser's obligations to satisfy the Sale Effective Date Assumed Liabilities after the Sale Effective Date through the Closing Date.  Subject to the terms and conditions set forth in this Agreement, upon the Closing, Purchaser shall assume and thereafter pay, perform and discharge when due the following Liabilities of Seller that have not been paid, performed or discharged as of the Closing (collectively the "Assumed Liabilities"):

(a)        All Liabilities and obligations under the BOC Receivables Facility, except for indemnification obligations arising from Seller's acts or omissions that shall have accrued prior to the Closing Date, to the extent and on the terms set forth in the BOC Receivables Facility, subject to any consensual modification or amendment of the BOC Receivables Facility reached between Purchaser and BOC and reduced in writing to the BOC Receivables Facility Assignment and Assumption Agreement, with the understanding that BOC is under no obligation to consent to any proposed modifications of the BOC Receivables Facility, and not subject to any amendments or extensions provided by BOC to Seller for purposes of supporting Seller's operations during the course of the Bankruptcy Case, in the form attached hereto as Exhibit 1.3(a) (the "BOC Assignment and Assumption");

(b)        All Liabilities and obligations under the Colebrook Receivables Facility, except for indemnification obligations arising from Seller's acts or omissions that shall have accrued prior to the Closing Date, to the extent and on the terms set forth in the Colebrook Receivables Facility, subject to any consensual modification or amendment of the Colebrook Receivables Facility reached between Purchaser and Colebrook and reduced in writing to the Colebrook Receivables Facility Assignment and Assumption Agreement, with the understanding that Colebrook is under no obligation to consent to any proposed modifications of the Colebrook Receivables Facility, and not subject to any amendments or extensions provided by Colebrook to Seller for purposes of supporting Seller's operations during the course of the Bankruptcy Case, in the form attached hereto as Exhibit 1.3(b) (the "Colebrook Assignment and Assumption");

(c)        any and all other Liabilities to the extent first accruing on or after the Closing Date, which Liabilities arise out of or are related to Acquired Contracts after the Closing (excluding in each case any Liability arising out of or related to any breach, default, act or omission that occurred prior to the Closing Date);

- 4 -

(d)     any and all Liabilities under any lease covering Leased Personal Property arising on or after the Closing Date (other than any Liability arising out of or related to any breach, default, act or omission that occurred prior to the Closing);

(e)     all Cure Amounts with respect to Acquired Contracts, subject to the provisions of Section 1.8;

(f)     any and all Liabilities arising out of the conduct of the Business by Purchaser or its Affiliates or the ownership of the Acquired Assets by Purchaser or its Affiliates on or after the Closing;

(g)     any and all Liabilities for post-petition ordinary course obligations and trade payables of the Business allowed as administrative expenses under Section 503(b) of the Bankruptcy Code;

(h)     any Liabilities incurred by Seller primarily related to the Business, that constitute or are allowed as administrative expenses under Section 503(b)(9) of the Bankruptcy Code, which allowed claims shall be paid by Purchaser within one hundred twenty (120) days after the later of the Closing Date and the date such claims are allowed by the Bankruptcy Court;

(i)     Liabilities relating to the Transferring Employees or arising under Assumed Benefit Plans or as otherwise provided in Section 7.3, it being understood by the Parties that, notwithstanding anything to the contrary, in no event shall Purchaser assume, pay, perform or discharge any Withdrawal Liability in respect of any Seller Benefit Plan;

1.4.  **Excluded Liabilities**. Notwithstanding anything to the contrary, Purchaser shall not assume and Seller shall retain any and all Liabilities of Seller other than the Assumed Liabilities, whether or not relating to or arising out of the operation of the Business prior to the Closing (collectively the "Excluded Liabilities"), including:

(a)     any and all Liabilities of Seller arising out of the Excluded Assets or not arising out of, relating to or in respect of the Business;

(b)     any Liabilities associated with debt, loans or credit facilities of Seller and/or the Business owing to financial institutions except to the extent expressly assumed by the Purchaser at or prior to the Closing;

(c)     all other Liabilities which Purchaser does not in writing (including under this Agreement) expressly assume;

(d)     any and all Withdrawal Liabilities in respect of any Seller Benefit Plan;

(e)     any and all Liabilities of Seller to timeshare owners or others for acts or failure to act with respect to the Resorts including but not limited to liabilities associates with (i) the lawsuit styled *Keona Palmer, et al, vs. Flagship Resort Development Corporation*, Docket No. ATL1515-19, (ii) *Castellanos et al v Flagship*, Docket No. ATL-L-379-23, and (iii) *Michael Lantych, Sherman and Dorothy Norman vs. Flagship Resort Development Corporation*, et al, Docket No. ATL-L-00379-23;

(f)     any and all Liabilities of Seller for acts or failure to act of Seller to Governmental Entities;

(g)     any and all Liabilities as developer/declarant under the Resorts' timeshare and condominium declarations; and

(h)     any and all Liabilities related to any transferred Seller Permits.

1.5.  **Acquired Accounts Receivable; Accounts Payable; Deposits**.

(a)     *Acquired Accounts Receivable*. After the Closing, Seller shall promptly deliver to Purchaser any cash, checks or other property that Seller shall receive to the extent relating to the Acquired Accounts Receivable. Seller agrees that after the Closing, Purchaser shall have the right and authority to collect for its own account or the account of its Affiliates all Acquired Accounts Receivables, subject to the rights of the Receivables Lenders and the requirements and procedures established by the Receivable Facilities. Seller agrees that it will

- 5 -

promptly transfer and deliver to Purchaser any cash or other property which Seller may receive in respect of such Acquired Accounts Receivables.

(b)       *Accounts Payable*. Seller will promptly deliver to the Purchaser a true copy of any invoice, written notice of accounts payable, or written notice of a dispute as to the amount or terms of any accounts payable received from the creditor of such accounts payable to the extent such accounts payable are owed by the Purchaser.

(c)       *Business Deposits*. Business Deposits received and held by Seller and relating to the period from and after the Closing shall be transferred to Purchaser at the Closing. Seller shall not have any further liability or responsibility after Closing with respect to any such Business Deposits for post-Closing periods and Seller shall be entitled to retain Business Deposits relating to the period prior to Closing.

1.6.  **Corrective Actions**. If, after the Closing, Seller and Purchaser determine that Seller has transferred to Purchaser any assets or Liabilities that, pursuant to the terms of this Agreement, constitute Excluded Assets or Excluded Liabilities, or Seller has retained any assets or Liabilities that, pursuant to the terms of this Agreement, constitute Acquired Assets and Assumed Liabilities, then such assets or Liabilities shall be promptly returned or transferred, as applicable, and the other Party shall be obliged to accept such return or transfer.

1.7.  **Retention of Assets**. Notwithstanding anything to the contrary contained in this Agreement, Seller and its Affiliates may retain and use, at their own expense, archival copies of all of the Acquired Contracts, books, records and other documents or materials conveyed hereunder, in each case, which Seller, in good faith, determines Seller or its Affiliates are reasonably likely to need access to in connection with (a) the preparation or filing of any Tax Returns or compliance with any other Tax reporting obligations, (b) the defense (or any counterclaim, cross-claim or similar claim in connection therewith) of any suit, claim, action, proceeding or investigation (including any Tax audit or examination) against or by Seller or any of its Affiliates or (c) in connection with the administration of the Bankruptcy Case.

1.8.  **Acquired Contracts Cure Amounts**. Section 1.8 of the Disclosure Schedule (the "Acquired Contract & Cure Schedule") contains a list of each Acquired Contract and Seller's good faith estimate of the amounts necessary to cure all defaults, if any, and that must be paid in connection with the assumption of such Acquired Contract pursuant to Section 365(b)(1)(A) and Section 365(b)(1)(B) of the Bankruptcy Code (each a "Cure Amount") (and if no Cure Amount is estimated to be applicable with respect to any particular Acquired Contract, the amount of such Cure Amount has been designated for such Contract as Zero Dollars ($0.00)). From the Execution Date through (and including) the Designation Deadline, promptly following any changes to the information set forth on the Acquired Contract & Cure Schedule (including, without limitation, any new Acquired Contracts to which Seller becomes a party and any change in the Cure Amount of any Acquired Contract), Seller shall provide Purchaser with a schedule (as such schedule may be amended, supplemented or otherwise modified from time to time in accordance with the terms of this Agreement, the "Acquired Contract & Cure Update Schedule") that updates and corrects such information. To the extent permitted by the Bid Procedures Order and the Sale Order, Purchaser may, at any time and from time to time through (and including) the deadline for such updates and corrections established pursuant to the Bid Procedures Order (the "Designation Deadline"), include in the definition of Acquired Assets and exclude from the definition of Excluded Assets any Acquired Contract of Seller solely or primarily related to or solely or primarily used, or held for use, in connection with the Business or operation of the Resorts and not otherwise included in the definition of Acquired Assets and require Seller to give notice to the non-debtor parties to any such Acquired Contract of Seller's assumption and assignment thereof to Purchaser and the Cure Amounts associated with such Acquired Contract; provided that no such change of the definitions of Acquired Assets or Excluded Assets referred to in this sentence shall reduce or increase the amount of the Purchase Price, except to the extent of any increase in the assumption of the Assumed Liabilities as a result of Acquired Contracts being added to the Acquired Assets by Purchaser pursuant to this Section 1.8. To the extent permitted by the Bid Procedures Order, Purchaser may, at any time and from time to time through (and including) the Designation Deadline, exclude from the definition of Acquired Assets and include in the definition of Excluded Assets, any pre-

- 6 -

petition Acquired Contract otherwise included in the definition of Acquired Assets and require Seller to give notice to the non-debtor parties to any such pre-petition Acquired Contract that such Acquired Contract will not be assigned to Purchaser and at Seller's option, the rejection of such Acquired Contract; provided that no such change to the definitions of Acquired Assets or Excluded Assets referred to in this sentence shall reduce or increase the amount of the Purchase Price, except to the extent of any reduction in the assumption of the Assumed Liabilities as a result of such pre-petition Acquired Contracts being excluded from the Acquired Assets by Purchaser pursuant to this Section 1.8. To exercise its rights under this Section 1.8 to include Acquired Contracts in, or exclude Acquired Contracts from, the Acquired Assets and the Excluded Assets, as applicable, Purchaser shall deliver one or more written notices to Seller specifying the Acquired Contract(s) to be so included or excluded and specifying the requisite additions, deletions or other changes to any applicable schedule to reflect such inclusion or exclusion. If any Acquired Contract is added to (or excluded from) the Acquired Assets and the Excluded Assets as permitted by this Section 1.8, then Purchaser and Seller agree to make appropriate additions, deletions or other changes to any applicable schedule to reflect such addition or exclusion. In addition, if any Acquired Contract is added to (or excluded from) the Acquired Assets and the Excluded Assets as permitted by this Section 1.8, Seller shall promptly take such steps as are reasonably necessary, including, if applicable, prompt delivery of notice to the non-debtor counterparty to such Acquired Contract, to cause such Acquired Contract to be assumed by Seller and assigned to Purchaser on the Closing Date (or excluded under the Sale Order and this Agreement). Any Acquired Contract that was executed or entered into prior to the Petition Date, but was amended, supplemented or otherwise modified at any time on or after the Petition Date, shall not cease to be a pre-petition Acquired Contract on account of such amendment, supplement or modification.

## Article 2     PURCHASE PRICE

2.1. **Purchase Price**. As consideration for the Acquired Assets, the Purchaser shall (i) pay to Seller an aggregate cash purchase price of Five Million Dollars ($5,602,000.00) (the "Closing Cash Consideration"), which Closing Cash Consideration shall be adjusted upwards as necessary to satisfy in full all financing provided by BOC and Colebrook to the Seller during the Bankruptcy Case under the DIP Loan Facility; (ii) assume the Assumed Liabilities; and (iii) pay the Cure Amount with respect to each Acquired Contract. The "Purchase Price" for the purposes of this Agreement shall be the sum of (i) through (iii) of this Section 2.1.

2.2. **Allocation of Purchase Price**. The Purchase Price (as determined for federal income Tax purposes, including any Assumed Liabilities that are required to be treated as part of the Purchase Price for federal income Tax purposes) shall be allocated among the Acquired Assets consistently with the terms of Exhibit 2.2 (the "Purchase Price Allocation").

2.3. **No Withholding**. Any amounts payable to Seller pursuant to this Agreement will be made free and clear of any withholding or other Tax.

## Article 3     BANKRUPTCY COURT MATTERS

3.1. **Bid Procedures Order**.

(a)      No later than one (1) Business Day after full execution of this Agreement by the Parties, Seller shall file a copy of this Agreement with the Bankruptcy Court.

(b)      If any bidders have submitted a qualifying competing bid (each such bid, a "Qualified Bid") in accordance with, and subject to, any order approving bid procedures for the marketing and sale of the Seller's assets, which order must be in form and substance acceptable to Purchaser (a "Bid Procedures Order"), then a public auction of the Acquired Assets (the "Auction") shall be held on the date and time and at such location as set by the Bankruptcy Court.

- 7 -

(c)     A hearing to approve the successful bid at the Auction, or, if no Auction is held, to approve this Agreement, shall be scheduled immediately following the Auction, within three (3) Business Days of the date on which the Auction concludes, or if there is no Auction, within three (3) Business Days of the date on which the Auction was originally scheduled (the "Sale Hearing").

(d)     If no timely Qualified Bid is submitted and consented to by the Lenders in accordance with the Bid Procedures Order, Seller shall request at the Sale Hearing that the Court approve the proposed sale of the Acquired Assets to Purchaser under this Agreement.

3.2. **Order Approving Sale**. In the event there is no Auction, or that Purchaser presents the winning bid at the Auction, then Seller shall use its commercially best efforts to obtain entry of an order of the Bankruptcy Court approving the Sale on the terms of this Agreement on the date previously set for the Sale Hearing, or such other date set by the Bankruptcy Court (the "Sale Order"). The Sale Order shall be in accordance with the terms of this Agreement, shall be in a form reasonably satisfactory to Purchaser and the Receivables Lenders.

3.3. **Certain Bankruptcy Undertakings by Seller**.

(a)     Except as ordered by the Bankruptcy Court, Seller shall neither take any action, nor fail to take any action, which action or failure to act would reasonably be expected to prevent or impede the consummation of the transactions contemplated by this Agreement, the Bid Procedures Motion filed with the Bankruptcy Court on May 12, 2025, and the Sale Order once issued by the Bankruptcy Court; or (ii) result in (A) the reversal, avoidance, revocation, vacating or modification (in any manner that would reasonably be expected to materially and adversely affect Purchaser's rights hereunder), or (B) the entry of a stay pending appeal.

(b)     If the Bid Procedures Order, the Sale Order or any other order of the Bankruptcy Court relating to this Agreement shall be appealed by any Person (or a petition for certiorari or motion for rehearing or re-argument shall be filed with respect thereto), Seller, with the cooperation and support of Purchaser, shall take all steps as may be reasonable and appropriate to defend against such appeal, petition or motion, and shall endeavor to obtain an expedited resolution of such appeal.

## Article 4     CLOSING AND DELIVERIES

4.1. **Time and Place of Closing**. Unless this Agreement is earlier terminated pursuant to Article 9 hereof, the closing of the transactions contemplated by this Agreement (the "Closing"), will take place remotely by the electronic exchange of the deliveries specified in Sections 4.2, 4.3 and 4.4 hereof no later than the fifth (5th) Business Day following satisfaction or waiver of all the conditions set forth in Article 8 (other than those conditions intended to be satisfied or waived at the Closing) (the "Closing Date").

4.2. **Deliveries by Seller**. At the Closing, Seller shall deliver to Purchaser (except as otherwise indicated below) the following items, all of which, if applicable, shall be duly executed:

(a)     *Bill of Sale for Personal Property*. A Bill of Sale and Assignment in the form attached as Exhibit 4.2(a) (the "Personal Property Bill of Sale"), conveying to Purchaser all of the Acquired Assets other than the Timeshare Inventory, the Acquired Contracts and the Seller Intellectual Property;

(b)     *Bargain and Sale Deed With Covenant Against Grantor's Acts*. A Bargain and Sale Deed With Covenants Against Grantor's Acts deed in recordable form (the "Bargain and Sale Deed") in the form attached hereto as Exhibit 4.2(b), conveying the Timeshare Inventory to Purchaser;

(c)     *Assignment and Assumption Agreements*. One or more assignment and assumption agreements (the "Assignment and Assumption Agreements") substantially in the form attached as Exhibit 4.2(c) to transfer the Acquired Contracts to Purchaser;

(d)     *Acquired Intellectual Property Assignment.* An assignment agreement (the "Acquired Intellectual Property Assignment"), effecting the assignment of the Acquired Intellectual Property to Purchaser, in substantially the form attached hereto as Exhibit 4.2(d);

(e)     *FIRPTA Certificate.* A duly executed non-foreign person affidavit of Seller (the "FIRPTA Certificate") in the form attached as Exhibit 4.2(e) and in form and substance required under the Treasury Regulations issued pursuant to Section 1445 of the Tax Code, stating that Seller (or the Person treated as the "transferor" with respect to Seller, as appropriate) is not a "foreign person" as defined in Section 1445 of the Tax Code;

(f)     *Vehicle Titles.* A vehicular Bill of Sale in the form attached as Exhibit 4.2(f) (the "Vehicle Bill of Sale") for all registered motor vehicles included in the Acquired Assets along with certificates of title endorsed for transfer to Purchaser;

(g)     *Owner's Affidavit.* To the Title Insurer, such owner's affidavits as reasonably required by the Title Insurer, and in a form reasonably acceptable to Seller, as necessary to issue the Purchaser's Title Policy (including causing the deletion of the standard pre-printed exceptions) (the "Owner's Title Affidavits");

(h)     *Transfer Tax Forms.* Such transfer Tax forms as required by state and local authorities;

(i)     *Sale Order.* A certified copy of the Sale Order, and the docket of the Bankruptcy Court evidencing the entry of the Sale Order;

(j)     *Assignment of Declarant's Rights.* An assignment of declarant's rights in the form attached as Exhibit 4.2(j) (the "Assignment of Declarant's Rights") duly executed and acknowledged by Seller as the condominium/timeshare declaration declarant that assigns to Purchaser all of the applicable declarant's rights in the Resort condominium and timeshare declarations;

(k)     *Secretary's Certificate.* A certificate of the Secretary or an Assistant Secretary of Seller certifying: (i) the good standing of Seller in the State of New Jersey; (ii) resolutions of the Board of Directors (or equivalent) of Seller authorizing the execution and delivery of this Agreement and the Sale Documents to which Seller is a party and the performance of its obligations hereunder and thereunder; (iii) the incumbency and signature of the officers of Seller executing this Agreement and the Sale Documents to which Seller is a party; (iv) that the representations and warranties of Seller contained in Article 5 are true and correct (without giving effect to any limitation as to "materiality" or "Material Adverse Effect" set forth therein) at and as of the Closing as if made at and as of such time (except to the extent expressly made as of an earlier date, in which case as of such earlier date); and (v) that Seller shall have performed in all material respects all covenants, agreements and obligations required to be performed by it under this Agreement at or prior to the Closing, including without limitation delivery of the items listed in this Section 4.2;

(l)     *Resignations.* Resignations in writing from all then existing Seller appointed directors of the boards of directors of the applicable timeshare and condominium associations and the appointed officers thereof;

(m)     *Bank Accounts.* Cause all of Seller's principals, officers, and employees to be removed from any association bank accounts and have Purchaser's designees appointed in their place;

(n)     *Estoppel Certificates.* Estoppel certificates, respectively executed and delivered by BOC with respect to the BOC Receivables Facility, and Colebrook with respect to the Colebrook Receivables Facility, each in commercially reasonable form and content and reasonably satisfactory to Purchaser and its lender(s), and expressly stating that Purchaser and its lender(s) may rely thereon, confirming the following: (i) attaching true copies of all loan and collateral security documents executed and delivered by Seller and any guarantor(s) in connection with the BOC Receivables Facility and the Colebrook Receivables Facility, respectively, that such attached documents represent the entire agreement between Seller and BOC and Seller and Colebrook, respectively, regarding such facilities, and that the BOC Receivables Facility and the Colebrook Receivables Facility, respectively, are presently in full force and effect and are valid, binding and enforceable obligations of

- 9 -

such lenders; (ii) that there are no known existing and uncured defaults, including without limitation Defaults and Events of Default as such terms may be defined in the loan documents attached pursuant to the preceding subsection, on the part of Seller under the BOC Receivables Facility and the Colebrook Receivables Facility, respectively, that there is no known event or condition which, with the passage of time or notice or both, would constitute a default, Default or Event of Default by Seller under the BOC Receivables Facility and the Colebrook Receivables Facility, respectively, in each instance which are or may become enforceable against Purchaser, or in the alternative that all existing or incipient defaults, Defaults and Events of Default are irrevocably and unconditionally waived as to Purchaser; and (iii) there are no Claims that may be asserted by BOC or Colebrook, respectively, against Purchaser or its lender(s) that accrued or which pertain to the period prior to the Closing Date or which may result in the cessation of funding to Purchaser under the BOC Receivables Facility and the Colebrook Receivables Facility, respectively; and

(o)       *Other Documents.* Any other documents, instruments or agreements which are reasonably requested that are necessary to consummate the transactions contemplated hereby and have not previously been delivered..

4.3.  **Delivery of Purchase Price by Purchaser**. At the Closing, Purchaser shall:

(a)       pay the Closing Cash Consideration to Seller by wire transfer of immediately available funds; and

(b)       pay the Cure Amounts with respect to each Acquired Contract in the manner specified in the Sale Order.

4.4.  **Other Deliveries by Purchaser**. At the Closing, Purchaser shall deliver to Seller (except as otherwise indicated below) the following items, all of which, if applicable, shall be duly executed, or otherwise perform the actions described in this Section 4.3:

(a)       *Assignment and Assumption Agreements.* Purchaser's counterpart to the Assignment and Assumption Agreements;

(b)       *Acquired Intellectual Property Assignment.* Purchaser's counterpart to the Acquired Intellectual Property Assignment;

(c)       *Transfer Tax Forms.* Such transfer Tax forms as required by state and local authorities;

(d)       *BOC Assignment and Assumption.* To BOC, Purchaser's counterpart to the BOC Assignment and Assumption;

(e)       *Colebrook Assignment and Assumption.* To Colebrook, Purchaser's counterpart to the Colebrook Assignment and Assumption;

(f)       *Management Company Guarantees.* To the respective Receivables Lender, an unconditional and irrevocable payment and performance guarantee executed by Boardwalk Management LLC, and its affiliates, Marina Title Corp., First Resorts Management Company, BKRP LLC, and Fantasea Resorts Management Company, Inc. (collectively, the "Management Company") of the respective Receivables Facility, in form and substance mutually acceptable to Purchaser and the respective Receivables Lender (collectively, the "Management Company Guarantees"), substantially in the form annexed hereto as Schedule 4.3;

(g)       *Secretary's Certificate.* A certificate of the Secretary or an Assistant Secretary of Purchaser certifying: (i) the good standing of Purchaser in the State of New Jersey; (ii) the written action of the Manager (or equivalent) of Purchaser authorizing the execution and delivery of this Agreement and the Sale Documents to which Purchaser is a party and the performance of its obligations hereunder and thereunder; (iii) the incumbency and signature of the officers of Purchaser executing this Agreement and the Sale Documents to which Purchaser is a party; (iv) that the representations and warranties of Purchaser contained in Article 6 are true and correct (without giving effect to any limitation as to "materiality" or "Material Adverse Effect" set

- 10 -

forth therein) at and as of the Closing as if made at and as of such time (except to the extent expressly made as of an earlier date, in which case of such earlier date); and (v) that Purchaser shall have performed in all material respects all covenants, agreements and obligations required to be performed by it under this Agreement at or prior to the Closing, including without limitation delivery of the items listed in this Section 4.2; and

(h)     *Other Documents*. Any other documents, instruments or agreements which are reasonably requested that are necessary to consummate the transactions contemplated hereby and have not previously been delivered.

## Article 5     REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Purchaser, except as set forth herein and in the Disclosure Schedules delivered to Purchaser on the date of this Agreement (the "Disclosure Schedules") (which Disclosure Schedules shall be arranged in sections corresponding to the numbered and lettered sections of this Agreement and the disclosure in any Section shall qualify other sections of this Agreement to the extent it is reasonably apparent from the face of the statement that it is applicable thereto), as follows:

5.1. **Organization**. Seller is duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation and has all requisite corporate power and authority to own, operate and lease its respective properties and assets and to carry on its respective business as now being conducted. Seller is duly qualified or licensed to do business and is in good standing in the jurisdiction in which the property owned, leased or operated by it or the nature of the Business conducted by it makes such qualification or licensing necessary, except where the failure to be so qualified, licensed or in good standing would not have a Material Adverse Effect.

5.2. **Authority; No Conflict; Required Filings and Consents**.

(a)     Seller has all requisite corporate power and authority to enter into this Agreement and, subject to entry of the Sale Order, to consummate the transactions contemplated by this Agreement and to perform its obligations hereunder and under the Sale Documents and other agreements contemplated hereby to which it is a party. The execution and delivery of this Agreement by Seller and the consummation by Seller of the transactions contemplated by this Agreement and the other Sale Documents to which it is a party have been duly authorized by all necessary corporate action on the part of Seller. This Agreement and each of the other Sale Documents to which Seller is a party have each been (or will be, at the Closing) duly executed and delivered by Seller and, assuming this Agreement constitutes the valid and binding obligation of the Purchaser hereto, constitutes the valid and binding obligation of Seller, enforceable against Seller in accordance with its respective terms, subject, as to enforcement, to (i) applicable bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereinafter in effect affecting creditors' rights generally and (ii) general principles of equity.

(b)     The execution and delivery of this Agreement and the other Sale Documents does not, and the consummation of the transactions contemplated by this Agreement and the other Sale Documents will not, (i) conflict with, or result in any violation or breach of, any provision of the organizational documents of Seller, (ii) result in any violation or breach of, or constitute (with or without notice or lapse of time, or both) a default (or give rise to a right of termination, cancellation or acceleration of any obligation or loss of any material benefit) under, or require a consent or waiver under, any of the terms, conditions or provisions of any note, bond, mortgage, indenture, lease, Contract or obligation to which Seller is a party or by which Seller may be bound, (iii) subject to the governmental filings and other matters referred to in Section 5.2(c) hereof, conflict with or violate any permit, concession, franchise, license, judgment, or Law applicable to Seller or (iv) result in the imposition or creation of any Lien upon or with respect to the Resorts other than a Permitted Encumbrance, except in the case of clauses (ii) and (iii) for any such breaches, conflicts, violations, defaults, terminations, cancellations, accelerations, losses or failures to obtain any such consent or waiver which (x) are not, individually or in the aggregate, reasonably likely to have a Material Adverse Effect or (y) would not materially delay or materially delay the Closing.

- 11 -

(c)        Subject to the entry of the Sale Order, no consent, approval, order or authorization of, or registration, declaration or filing with, any court, administrative agency, commission, regulatory body or other governmental authority or instrumentality ("Governmental Entity") is required by or with respect to Seller in connection with the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby or by the other Sale Documents, except for (i) the Sale Order; (ii) such consents, approvals, orders, authorizations, permits, filings, declarations or registrations related to, or arising out of, compliance with statutes, rules or regulations regulating the consumption, sale or serving of food, alcoholic beverages or tobacco products or the renaming or rebranding of the operations at the Resorts; (iii) such other filings, consents, approvals, orders, authorizations, permits, registrations and declarations as may be required under the Laws of any jurisdiction in which Seller conducts any business or owns any assets, the failure of which to make or obtain would not, individually or in the aggregate, be reasonably likely to have a Material Adverse Effect and (iv) any consents, approvals, orders, authorizations, registrations, permits, declaration or filings required by Purchaser or any of its Subsidiaries, Affiliates or key employees.

5.3.  **Financial Statements**. Section 5.3 of the Disclosure Schedules, to the knowledge of Seller, contains a true and complete copy of Seller's unaudited consolidated balance sheet as of [December 31, 2024] (the "Balance Sheet Date") and consolidated income and cash flow statements for the twelve (12) months then ended (collectively, the "Annual Financial Statements") and a true and complete copy of Seller's unaudited consolidated financial statements for the three (3)-month period ended March 31, 2025 (the "Interim Financial Statements" and, together with the Annual Financial Statements, the "Financial Statements"). The Financial Statements were prepared in accordance with GAAP in effect at the time of such preparation (except as disclosed in the notes thereto) applied on a consistent basis throughout the periods involved and fairly present in all material respects the consolidated financial position of Seller as of such date, and in the case of the Interim Financial Statements, subject to normal period-end adjustments and the absence of notes; provided, that the Financial Statements as of the Balance Sheet Date reflect accruals for Property Taxes based on management's good faith estimate of the assessed value of the Resorts as of the date of such Financial Statements.

5.4.  **No Undisclosed Liabilities**. As of the date of this Agreement, except (i) as set forth in the Financial Statements, (ii) for Liabilities incurred since the Balance Sheet Date in the Ordinary Course of Business, (iii) Liabilities incurred under the DIP Loan Agreement, or (iv) Liabilities under Contracts that relate to obligations that have not yet been performed, and are not required to be performed as of the date of this Agreement, Seller has no Liabilities required by GAAP to be disclosed on a balance sheet which would, individually or in the aggregate, reasonably be expected to cause a Material Adverse Effect. There are no off-balance sheet arrangements of any type (including any off-balance sheet arrangement required to be disclosed pursuant to Item 303(a)(4) of Regulation S-K promulgated under the Securities Act of 1933) nor any obligations to enter into any such arrangements.

5.5.  **Taxes**.

(a)        Seller has timely filed or will timely file (taking into account any applicable extension of time within which to file) with the appropriate taxing authorities all material Tax Returns that are required to be filed by, or with respect to, Seller prior to the Closing Date and has paid the Taxes shown due, if any, on such Tax Returns, except as may not be permitted under the Bankruptcy Code or where the failure to file such Tax Returns or pay such Taxes would not, individually or in the aggregate, have a Material Adverse Effect.

(b)        Seller has adequately reserved on the Financial Statements according to GAAP for all Taxes payable by, or in respect of, Seller for which no Tax Return has yet been filed except for (i) Taxes for which the failure to pay would not result in a Lien on the Acquired Assets or (ii) Taxes that are being contested in good faith and that are specified in the Disclosure Schedules.

(c)        Seller has withheld and paid over to the appropriate authorities all Taxes required to be withheld and paid over in connection with any amounts paid or owing to any employee, creditor, independent contractor or other third party.

- 12 -

(d)        There is no action, suit, proceeding, investigation, audit or written claim now pending against Seller in respect of any Tax, nor has any written notice of any such action, suit, proceeding, investigation, audit or claim been received by Seller from any taxing authority.

(e)        There are no Liens for Taxes (other than Permitted Encumbrances) upon the Acquired Assets.

(f)        Seller has not engaged in any reportable transaction within the meaning of Sections 6111 and 6112 of the Tax Code.

5.6.  **Title to Personal Property; Liens**. Seller has good and valid title to, or an adequate leasehold interest in its Personal Property, except as would not, individually or in the aggregate, reasonably be expected to cause a Material Adverse Effect. The Personal Property of Seller is sufficiently free of Liens to allow Seller to conduct the Business, and to the knowledge of Seller, the consummation of the transactions contemplated by this Agreement or by the other Sale Documents will not alter or impair such ability in any material respect.

5.7.  **Timeshare Inventory**.

(a)        Section 5.7(a) of the Disclosure Schedules identifies all Timeshare Inventory owned by Seller (together with all of Seller's rights, title and interest in and to all land, buildings, structures, easements, appurtenances and improvements thereon, collectively).

(b)        Seller has a good and marketable fee title in the Timeshare Inventory identified as owned by it in Section 5.7(a) of the Disclosure Schedule, free and clear of any and all Liens and Encumbrances, except for the Permitted Encumbrances.

(c)        Section 5.7(c) of the Disclosure Schedules identifies the documents and agreements pursuant to which Seller leases or licenses a portion of the Timeshare Inventory to another Person, including, without limitation, copies of the form documents used to carry out Interval Rentals (together with all amendments and modifications thereof, the "Lease Documents"). True and correct copies of the Lease Documents have been made available to Purchaser. The Lease Documents are unmodified and in full force and effect, and there are no other agreements, written or oral, pursuant to which a leasehold interest in, or similar license or occupancy right to, a portion of the Timeshare Inventory has been granted to any other Person. Seller is not, nor to the knowledge of Seller, is any landlord or other party, in material default under the Lease Documents, and, to the knowledge of Seller, no defaults (whether or not subsequently cured) by Seller or any landlord or other party have been alleged thereunder, in each case except as may arise as a result of the commencement of the Bankruptcy Case. Seller has not given or received any written notice of default under any of the Lease Documents.

(d)        To the knowledge of Seller, (i) the Timeshare Inventory is not in violation of any applicable Laws, except for such violations which, individually or in the aggregate, would not be reasonably likely to have a Material Adverse Effect; and (ii) there are no defects in the physical condition of the Timeshare Inventory or the improvements located on the Timeshare Inventory, except for defects which, individually or in the aggregate, would not be reasonably likely to have a Material Adverse Effect.

(e)        Seller has not received written notice of, nor does Seller have any actual knowledge of, any action, proceeding or litigation pending (and, to the knowledge of Seller, overtly contemplated or threatened) (i) (a) to take all or any portion of the Timeshare Inventory, or any interest therein, by eminent domain, (b) to modify the zoning of, or other governmental rules or restrictions applicable to, the Timeshare Inventory, or the current use thereof, or (c) for any street widening or changes in highway or traffic lanes or patterns in the immediate vicinity of the Timeshare Inventory, except which, in each case with respect to the items referenced in clauses (a), (b) and (c) above, would not be reasonably likely to have a Material Adverse Effect; or (ii) otherwise relating to the Timeshare Inventory or the interests of Seller therein, except which would not be reasonably likely to have a Material Adverse Effect.

- 13 -

(f)        Seller has not received written notice of any condemnation or rezoning proceedings pending or, to the knowledge of Seller, threatened with respect to the Timeshare Inventory.

(g)        There are no options to purchase, rights of first refusal, options to lease, Contracts, commitments, letters of intent or other obligations outstanding for the sale, exchange, material encumbrance (other than Permitted Encumbrances), lease, sublease or transfer of the Timeshare Inventory, or any portion thereof or interest therein except as set forth in the Lease Documents or as permitted by this Agreement.

(h)        To the knowledge of Seller, and except as otherwise disclosed in written materials previously provided to Purchaser, no portion of the Timeshare Inventory or the roads immediately adjacent to and currently utilized to access the Timeshare Inventory: (i) was the former site of any public or private landfill, dump site, retention basin or settling pond; (ii) was the former site of any oil or gas drilling operations; or (iii) was the former site of any experimentation, processing, refining, reprocessing, recovery or manufacturing operation for any petrochemicals.

(i)        Seller has not made or entered into any Contracts, other than the Receivables Facilities, to sell, mortgage, pledge or hypothecate, lease, sublease, convey, alienate, transfer or otherwise dispose of or encumber the Timeshare Inventory, or any portion thereof.

(j)        To the knowledge of Seller, (i) the Timeshare Inventory is not in material violation of any applicable Laws nor has any material certificate (including, without limitation, certificate of occupancy), permit or license from any government authority having jurisdiction over the Resorts not been obtained and is not in full force and effect, nor is there any pending threat of modification or cancellation of any of same, except in each case as would not be reasonably likely to have a Material Adverse Effect; or (ii) Seller has not received any written notice of any violation of any federal, state or municipal law, ordinance, order, regulation or requirement materially adversely affecting the Timeshare Inventory issued by any Governmental Entity, except in each case as would not be reasonably likely to have a Material Adverse Effect.

**5.8. Seller Intellectual Property**. Section 5.8 of the Disclosure Schedules lists all (i) Name registrations and applications and web domain uniform resource locators (URLs) owned by Seller, and (ii) registrations and applications for all other Intellectual Property owned by Seller (the items described in clauses (i) and (ii), collectively, the "Seller Intellectual Property"). To the knowledge of Seller, Seller owns or possesses adequate rights to use Seller Intellectual Property as currently conducted without material restrictions or material conditions on use and, to the knowledge of Seller, there is no conflict with the rights of Seller therein or any conflict by it with the rights of others therein which, individually or in the aggregate, would be reasonably likely to have a Material Adverse Effect. To the knowledge of Seller, no party to any Contract related to Seller Intellectual Property is in breach or default, and to the knowledge of Seller, no event has occurred which with notice or lapse of time would constitute a breach or default or permit termination, modification or acceleration thereunder. To Seller's knowledge, no Seller Intellectual Property is involved in any interference, reexamination, cancellation, or opposition proceeding, or any currently pending or written threat of suit, action, or proceeding arising out of a right or claimed right of any Person with respect to any Intellectual Property right. Seller has not received any written communication that Seller is using or disclosing in an unauthorized manner, infringing, or misappropriating in the conduct of the Business as presently conducted the right or claimed right of any Person with respect to any Intellectual Property right which, individually or in the aggregate, would be reasonably likely to have a Material Adverse Effect. To Seller's knowledge, no Seller Intellectual Property is being used or disclosed in an unauthorized manner, infringed, or misappropriated by any Person. Seller has not entered into any agreement to indemnify any Person against any charge of unauthorized use or disclosure, infringement, or misappropriation of Seller Intellectual Property.

**5.9. Agreements, Contracts and Commitments**. Section 5.9 of the Disclosure Schedules, to the knowledge of Seller, sets forth, as of the date of this Agreement, a true and complete list of, and Seller has made available to Purchaser true and complete copies of (collectively, the "Material Contracts"):

- 14 -

(a)      each Contract of Seller involving aggregate fiscal year payments by or to Seller, of more than Five Hundred Thousand Dollars **($500,000.00),** other than any Lease Documents, Labor Agreements or Seller Benefit Plans;

(b)      (i) all Contracts pursuant to which any indebtedness of Seller is outstanding or may be incurred, and (ii) all Contracts of or by Seller guaranteeing any debt obligations of any other Person, including the respective aggregate principal amounts outstanding as of the Closing Date;

(c)      all Contracts pursuant to which Seller has agreed not to, or which, following the consummation of the transactions contemplated by this Agreement or by the other Sale Documents, could restrict the ability of Purchaser to compete with any Person in any business or in any geographic area or to engage in any business or other activity, including any restrictions relating to "exclusivity" or any similar requirement in favor of any Person other than Seller or pursuant to which any benefit is required to be given or lost as a result of so competing or engaging;

(d)      all Contracts to which Seller is party granting any license to, or franchise in respect of, any material right, property or other asset;

(e)      all Contracts pursuant to which Intellectual Property is licensed to or from Seller (excluding for the use of commercially available, off-the-shelf software); and

(f)      all joint venture, limited liability company, partnership or other similar Contracts (including all amendments thereto) in which Seller holds an interest.

Seller has performed all material obligations required to be performed by it to date under each Material Contract. Each Material Contract is a legal, valid and binding obligation of Seller, and to the knowledge of Seller, the other parties thereto, subject to (i) applicable bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereinafter in effect affecting creditors' rights generally, and (ii) general principles of equity. Seller is not in violation of or in default under (nor, to the knowledge of Seller, does there exist any condition which upon the passage of time or the giving of notice or both would cause such a violation of or default under) any Material Contract to which it is a party or by which Seller, or any of its properties or other assets are bound except (x) for violations or defaults that individually or in the aggregate have not had and are not reasonably likely to have a Material Adverse Effect, and/or (y) events that may arise as a result of the commencement of the Bankruptcy Case.

5.10.      **Litigation**. Except as described in <u>Section 5.10</u> of the Disclosure Schedules, as of the Closing Date, to the knowledge of Seller, there is no action, suit or proceeding, claim, arbitration or investigation against Seller, pending, or as to which Seller has received any written notice of assertion or, to the knowledge of Seller, threatened against Seller or the transactions contemplated by this Agreement or by the other Sale Documents, before any court, arbitrator, governmental or regulatory authority or body, domestic or foreign, except for any matters that individually or in the aggregate, would not be reasonably likely to have a Material Adverse Effect or materially impair or delay the Closing.

5.11.      **Environmental Matters**. Except as that, individually or in the aggregate, would not be reasonably likely to have a Material Adverse Effect:

(a)      Seller has all Environmental Permits and the Environmental Permits are in full force and effect;

(b)      the Timeshare Inventory and Seller's ownership, leasing, operation and use thereof, are in compliance with all applicable Environmental Laws;

(c)      there are no Environmental Liabilities of Seller;

(d)      there are no Environmental Conditions;

(e)      Seller has not received any written notices from any Governmental Entity or other Person alleging Liability or Environmental Liability under or violation of any Environmental Law related to the

- 15 -

Timeshare Inventory, or alleging responsibility for the removal, clean-up, or Remediation of any Environmental Condition or any violation, or alleged violation, of any Environmental Law or related to any Environmental Liability;

(f)    Seller is not subject to any pending or threatened enforcement or investigatory action by any Governmental Entity regarding an Environmental Condition;

(g)    to the knowledge of Seller, no active or out-of-service underground storage tanks, or sites from which such storage tanks have been removed, or landfills, surface impoundments, waste piles or land disposal areas, exist in, at or on the Timeshare Inventory, that could reasonably be expected to give rise to any material Environmental Liability;

(h)    all environmental site assessment reports (including any Phase I or Phase II reports), and all investigation, Remediation or compliance studies, audits, assessments or similar documents which, to the knowledge of Seller, are in the possession of Seller and relate to the Environmental Conditions at the Timeshare Inventory have been made available to Purchaser;

(i)    the Timeshare Inventory is not subject to any current or threatened deed restriction, use restriction, institutional or engineering control or Lien pursuant to any Environmental Laws; and

(j)    Seller makes no representation or warranty regarding compliance or failure to comply with, or any actual or contingent Liability under, any Environmental Law, except as expressly set forth in this Section 5.11.

5.12.    **Absence of Certain Changes or Events**. Except in connection with the commencement of the Bankruptcy Case, during the period from the Balance Sheet Date to the Closing Date, Seller has conducted the Business in all material respects in the Ordinary Course of Business, and there has not been:

(a)    any event, circumstance or condition that individually or in the aggregate has had or is reasonably likely to have a Material Adverse Effect;

(b)    any granting by Seller to any director or officer of Seller of any material increase in compensation or bonus except (i) in the Ordinary Course of Business, (ii) in accordance with Seller's annual performance appraisal process or (iii) as was required under Seller Benefit Plan as in effect on the Execution Date;

(c)    any entering into of Seller Benefit Plan, except in the Ordinary Course of Business; or

(d)    any change in financial or Tax accounting methods, principles or practices by Seller materially affecting the financial condition or results of operations of Seller, taken as a whole, except insofar as may have been required by a change in GAAP.

5.13.    **Permits**. Seller and, to the knowledge of Seller, each of its directors, officers and Persons performing management functions similar to officers and partners, hold all permits, registrations, findings of qualification and/or suitability, licenses, consents, authorizations, variances, exemptions, certificates of occupancy, orders and approvals of all Governmental Entities necessary to conduct the Business and operations conducted at the Resorts, each of which is in full force and effect in all material respects (the "Seller Permits"). To the knowledge of Seller, no event has occurred which permits, or upon the giving of notice or passage of time or both, would permit, revocation, non-renewal, modification, suspension, limitation or termination of any of the Seller Permits that currently are in effect, the loss of which, individually or in the aggregate, would be reasonably likely to have a Material Adverse Effect. Seller and, to the knowledge of Seller, its directors, officers, key employees and Persons performing management functions similar to officers and partners, are in compliance with the terms of Seller Permits, except for such failures to comply that would not, individually or in the aggregate, be reasonably likely to have a Material Adverse Effect. The Business conducted by Seller at the Resorts is not being conducted in violation of any applicable Law of any Governmental Entity, except for possible violations which, individually or in the aggregate, do not and would not be reasonably likely to have a Material Adverse Effect. Seller has not received any written notice of any investigation or review by any

- 16 -

Governmental Entity that is pending, and, to the knowledge of Seller, no investigation or review is threatened, nor has any Governmental Entity indicated in writing any intention to conduct the same, other than those the outcome of which would not, individually or in the aggregate, be reasonably likely to have a Material Adverse Effect.

5.14.    **Personnel; Labor Matters**.

(a)      Section 5.14(a) of the Disclosure Schedules sets forth each collective bargaining agreement, letter of understanding, recognition agreement, card check agreement, or neutrality agreement with any union to which Seller is a party (collectively "Labor Agreements"). Except as would not be, individually or in the aggregate, reasonably likely to result in a Material Adverse Effect: (i) there are no pending arbitrations, demands for arbitration or grievances, or appeals from an arbitration under any Labor Agreements; (ii) there are no pending unfair labor practice charges, complaints, or proceedings pending against Seller, or filed by Seller, before, or on appeal from, the National Labor Relations Board, or any other labor relations Governmental Entity; (iii) there are no pending representation petitions or proceedings, de-certification petitions or proceedings, de-authorization petitions or proceedings pending against Seller, or filed by Seller, before, or on appeal from, the National Labor Relations Board, or any other labor relations Governmental Entity; (iv) there are no pending or scheduled negotiations with any union; and (v) there are no strikes, slowdowns, work stoppages, picketing, union boycotts, or lockouts (collectively "Labor Disruptions"), or, to the knowledge of Seller, threats of Labor Disruptions.

(b)      Seller is in compliance with all Laws in respect of the Business relating to employment, including Laws relating to wages, hours, collective bargaining, discrimination, civil rights, safety and health, worker notification requirements, immigration, workers' compensation, and layoffs, except for such noncompliance which would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(c)      Section 5.14(c) of the Disclosure Schedules lists the names, positions and base salaries or wage rates of the Resort Employees covered by such Disclosure Letter as of the Execution Date, and shall be updated to accurately reflect any changes thereto occurring after the Execution Date five (5) days prior to the Closing Date.

5.15.    **Employee Benefits**.

(a)      Section 5.15(a) of the Disclosure Schedules sets forth an accurate and complete list of all (i) "employee welfare benefit plans," within the meaning of Section 3(1) of the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations thereunder ("ERISA"); (ii) "employee pension benefit plans," within the meaning of Section 3(2) of ERISA; and (iii) material bonus, stock option, stock purchase, restricted stock, incentive, fringe benefit, profit-sharing, pension or retirement, deferred compensation, medical, life insurance, disability, accident, salary continuation, severance, accrued leave, vacation, sick pay, sick leave, supplemental retirement and unemployment benefit plans, programs, arrangements, commitments and/or practices (whether or not insured) for employees of Seller who are located at the Resorts (the "Resort Employees") (all of the foregoing plans, programs, arrangements, commitments, practices and Contracts referred to in (i), (ii) and (iii) above are referred to, as it relates to Seller, the "Seller Benefit Plans").

(b)      True and complete copies of each of the following documents relating to Seller Benefit Plan (other than any Multiemployer Plan) have been made available by Seller to Purchaser, or will be made available by Seller to Purchaser: (i) each plan document, together with all amendments thereto and related trust documents and amendments thereto; (ii) the most recent Forms 5500 and all schedules thereto and the most recent actuarial report, if any; (iii) the most recent IRS determination letter, if applicable; and (iv) summary plan descriptions, if applicable.

(c)      With respect to Seller Benefit Plan (other than any Multiemployer Plan): (i) if such plan is intended to qualify under Section 401(a) of the Tax Code, such plan has received a determination letter or can

- 17 -

rely on an opinion letter from the IRS stating that it so qualifies and that its trust is exempt from taxation under Section 501(a) of the Tax Code, and to the knowledge of Seller nothing has occurred since the date of such determination that could reasonably be expected to result in the loss of such qualification or exempt status; (ii) such plan has been administered and operated in all material respects in accordance with its terms and applicable Law (including ERISA and the Tax Code, and all rules and regulations promulgated thereunder); (iii) to the knowledge of Seller, no fiduciary has any Liability for breach of fiduciary duty or any other failure to act or comply in connection with the administration or investment of the assets of any such plan; (iv) no disputes are pending or, to the knowledge of Seller, threatened by any Governmental Entity or authority or by any participant or beneficiary against any such plan, the assets of any trust under any such plan or the applicable plan sponsor or the plan administrator, or against any fiduciary of any such plan with respect to the design or operation of such plan, other than routine claims for benefits thereunder; and (v) all contributions required to be made by or under any such plan (or trust or fund established thereunder or in connection therewith) or any related collective bargaining agreement as of the Closing Date (taking into account any extensions of time for the making of such contributions) have been made in full.

(d)     Section 5.15(d) of the Disclosure Schedules identifies each Seller Benefit Plan that is a Multiemployer Plan. Except as set forth on Section 5.15(d) of the Disclosure Schedules, neither Seller nor any ERISA Affiliate of Seller has incurred any Withdrawal Liability that has not been satisfied in full. To the knowledge of Seller, except for the transactions contemplated by this Agreement or by the other Sale Documents, there does not now exist, nor do any circumstances exist which may reasonably be expected to give rise to, any Withdrawal Liability on the part of Seller or any ERISA Affiliate of Seller. All contributions required to be made by Seller to any Multiemployer Plan by applicable Law, regulation, any plan document or other contractual undertaking for any period through the Closing Date have been timely made or paid in full.

(e)     Other than with respect to any Multiemployer Plans, no Seller Benefit Plan is subject to Title IV of ERISA, Section 302 of ERISA, Section 412 of the Tax Code or Section 4971 of the Tax Code. To the knowledge of Seller, except for the transactions contemplated by this Agreement with respect to any Multiemployer Plan, there does not now exist, nor do any circumstances exist which may reasonably be expected to give rise to, any Liability on the part of Seller or any ERISA Affiliate of Seller under Title IV of ERISA, Section 302 of ERISA, Section 412 of the Tax Code or Section 4971 of the Tax Code. No property or assets of Seller or any ERISA Affiliate of Seller is, or would reasonably be expected to become, the subject of any Lien arising under ERISA or the Tax Code with respect to any Assumed Benefit Plan.

5.16.     **Insurance**. Section 5.16 of the Disclosure Schedules lists the insurance policies of Seller or otherwise covering the Resorts or the Business or an Acquired Asset (collectively, the "Insurance Policies"), and for each such Insurance Policy indicates: (i) the name of the insurer; (ii) the deductible or self-insurance retention amount and the coverage limit; (iii) the type of insurance; (iv) policy number; (v) the expiration date; (vi) all co-insured or additional insured; and (vii) pending claims under the policy relating to Seller, the Resorts, the Business or any of the Acquired Assets. True, correct and complete copies of each such Insurance Policy have been delivered to Purchaser. Section 5.16 of the Disclosure Schedules also lists all pending claims under such Insurance Policies. As of the date hereof, all such Insurance Policies are in full force and effect, and Seller is not in material default with respect to its obligations under any of such Insurance Policies, except for such failure to be in full force and effect and for such defaults that would not have a Material Adverse Effect.

5.17.     **Brokers**. No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement or by the other Sale Documents based upon arrangements made by or on behalf of Seller.

5.18.     **Timeshare Exchange Network**. The affiliation agreement with RCI, LLC expires on _____ __, ____ and has not otherwise been amended or extended. To Seller's knowledge, Seller and the applicable timeshare association for each of the Resorts have paid all fees and other amounts due and owing under such written affiliation agreement and is not otherwise in default in any respect thereunder.

- 18 -

5.19. **Developer or Declarant Rights.** Seller has not assigned or expressly waived any developer/declarant rights that Seller holds under the applicable condominium and/or timeshare declarations and has the authority to assign same to Purchaser, without the consent of any timeshare or condominium association or any other Person.

5.20. **Timeshare Charges**. Except for any delinquent amounts as set forth on Schedule 5.20 attached hereto, all timeshare charges, dues, maintenance fees and real estate taxes required to be paid by Seller on Timeshare Inventory owned by Seller which are due pursuant to the applicable timeshare declaration have been paid by Seller.

5.21. **Timeshare Registrations**. All of Seller's timeshare registrations for the Resorts are current and in full force and effect. The Resorts are registered in all states in which Timeshare Intervals are offered and sold.

5.22. **Condition of Resorts.** To Seller's knowledge, there are no latent physical defects or physical conditions that are reasonably likely to have a Material Adverse Effect on the Resorts.

5.23. **Timeshare and Condominium Associations**. To Seller's knowledge, each of the timeshare associations and condominium associations are duly organized, validly existing and in good standing under applicable Law and there are currently no special assessments contemplated or anticipated to be levied by the timeshare association against the Timeshare Inventory.

5.24. **Sales and Marketing**. Seller has sufficient Timeshare Inventory to maintain an active sales and marketing program for the sales of Timeshare Intervals at the Resorts.

5.25. **Patriot Act Compliance**. Neither Purchaser nor any of its respective officers, directors, shareholders, partners, members or affiliates (including without limitation indirect holders of equity interests in Purchaser) is or will be an entity or Person (i) that is listed in the Annex to, or is otherwise subject to the provisions of Executive Order 13224 issued on September 24, 2001 ("EO13224"), (ii) whose name appears on the United States Treasury Department's Office of Foreign Assets Control ("OFAC") most current list of **"Specifically Designated National and Blocked Persons"** (which list may be published from time to time in various mediums including, but not limited to, the OFAC website, http://www.treas.gov/offices/enforcement/ofac/sdn/t11sdn.pdf), (iii) who commits, threatens to commit or supports **"terrorism,"** as that term is defined in EO13224, (iv) is subject to sanctions of the United States government or is in violation of any federal, state, municipal or local laws, statutes, codes, ordinances, orders, decrees, rules or regulations relating to terrorism or money laundering, including, without limitation, EO13224 and the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, or (v) who is otherwise affiliated with any entity or Person listed above (any and all parties described in clauses (i) – (v) above are herein referred to as a "Prohibited Person"). Purchaser covenants and agrees that neither Purchaser nor any of its respective officers, directors, shareholders, partners, members or affiliates (including without limitation indirect holders of equity interests in Purchaser) shall (aa) conduct any business, nor engage in any transaction or dealing, with any Prohibited Person, including, but no limited to, the making or receiving of any contribution of funds, goods, or services, to or for the benefit of a Prohibited Person, or (bb) engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in EO13224.  The provisions of this Section 5.26 shall survive the Closing or termination of this Agreement.

## Article 6 REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to Seller, except as set forth herein, as follows:

6.1. **Organization**. Purchaser is duly organized, validly existing and in good standing under the laws of New Jersey and has all requisite limited liability company power and authority to carry on its business as now being conducted. Purchaser is duly qualified or licensed to do business and is in good standing in each

- 19 -

jurisdiction in which the property owned, leased or operated by it or the nature of the business conducted by it makes such qualification or licensing necessary, except where the failure to be so qualified, licensed or in good standing would not materially impair or delay the Closing.

6.2. **Authority; No Conflict; Required Filings and Consents**.

(a)  Purchaser has all requisite power and authority to enter into this Agreement and to consummate the transactions contemplated by this Agreement. The execution and delivery of this Agreement and the Sale Documents and other agreements contemplated hereby to which it is a party and the consummation by Purchaser of the transactions contemplated by this Agreement have been duly authorized by all necessary action on the part of Purchaser. This Agreement has been duly executed and delivered by Purchaser and constitutes the valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms, subject, as to enforcement, to (i) applicable bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereinafter in effect affecting creditors' rights generally and (ii) general principles of equity.

(b)  The execution and delivery by Purchaser of this Agreement and the Sale Documents and other agreements contemplated hereby to which Purchaser is a party does not, and the consummation by Purchaser of the transactions contemplated by this Agreement will not, (i) conflict with, or result in any violation or breach of, any provision of the certificate of incorporation, bylaws or other organizational document of Purchaser, (ii) result in any violation or breach of, or constitute (with or without notice or lapse of time, or both) a default (or give rise to a right of termination, cancellation or acceleration of any obligation or loss of any material benefit) under, or require a consent or waiver under, any of the terms, conditions or provisions of any note, bond, mortgage, indenture, lease, Contract or obligation to which Purchaser is a party or by which any of them or any of its properties or assets may be bound, or (iii) subject to the governmental filings and other matters referred to in Section 6.2(c) hereof, conflict with or violate any permit, concession, franchise, license, judgment, or Law applicable to Purchaser or any of its or their properties or assets, except in the case of clauses (ii) and (iii) for any such conflicts, violations, defaults, terminations, cancellations or accelerations which would not materially impair or delay the Closing.

(c)  No consent, approval, order or authorization of, or registration, declaration or filing with, any Governmental Entity is required by or with respect to Purchaser in connection with the execution and delivery of this Agreement by Purchaser or the consummation by Purchaser of the transactions contemplated hereby, except for (i) such consents, approvals, orders, authorizations, permits, filings, declarations or registrations related to, or arising out of, compliance with statutes, rules or regulations regulating the consumption, sale or serving of food, alcoholic beverages or tobacco or the renaming or rebranding of the operations at the Resorts, (iii) such other filings, consents, approvals, orders, authorizations, permits, registrations and declarations as may be required under the Laws of any jurisdiction in which Purchaser conducts any business or owns any assets, the failure of which to make or obtain would not, individually or in the aggregate, be reasonably likely to materially impair or delay the Closing and (iv) any consents, approvals, orders, authorizations, registrations, permits, declarations or filings required by Seller or its Affiliates or key employees.

6.3. **Brokers**. Neither Purchaser nor any of its Representatives have employed any broker, financial advisor or finder or incurred any Liability for any brokerage fees, commissions or finder's fees in connection with the transactions contemplated by this Agreement.

6.4. **Litigation**. As of the date hereof, there are no actions, claims, suits or proceedings pending or, to the knowledge of Purchaser, threatened against Purchaser before any Governmental Entity, which, if determined adversely, could prevent or materially delay Purchaser from completing any of the transactions contemplated by this Agreement.

6.5. **No Implied Representations**. Purchaser acknowledges and agrees that, except as expressly set forth in this Agreement, neither Seller nor any of its Subsidiaries, Affiliates, agents or representatives or purported agents or representatives has made, and none of the foregoing entities or Persons is liable for or bound in any manner by, any express or implied warranties, guaranties, promises, statements, inducements, representations

- 20 -

or information pertaining to the businesses or properties of Seller, or any part thereof, the physical condition thereof, environmental matters, the income, expenses or operation thereof, the financial prospects for such businesses, the uses which can be lawfully made of the Timeshare Inventory or the Resorts under applicable zoning or other laws or any other matter or thing with respect thereto, including any existing or prospective authority of any Governmental Entities. Without limiting the foregoing, Purchaser acknowledges and agrees that, except as expressly set forth in this Agreement, Seller (a) are not liable for or bound by (and Purchaser has not relied upon) any verbal or written statements, representations, warranties, agreements, arrangements, understandings, investment bankers or real estate brokers "setups," financial projections, financial models or any other information respecting the businesses or properties of Seller or any part thereof furnished by Seller or any of their respective Affiliates, representatives or other Person representing or purportedly representing any of the foregoing, and (b) is not making any implied warranty or representation as to condition, merchantability or suitability as to any of the assets or properties of Seller. It is understood and agreed that any cost estimates, projections or other predictions contained or referred to in the Disclosure Schedules are not and shall not be deemed to be representations or warranties of Seller.

6.6. **Financial Condition**. Purchaser has the financial capability to pay the Purchase Price and perform all of its obligations under this Agreement and the Sale Documents.

## Article 7   COVENANTS

7.1. **Conduct of Business of Seller**. During the period commencing on the Execution Date and continuing until the earlier of the termination of this Agreement or the Closing, subject to the limitations set forth below, Seller shall (except (A) as required by the Bankruptcy Court, as prohibited by the Bankruptcy Code, or as contemplated by the Bankruptcy Case, (B) as contemplated by this Agreement, (C) as is reasonably required for Seller to maintain the viability and marketability of the Resorts and to prevent the destruction, removal, wasting, deterioration or impairment of the Resorts (including regular repair and maintenance efforts, continuation of any planned capital expenditures, and marketing and promotional programs), or (D) to the extent that Purchaser shall otherwise consent in writing, such consent not to be unreasonably withheld, conditioned or delayed) operate the Business in the Ordinary Course of Business in all material respects, pay its debts and Taxes when due (subject to good faith disputes over such debts or Taxes), and market and promote the Resorts in the Ordinary Course of Business in all material respects. Without limiting the generality of the foregoing, except (i) as required by the Bankruptcy Court, as prohibited by the Bankruptcy Code, or as contemplated by the Bankruptcy Case, (ii) as contemplated by this Agreement, (iii) to the extent that Purchaser shall otherwise consent in writing, such consent not to be unreasonably withheld, conditioned or delayed, or (iv) as disclosed in Section 7.1 of the Disclosure Schedules, during the period commencing on the Execution Date and continuing until the earlier of the termination of this Agreement or the Closing, Seller shall not:

(a)         sell, pledge, lease, exclusively license, dispose of, grant, encumber or otherwise authorize the sale, pledge, lease, exclusive license, disposition, grant or Encumbrance of any of its property or assets necessary for the operation or business of the Business, except for (i) sales of current assets in the Ordinary Course of Business in connection with the operation of the Resorts or (ii) sales of equipment and other non-current assets in the Ordinary Course of Business in connection with the operation of the Resorts;

(b)         voluntarily incur any material Liabilities, except in the Ordinary Course of Business;

(c)         violate, modify, amend or terminate any of the Acquired Contracts or waive, release or assign any material rights or claims under any of the Acquired Contracts, in each case except in the Ordinary Course of Business or as required by applicable Law;

(d)         cause or permit any of its property or assets to be subjected to any Encumbrance, other than Permitted Encumbrances;

- 21 -

(e)        fail to maintain insurance coverage with coverage limits no less than those maintained as of the date hereof; *provided, however,* that in the event any such coverage shall be terminated or lapse, to the extent available at reasonable cost, Seller shall procure substantially similar substitute insurance policies which in all material respects are in at least such amounts and against such risks as are currently covered by such policies;

(f)        enter into any Contract, or series of related Contracts which (i) involves aggregate consideration in excess of One Hundred Thousand Dollars ($100,000.00) per month, (ii) is between Seller, on the one hand, and any Affiliates of Seller, on the other hand, other than on an arms' length basis, or (iii) contains any restrictions on the operations of the Resorts following the Closing; *provided, however,* that Seller may enter into the following agreements without any consent from Purchaser: (A) any Interval Rental or Interval Sale in the Ordinary Course of Business; and (B) purchase orders in the Ordinary Course of Business;

(g)        acquire or agree to acquire by merging or consolidating with, or by purchasing a substantial equity interest in or a substantial portion of a material amount of assets of, or by any other manner, any business or any corporation, partnership, association or other business organization or division thereof or otherwise acquire or agree to acquire any assets, other than in the Ordinary Course of Business;

(h)        grant to any Resort Employee any material increase in (i) compensation, bonus or other benefits or (ii) severance or termination pay, in each case, except (A) as required by Seller Benefit Plan or Labor Agreement as in effect on the Execution Date, (B) increases in cash compensation in the Ordinary Course of Business and (C) payments to retain any employees of Seller not to exceed Two Hundred Fifty Thousand Dollars ($250,000.00) in the aggregate;

(i)        (i) enter into, amend or terminate a Seller Benefit Plan unless the effect thereof would be neither material nor adverse to Seller or (ii) accelerate, fund or secure the vesting or payment of compensation or benefits under a Seller Benefit Plan, in each case except for (A) the entry into of employment agreements in the Ordinary Course of Business, (B) as required by a Seller Benefit Plan or Labor Agreement as in effect on the Execution Date, or (C) as required by Law;

(j)        except as required by GAAP or applicable Law, make a change in its fiscal year, revalue any of its material assets or make changes in financial or Tax accounting methods, principles or practices;

(k)        make any election with respect to Taxes (other than elections that are consistent with past practice) or enter into any settlement or compromise of any material Tax liability or refund;

(l)        other than in the Ordinary Course of Business, amend, modify, extend or terminate any of the Lease Documents, or otherwise enter into any Contract or other agreement for the use and occupancy of the Timeshare Inventory or the Resorts or any interests therein other than Interval Rentals or Interval Sales in the Ordinary Course of Business;

(m)       forgive or cancel any indebtedness owed to Seller not in the Ordinary Course of Business;

(n)        reduce, or otherwise modify in a materially adverse manner, Seller's policies, standards and procedures for the issuance of credit to its customers; or

(o)        agree, whether or not in writing, to do any of the foregoing, or to authorize or announce an intention to do any of the foregoing.

7.2. **Cooperation; Notice; Cure**. Subject to compliance with applicable Law, from the Execution Date through the Closing, Seller and Purchaser shall confer on a regular and frequent basis with one or more representatives of the other Party to report on the general status of ongoing operations of the Business. Seller shall promptly notify Purchaser, and Purchaser shall promptly notify Seller in writing of, and will use commercially reasonable efforts to cure before the Closing Date, any event, transaction or circumstance, as soon as practical after it becomes known to such Party, that causes or will cause any covenant or agreement of Seller or of Purchaser under this Agreement to be breached in any material respect or that renders or will render untrue any representation or warranty of Seller or Purchaser contained in this Agreement to the extent such

- 22 -

untruth would reasonably be expected to result in the failure of such Party to timely satisfy the conditions set forth in Article 8, as applicable. Nothing contained in Section 7.1 shall prevent Seller from giving such notice, using such efforts or taking any action to cure or curing any such event, transaction or circumstance. No notice given pursuant to this Section 7.2 shall have any effect on the representations, warranties, covenants or agreements contained in this Agreement for purposes of determining satisfaction of any condition contained herein.

7.3. **Employee Matters.**

(a) Purchaser shall make offers of employment to be effective as of the Closing Date (i) to each Resort Employee who is covered by a Labor Agreement, and (ii) to such other Resort Employees as Purchaser may determine in its sole discretion, each on such terms and conditions as Purchaser shall determine, in its sole discretion (subject to the terms of any Labor Agreement that is applicable to such Resort Employee). Each Resort Employee who is offered and who accepts employment with Purchaser as of the Closing Date is referred to herein as a "Transferring Employee." Seller and Purchaser intend and shall each use commercially reasonable efforts to ensure that each Transferring Employees shall have continuous and uninterrupted employment immediately before and immediately after the Closing and, for purposes of any severance or similar benefit plan, program, policy, agreement or arrangement of Purchaser or Seller (or their respective Affiliates), the transactions contemplated by this Agreement shall not constitute a termination of employment of any Transferring Employee prior to or upon the consummation of such transactions.

(b) Purchaser shall assume and honor all Liabilities of Seller as of the Closing Date under any Seller Benefit Plan set forth in Section 5.15(a) of the Disclosure Schedules (each, an "Assumed Benefit Plan"). Each Transferring Employee shall cease to be an active participant in any Seller Benefit Plan that is not an Assumed Benefit Plan (excluding a Seller Benefit Plan that is sponsored by any labor organization in connection with any applicable Labor Agreement) (each, a "Retained Benefit Plan") effective as of the Closing Date; *provided, however,* that each such Transferring Employee shall be entitled to any benefits accrued under such Retained Benefit Plan prior to the Closing Date, as determined under the terms and conditions of such Retained Benefit Plan.

(c) To the extent permitted under the terms of applicable benefit plans, programs and arrangements adopted or maintained by Purchaser for the benefit of the Transferring Employees (collectively, "Purchaser Plans"), Purchaser shall waive, or use commercially reasonable efforts to cause to be waived any pre-existing condition limitation under any Purchaser Plan that is an "employee welfare benefit plan" within the meaning of Section 3(1) of ERISA in which the Transferring Employees (and their eligible dependents) will be eligible to participate from and after the Closing, except to the extent such pre-existing condition limitation or exclusion would have been applicable under a comparable Seller Benefit Plan immediately prior to the Closing. Purchaser shall cause appropriate Purchaser Plans to recognize the dollar amount of all expenses incurred by each Transferring Employee (and his or her eligible dependents) during the calendar year in which the Closing occurs to the extent recognized by a comparable Seller Benefit Plan for purposes of satisfying such year's deductible and co-payment limitations or exclusions prior to Closing, to the extent that recognition of such deductibles and co-payment credits are permitted by the applicable Purchaser Plan. Effective as of the Closing, Purchaser shall make available a group health plan to those Transferred Employees who, immediately prior to the Closing Date, participate in Seller's group health plan.

(d) With respect to any Purchaser Plan in which the Transferring Employees are eligible to participate, for all purposes of determining vesting and eligibility to participate and, with respect to any severance and vacation plans, programs or arrangements, for purposes of benefit level, a Transferring Employee's service with Seller shall be treated as service with Purchaser; *provided, however,* that such service need not be recognized to the extent that such recognition would result in any duplication of benefits to a Transferring Employee.

69792/0001-51099708v2
8249685

(e)     From and after the Closing Date, Purchaser shall assume and honor, in accordance with their respective terms, the Labor Agreements as in effect immediately prior to the Closing Date, it being understood by the Parties that, notwithstanding the foregoing or anything to the contrary, in no event shall Purchaser assume any Withdrawal Liability in respect of Seller Benefit Plan. Purchaser acknowledges and agrees that, notwithstanding anything to the contrary in this Section 7.3, the provisions of this Section 7.3 shall be subject to any applicable provision of a Labor Agreement in respect of the covered Transferring Employees, to the extent such provision is inconsistent with or otherwise in conflict with the provisions of any such Labor Agreement.

(f)     Seller agree to notify Purchaser of any layoffs of any Resort Employees in the 90-day period prior to the Closing Date, and Purchaser agrees to provide any required notice under the WARN Act and any similar federal, state or local Law with respect to any Resort Employee who will not receive an offer of employment from Purchaser effective on the Closing Date, and each Party agrees to take such actions as are necessary for it to otherwise comply with the WARN Act and any such other similar Law with respect to any "plant closing" or "mass layoff" (as defined in the WARN Act) or group termination or similar event affecting Resort Employees (including as a result of the consummation of the transactions contemplated by this Agreement), or affecting Transferring Employees from and after the Closing. Purchaser shall be solely liable for any and all Liabilities and related costs and expenses arising from or relating to any claim brought as a result of Purchaser's failure to comply with the applicable notice requirements of the WARN Act or any similar federal, state or local Law with respect to any Resort Employee who does not receive an offer of employment from Purchaser.

(g)     Following the Execution Date, Seller and Purchaser shall reasonably cooperate in all matters reasonably necessary to effect the transactions contemplated by this Section 7.3, including but not limited to (i) exchanging information regarding the employment terms and conditions of current Resort Employees that is reasonably requested by Purchaser for purposes of making offers of employment pursuant to Section 7.3(a), (ii) exchanging data relating to workers compensation, employee benefits and employee benefit plan coverage (except to the extent prohibited by applicable Law), (iii) obtaining a work permit or other approval required for a Transferring Employee's employment to continue with Purchaser following the Closing, and (iv) complying with all applicable Laws relating to notification of unions and relevant Governmental Entities and at the Purchaser's cost negotiations with unions in respect of the transactions contemplated hereby.

(h)     The provisions of this Section 7.3 are for the sole benefit of the Parties to this Agreement and nothing herein, expressed or implied, is intended, shall or shall be construed to confer upon or give to any Person (including, for the avoidance of doubt, any employees of Seller (including the Resort Employees and Transferring Employees)), other than the Parties and their respective permitted heirs, executors, administrators, successors and assigns, any legal or equitable or other rights or remedies (with respect to the matters provided for in this Section 7.3) under or by reason of any provision of this Agreement.

(i)     Except as provided in this Section 7.3, Purchaser shall have no obligation to extend offers of employment to any employee(s) of Seller or to enter or continue any employment or other service relationship with any Resort Employee or Transferring Employee or other service provider. Nothing contained herein, whether express or implied, shall (i) be treated as an amendment or other modification of any employee benefit plan, program or arrangement or the establishment of any employee benefit plan, program or arrangement, (ii) limit the rights of Purchaser or any of its Affiliates to amend, terminate or otherwise modify (or cause to be amended, terminated or otherwise modified) any Purchaser Plan, Assumed Benefit Plan or other employment benefit or compensation plan, program, policy or arrangement from and after the Closing Date or (iii) create any rights to continued employment with any of Seller, Purchaser, or any of their respective Affiliates or rights to continued participation in any Purchaser Plan, Assumed Benefit Plan or other employment benefit or compensation plan, program, policies or arrangements, it being agreed that all provisions contained in this Agreement with respect to employee benefit plans or employee compensation are included for the sole benefit of the respective Parties and shall not create any third-party beneficiary or other right in any other Person.

- 24 -

7.4. **Access to Information and the Resorts**. Upon reasonable notice, subject to the rights of the respective Timeshare Interval Owners and applicable Law, Seller shall, and shall cause its Representatives, to provide Purchaser's Representatives with reasonable access, during normal business hours during the period commencing on the Execution Date and continuing through the Closing, to the Resorts and all personnel, properties, books, Contracts and records of each respective Resort and, during such period, Seller shall furnish promptly to Purchaser all information concerning the Business and operation of the Resorts and the Resort Employees as Purchaser may reasonably request (collectively, the "Inspection"); *provided, however,* that (i) Purchaser shall provide Seller with at least twenty-four (24) hours' prior written notice of any Inspection; (ii) if Seller so requests, Purchaser's Representatives shall be accompanied by a Representative of Seller; (iii) Purchaser shall not initiate contact with employees or other representatives of Seller other than Representatives of Seller without the prior written consent of Seller, which consent shall not be unreasonably withheld, conditioned or delayed (and, at Seller's option, one Representative of Seller or other agent of Seller shall be present at all Inspections); (iv) Purchaser's Representatives shall not be entitled to perform any physical testing of any nature with respect to any portion of the Resorts without Seller's prior written consent, which consent may be withheld if in the reasonable judgment of Seller such testing would interfere with the operation of the Business conducted at the Resorts; (v) Purchaser shall not interfere with the operation of the Business conducted at the Resorts; (vi) Purchaser shall, at its sole cost and expense, promptly repair any damage to the Resorts or any other property owned by a Person other than Purchaser arising from or caused by Inspection, and shall promptly reimburse Seller for any loss arising from or caused by any Inspection, and restore the Resorts or such other third-party property to substantially the same condition as existed prior to such Inspection, and shall indemnify, defend and hold harmless Seller and its Affiliates from and against any personal injury or property damage claims, liabilities, judgments or expenses (including reasonable attorneys' fees) incurred by any of them arising or resulting therefrom; and (vii) Seller shall not be obligated to provide any information with respect to the Auction other than as provided in Section 3.1 or the Bid Procedures Order. Purchaser shall not permit any mechanics' Liens to be filed against all or any part of the Resorts as a result of Purchaser's activities pursuant to this Section 7.4, and such obligation shall survive the termination of this Agreement. Purchaser will hold and cause its Representatives to hold any such information furnished to it by Seller, which is nonpublic, in confidence. No information or knowledge obtained in any investigation pursuant to this Section 7.4 shall affect or be deemed to modify any representation or warranty contained in this Agreement or the conditions to the obligations of the Parties to consummate the transactions contemplated herein.

7.5. **Governmental Approvals**.

(a) Purchaser and Seller shall cooperate with each other and use their reasonable best efforts to (i) as promptly as practicable, take, or cause to be taken, all appropriate action, and do or cause to be done, all things necessary, proper or advisable under applicable Law or otherwise to consummate and make effective the transactions contemplated by this Agreement or by the other Sale Documents as promptly as practicable, (ii) obtain from any Governmental Entities any consents, licenses, permits, waivers, approvals, authorizations or orders required (A) to be obtained or made by Seller or Purchaser or any of their respective Affiliates or any of their respective Representatives and (B) to avoid any action or proceeding by any Governmental Entity in connection with the authorization, execution and delivery of this Agreement and the consummation of the transactions contemplated hereby or by the other Sale Documents, and (iii) make all necessary filings, and thereafter make any other required submissions with respect to this Agreement, as required under (A) any applicable federal or state securities Laws, and (B) any other applicable Law (collectively, the "Governmental Approvals"), and to comply with the terms and conditions of all such Governmental Approvals.

(b) Without limiting the generality of Section 7.5(a), Purchaser and Seller shall (i) each use its reasonable best efforts to avoid the entry of, or to have vacated or terminated, any decree, order, or judgment that would restrain, prevent or delay the Closing, on or before the Outside Date, including defending through litigation on the merits any claim asserted in any court by any Person, and (ii) each use its reasonable best efforts to avoid or eliminate each and every impediment under any antitrust, competition or trade regulation Law that may be asserted by any Governmental Entity with respect to the Closing so as to enable the Closing to occur

- 25 -

as soon as reasonably possible (and in any event no later than the Outside Date), including implementing, contesting or resisting any litigation before any court or quasi-judicial administrative tribunal seeking to restrain or enjoin the Closing.

(c)     Purchaser and Seller shall promptly advise the other Party upon receiving any communication from any Governmental Entity whose consent or approval is required for consummation of the transactions contemplated by this Agreement or by the other Sale Documents which causes such Party to reasonably believe that there is a reasonable likelihood that such consent or approval from such Governmental Entity will not be obtained or that the receipt of any such approval will be materially delayed. Purchaser and Seller shall use its reasonable best efforts to take, or cause to be taken, all actions reasonably necessary to defend any lawsuits or other legal proceedings challenging this Agreement or the consummation of the transactions contemplated by this Agreement or by the other Sale Documents, seeking to prevent the entry by any Governmental Entity of any decree, injunction or other order challenging this Agreement or the consummation of the transactions contemplated by this Agreement or by the other Sale Documents, appealing as promptly as possible any such decree, injunction or other order and having any such decree, injunction or other order vacated or reversed.

(d)     From the Execution Date through the Closing, each Party shall promptly notify the other Party in writing of any pending or, to the knowledge of Purchaser or Seller, as appropriate, threatened action, suit, arbitration or other proceeding or investigation by any Governmental Entity or any other Person (i) challenging or seeking damages in connection with the Closing of any of transactions contemplated by this Agreement or by the other Sale Documents, or (ii) seeking to restrain or prohibit the consummation of the Closing.

7.6. **Publicity**. Seller and Purchaser shall agree on the form and content of the initial press release regarding the transactions contemplated hereby or by the other Sale Documents and thereafter shall each Party shall consult with the other Party before issuing, provide each other the opportunity to review and comment upon and use all reasonable efforts to agree upon, any press release or other public statement with respect to any of the transactions contemplated hereby or by the other Sale Documents and shall not issue any such press release or make any such public statement prior to such consultation and prior to considering in good faith any such comments, except as may be required by applicable Law. The commenting party shall provide any such comments in a timely manner such that the party issuing such press release or other public statement shall have a commercially reasonable period of time to respond to such comments prior to any deadline imposed by such applicable Law in respect of such press release or other public statement.

7.7. **Further Assurances and Actions**.

(a)     Subject to the terms and conditions herein, each of the Parties agrees to use its reasonable best efforts to take, or cause to be taken, all appropriate action, and to do, or cause to be done, all things reasonably necessary, proper or advisable under applicable Laws and regulations to consummate and make effective the transactions contemplated by this Agreement, including, without limitation, using their respective reasonable best efforts to (i) obtain all licenses, permits, consents, approvals, authorizations, qualifications and orders of Governmental Entities and parties to Contracts with each Party as are necessary for consummation of the transactions contemplated by this Agreement or by the other Sale Documents, and (ii) fulfill all conditions precedent applicable to such Party pursuant to this Agreement.  Notwithstanding the foregoing, any reasonable fees or out-of-pocket expenses Seller incurs in order to satisfy the foregoing requirements shall be paid or reimbursed by Purchaser.

(b)     If at any time after the Closing any further action is reasonably necessary to carry out the purposes of this Agreement or the other Sale Documents, the proper officers and/or directors or manager of Purchaser and Seller, and their Affiliates as applicable, shall take all such action (including executing and delivering further affidavits, instruments, notices, assumptions, releases and acquisitions; provided, however, Seller shall do so at Purchaser's sole cost and expense).

7.8. **Transfer Taxes**. All transfer, documentary, sales, use, registration and similar Taxes (including all applicable real estate transfer or gains Taxes and stock transfer Taxes) and related fees (including any penalties,

- 26 -

interest and additions to Tax) incurred in connection with this Agreement and the transactions contemplated hereby shall be split 50/50 between Purchaser and Seller; *provided, however,* that each Party hereby waives any requirements under any bulk sale rule arising from any transaction under this Agreement.

7.9. **Insurance**. Seller's and/or Seller's affiliates' fire and casualty insurance and other insurance policies may be cancelled by Seller as of the Closing Date, and any refunded premiums shall be retained by Seller or Seller's affiliates, as the case may be. Purchaser will be responsible for acquiring and placing its casualty insurance, business interruption insurance, liability insurance and other insurance policies for periods from and after the Closing.

7.10. **Certain Transactions**. Prior to the Closing, Purchaser shall not, and shall not permit any of its Affiliates to, take, or agree or commit to take, (i) any action that would or is reasonably likely to materially delay the receipt of, or materially impact the ability of a Party to obtain, any Governmental Approval necessary for the consummation of the transactions contemplated by this Agreement or by the other Sale Documents, or (ii) any action that would or is reasonably likely to cause any Governmental Entity having jurisdiction over federal antitrust or competition Laws of the United States to commence or re-open a proceeding or investigation that could reasonably be expected to challenge or prevent the transactions contemplated by this Agreement or by the other Sale Documents or delay the Closing thereof beyond the Outside Date.

7.11. **Certain Notifications**. From the Execution Date through the Closing, each Party shall promptly notify the other Party in writing regarding any fact, circumstance, event or action which will result in, or would reasonably be expected to result in, the failure of such Party to timely satisfy any of the closing conditions specified in Article 8 of this Agreement, as applicable.

7.12. **Relationships.** Seller shall use reasonable commercial efforts to preserve its relationship with its owners, customers, suppliers and others with whom it has an existing business relationship in connection with the Resorts and Seller's Business.

7.13. **Non-assignable Licenses.** Purchaser acknowledges that the licenses set forth in Schedule 7.13 are not assignable or transferable by Seller to Purchaser and, therefore, that Purchaser will need to apply for and obtain replacements for such non-assignable or non-transferable licenses in Purchaser's own name. Seller shall provide such cooperation and assistance as reasonably requested by Purchaser to facilitate obtaining new licenses.

7.14. **Prorations and Adjustments.** To the extent not included in applicable timeshare assessments at the respective Resorts, real estate taxes, utility company deposits, escrows of any nature, deposits, water and sewer charges, post-Petition timeshare assessments, and municipal liens and confirmed assessments pertaining to the Timeshare Inventory shall be adjusted between Seller and Purchaser at the Closing as of the Closing Date on a full calendar or fiscal year basis or otherwise as is applicable.

## Article 8     CONDITIONS TO CLOSING

8.1. **Conditions to Each Party's Obligation to Effect the Closing**. The respective obligations of each Party to effect the Closing is subject to the satisfaction of each of the following conditions on or prior to the Closing Date, any of which (except for the condition set forth in Section 8.1(c)) may be waived in whole or in part in a writing executed by all of the Parties:

(a) *No Injunctions*. No Governmental Entity shall have enacted, issued, promulgated, enforced or entered any order, executive order, stay, decree, judgment or injunction or statute, rule, regulation which is in effect (whether temporary, preliminary or permanent) and which prevents or prohibits the consummation of any of the transactions contemplated by the Agreement or by the other Sale Documents or that makes it illegal for either Party to perform its obligations hereunder.

- 27 -

(b)  *Governmental Consents.* Purchaser and Seller shall have obtained all consents, approvals, interim authorization, findings of qualification and/or suitability, licenses, permits, orders or authorizations of and registrations, declarations or filings with any Governmental Entity required or necessary to close the transactions contemplated by this Agreement or by the other Sale Documents and necessary for ownership and operation of the Resorts from and after the Closing (including, without limitation, interim authorization, approval, licensing or registration of Purchaser and its officers, executive directors, key employees or Persons performing management functions similar to officers, each, as required by any Governmental Entity) shall have been obtained and made and shall be in full force and effect.

(c)  *Bankruptcy Court Approval.* The Bankruptcy Court shall have entered the Sale Order in the Bankruptcy Case and such Sale Order shall not have been reversed, stayed or modified in any material respect prior to the Closing Date, which order shall (i) authorize Seller's entry into this Agreement and the terms and conditions hereof, including pursuant to Section 363 of the Bankruptcy Code, (ii) authorize and approve the Seller to consummate the sale(s) and transaction(s) contemplated by this Agreement, with such sales and transactions to be free and clear of all Liens, claims and Encumbrances, and (iii) provide that the Seller, Purchaser and Receivables Lenders are entitled to the rights and protections contained in the Sale Order. Seller agrees to timely close, notwithstanding the filing or pendency of any appeal of the Sale Order so long as the Sale Order includes a finding of "good faith" pursuant to Section 363(m) of the Bankruptcy Code.

8.2. **Additional Conditions to Obligations of Purchaser**. The obligation of Purchaser to effect the Closing is subject to the satisfaction of each of the following conditions on or prior to the Closing Date which may be waived in whole or in part in writing exclusively by Purchaser:

(a)  *Representations and Warranties.* The representations and warranties of Seller contained in Article 5 shall be true and correct (without giving effect to any limitation as to "materiality" or "Material Adverse Effect" set forth therein) at and as of the Closing as if made at and as of such time (except to the extent expressly made as of an earlier date, in which case as of such earlier date), except where the failure of such representations and warranties to be true and correct would not, individually or in the aggregate, result in a Material Adverse Effect.

(b)  *Performance of Obligations of Seller.* Seller shall have performed in all material respects all covenants, agreements and obligations required to be performed by Seller under this Agreement at or prior to the Closing, including without limitation delivery of the items listed in Section 4.2 hereof.

(c)  *Resolution of Amounts Due to Timeshare and Condominium Associations.* Seller and the respective timeshare and condominium associations shall have resolved all outstanding amounts due and payable to the timeshare and condominium associations from Seller to the satisfaction of Purchaser.

(d)  *Modification of Receivables Facilities.* The BOC Receivables Facility and the Colebrook Receivables Facility shall be modified as appropriate to give effect to the terms of this Agreement, to facilitate the transactions contemplated by this Agreement, and to continue both the BOC Receivables Facility and the Colebrook Receivables Facility on substantially the same terms as existed prior to the Petition Date, which terms must be acceptable to the Receivables Lenders.

8.3. **Additional Conditions to Obligations of Seller**. The obligations of Seller to effect the Closing are subject to the satisfaction of each of the following conditions on or prior to the Closing Date, any of which may be waived in whole or in part in writing exclusively by Seller:

(a)  *Representations and Warranties.* The representations and warranties of Purchaser contained in Article 6 that are qualified as to materiality (or any variation thereof) shall be true and correct and such representations and warranties that are not so qualified shall be true and correct in all material respects at and as of the Closing as if made at and as of such time (except to the extent expressly made as of an earlier date, in which case as of such earlier date).

- 28 -

(b)      *Performance of Obligations of Purchaser*. Purchaser shall have performed in all material respects all covenants, agreements and obligations required to be performed by it under this Agreement at or prior to the Closing, including without limitation delivery of items listed in Sections 4.3 and 4.4 hereof.

(c)      *Assumption of the Sale Effective Date Assumed Liabilities*. The Purchaser shall assume the Sale Effective Date Assumed Liabilities in accordance with section 1.3 of this Agreement. The Management Company shall execute a guaranty of the Purchaser's obligations to satisfy the Sale Effective Date Assumed Liabilities with the Seller for the benefit of the Debtor's estate.

(d)      *Purchaser Contribution*. On the Closing Date of the Sale, and in exchange for the releases set forth in Section 13.14 of this Agreement, Kevin Jones, Roxanne Passarella, and the Management Company shall contribute a total of $150,000.00 in cash (the "Purchaser Contribution") to the Plan Administrator Wind-Down and Expense Reserve (as defined in the *Plan of Liquidation of Flagship Resort Development* Corporation Pursuant to Chapter 11 of the Bankruptcy Code [Docket No. 175], as amended, modified, or supplemented from time to time (the "Plan")).  It being expressly understood and agreed that the Purchaser Contribution is in addition to the Purchase Price.

8.4. **Frustration of Closing Conditions**. Seller may not rely on the failure of any condition set forth in Sections 8.1 or 8.3 to be satisfied if such failure was caused by Seller's failure to perform any of its obligations under this Agreement, to act in good faith or to use their reasonable best efforts to consummate the Closing. Purchaser may not rely on the failure of any condition set forth in Sections 8.1 or 8.2 to be satisfied if such failure was caused by the failure of Purchaser to perform any of its obligations under this Agreement, to act in good faith or to use its reasonable best efforts to consummate the Closing.

## Article 9      TERMINATION

9.1. **Termination**. This Agreement may be terminated at any time prior to the Closing (with respect to Sections 9.1(b) through 9.1(f) hereof, by written notice by the terminating Party to the other Party), provided that Seller may only terminate this Agreement pursuant to the terms of this Section 9.1 with the consent of BOC and Colebrook (which consent shall not be unreasonably withheld):

(a)      by mutual agreement of Seller, Purchaser, BOC and Colebrook;

(b)      (i) by Seller, if the Closing shall not have occurred on or before the fifth (5th) day entry of the Sale Order, or (ii) by Seller or Purchaser, if Purchaser is the Backup Bidder, if the Closing shall not have occurred on or before the date on which Purchaser's bid is no longer required to remain open pursuant to the Bid Procedures Order (such date set forth in (i) and (ii) above, the "Outside Date"); provided, that, the right to terminate this Agreement under this Section 9.1(b) shall not be available to any Party whose action or failure to act has been the primary cause of or resulted in the failure of the Closing to occur on or before the Outside Date and such action or failure to act constitutes a breach of this Agreement;

(c)      by Seller or Purchaser, if a court of competent jurisdiction or other Governmental Entity shall have issued a non-appealable final order, decree or ruling or taken any other non-appealable final action, in each case, having the effect of permanently restraining, enjoining or otherwise prohibiting the Closing and one or more of the transactions contemplated hereby; provided, however, that the right to terminate this Agreement under this Section 9.1(c) shall not be available to any Party whose action or failure to act has been the primary cause of such order, decree, ruling or final action, and such Party's action or failure to act constitutes a breach of this Agreement;

(d)      by Purchaser, if Seller or Seller has breached any representation, warranty, covenant or agreement on the part of Seller or Seller set forth in this Agreement which (i) would result in a failure of a condition set forth in Sections 8.2(a) or 8.2(b) hereof and (ii) is not cured in all material respects within thirty (30) calendar days after written notice thereof; provided, however, that if such breach cannot reasonably be cured within such thirty (30) day period but can be reasonably cured prior to the Outside Date, and Seller is

- 29 -

diligently proceeding to cure such breach, this Agreement may not be terminated pursuant to this Section 9.1(d); provided, further, that Purchaser's right to terminate this Agreement under this Section 9.1(d) shall not be available if, at the time of such intended termination, Seller has the right to terminate this Agreement under Sections 9.1(b), 9.1(c) or 9.1(e) hereof; or

(e)     by Seller, if Purchaser has breached any representation, warranty, covenant or agreement on the part of Purchaser set forth in this Agreement which (i) would result in a failure of a condition set forth in Section 8.1(b) or Sections 8.3(a) or 8.3(b) hereof and (ii) is not cured in all material respects within thirty (30) calendar days after written notice thereof; provided, however, that if such breach cannot reasonably be cured within such thirty (30) day period but can be reasonably cured prior to the Outside Date, and Purchaser is diligently proceeding to cure such breach, this Agreement may not be terminated pursuant to this Section 9.1(f); provided, further, that Seller's right to terminate this Agreement under this Section 9.1(f) shall not be available if, at the time of such intended termination, Seller is then in material breach of its representations, warranties, covenants or other agreements contained in this Agreement or the other Sale Documents;

(f)     by Seller or Purchaser if the Auction is held and (i) Purchaser is not the Successful Bidder or the Backup Bidder (as such terms are defined in the Bid Procedures Order), or (ii) Purchaser is the Backup Bidder but is no longer obligated to remain as the Backup Bidder pursuant to the terms of the Bid Procedures Order and Sale Order; and

(g)     by Purchaser upon the failure of any of the conditions set forth in Section 8.2, unless waived in writing by Purchaser in its sole discretion.

9.2.  **Effect of Termination**.

(a)     *Liability*. In the event of termination of this Agreement as provided in Section 9.1 hereof, this Agreement shall immediately become void and there shall be no Liability on the part of Purchaser or Seller, or their respective Affiliates or Representatives, other than pursuant to this Section 9.2 and Article 13, which provisions shall survive such termination.

(b)     *Fees and Expenses*. Except as otherwise expressly provided in this Agreement, all fees and expenses incurred in connection with this Agreement and the transactions contemplated hereby or by the other Sale Documents shall be paid by the Party incurring such expenses, whether or not the Closing is consummated.

## Article 10   SURVIVAL

10.1.  **No Survival of Representations or Warranties**. Except as expressly set forth in this Agreement, all of the (i) representations and warranties in this Agreement or in any instrument delivered pursuant to this Agreement, and (ii) covenants and agreements in this Agreement or in any instrument delivered pursuant to this Agreement that by their terms contemplate performance prior to or on the Closing Date shall terminate on the Closing Date, except for those representations and warranties which contemplate performance by a Party post-Closing, in which event such representations and warranties shall survive the Closing for a period of one (1) year.

## Article 11   INDEMNITY

11.1.  **Seller Indemnity**. Seller shall indemnify, defend and holder Purchaser and the Receivables Lenders harmless from and against all liabilities, losses, claims, damages, expenses (including, without limitation, reasonable costs and attorney's fees, reasonable costs and attorney's fees on appeal), judgments, proceedings, and causes of action of any kind (collectively, "Claims") arising out of, resulting from, relating to or in any way

- 30 -

connected with Seller's possession, ownership, sale, disposal and/or use of the Acquired Assets, prior to the time at which such Acquired Assets, or any of them, are transferred to Purchaser.

11.2.　　The provisions in this <u>Article 11</u> shall survive Closing.

## Article 12　DEFINITIONS

12.1.　　**Definitions**. Capitalized terms used in this Agreement and not otherwise defined shall have the meanings specified in this <u>Article 12</u>:

"*Affiliate*" means, with respect to any Person, any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such first-mentioned Person.

"*Avoidance Actions*" means all claims, powers and remedies of a debtor assertable or arising under chapter 5 of the Bankruptcy Code or any other applicable Law, including, without limitation, all preference, fraudulent transfer, and other claims to avoid a transfer.

"*Bankruptcy Code*" means title 11 of the United States Code (11 U.S.C. §§ 101-1330).

"*BOC*" means Banc of California, a California state-chartered bank.

"*BOC Receivables Facility*" means the loan facility established pursuant to the Second Consolidated, Amended and Restated Loan and Security Agreement dated effective as of December 17, 2019, by and between Seller and BOC, as amended through that certain Waiver and Tenth Amendment to Second Consolidated, Amended and Restated Loan and Security Agreement dated as of January 24, 2025 and the Eleventh Amendment and Consent to Second Consolidated, Amended and Restated Loan and Security Agreement, dated April 25, 2025.

"*Business Deposits*" means deposits received by Seller relating to Interval Rentals and Interval Sales and similar services and/or events of the Business, including all security and other deposits, advance or pre-paid rents or other amounts and key money or deposits (including any interest thereon).

"*Business Day*" means a day other than a Saturday, Sunday or other day on which commercial banks in Atlantic City, New Jersey are authorized or required by Law to close.

"*Colebrook*" means Colebrook Financial Company, LLC, a Connecticut limited liability company.

"*Colebrook Receivables Facility*" means the loan facility established pursuant to the Seventh Amended and Restated Revolving Loan and Security Agreement dated May 12, 2012, by and between Seller and Colebrook, as amended, restated or supplemented, but excluding amendments or extensions solely necessitated by the need to continue financing to finance the Seller's operations through the Bankruptcy Case and attendant to the relief set forth in the *Interim Order (I) Authorizing the Debtor to Obtain Post-Petition Financing Pursuant to the Existing Receivables Facilities, (II) Modifying Same and the Automatic Stay, (III) Scheduling a Final hearing, and (IV) Granting Related Relief*, entered by the Bankruptcy Court on May 15, 2025.

"*Contract*" means any agreement, contract, lease, power of attorney, note, loan, evidence of indebtedness, purchase order, letter of credit, settlement agreement, franchise agreement, undertaking, covenant not to compete, employment agreement, license, instrument, obligation, commitment, understanding, policy, purchase and sales order, quotation and other executory commitment to which any Person is a party or to which any of the assets of such Person are subject, whether oral or written, express or implied.

"*Customer Database*" means all customer databases, customer lists, historical records of customers and any other customer information collected and used by Seller solely in connection with marketing and promoting the Resorts.

"*DIP Loan Agreement*" means that certain Senior Secured Superpriority, Debtor-in-Possession Loan and Security Agreement between Seller as Debtor in the Bankruptcy Case and BOC and Colebrook, attached as Exhibit A to the Interim Order (as may be amended, the "<u>DIP Loan Agreement</u>").

- 31 -

"*DIP Loan Facility*" means the debtor-in-possession loan facility established pursuant to the DIP Loan Agreement.

"*Encumbrances*" means Liens, covenants, conditions, restrictions, agreements, easements, title defects, options, rights of first offer, rights of first refusal, restrictions on transfer, rights of other parties, limitations on use, limitations on voting rights, or other encumbrances of any kind or nature.

"*Environmental Condition*" means, as relating exclusively to the Resorts, the release into the environment of any Hazardous Substance as a result of which Seller (i) has or may become liable to any Person for an Environmental Liability, (ii) is or was in violation of any Environmental Law, (iii) has or may be required to incur response costs for investigation or Remediation, or (iv) by reason of which any Timeshare Inventory or other assets of Seller, may be subject to any Lien under Environmental Laws; provided, however, that none of the foregoing shall be an Environmental Condition if such matter was Remediated or otherwise corrected prior to the Execution Date in accordance with Environmental Law.

"*Environmental Laws*" means all applicable and legally enforceable foreign, federal, state and local statutes or laws, judgments, orders, regulations, licenses, permits, rules and ordinances relating to pollution or protection of health, safety or the environment, including, but not limited to the Federal Water Pollution Control Act (33 U.S.C. §1251 et seq.), Resource Conservation and Recovery Act (42 U.S.C. §6901 et seq.), Safe Drinking Water Act (42 U.S.C. §3000(f) et seq.), Toxic Substances Control Act (15 U.S.C. §2601 et seq.), Clean Air Act (42 U.S.C. §7401 et seq.), Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. §9601 et seq.) and other similar state and local statutes, in effect as of the Execution Date.

"*Environmental Liabilities*" means, as it relates to Seller, all Liabilities (including, without limitation, all reasonable fees, disbursements and expenses of counsel, expert and consulting fees and costs of investigations and feasibility studies and responding to government requests for information or documents), fines, penalties, restitution and monetary sanctions, interest, direct or indirect, known or unknown, absolute or contingent, past, present or future, resulting from any claim or demand, by any Person or entity, under any Environmental Law, or arising from Environmental Conditions.

"*Environmental Permits*" means any permit, license, authorization or approval required under applicable Environmental Laws.

"*ERISA Affiliate*" means, with respect to any entity, any trade or business, whether or not incorporated, that together with such entity would be deemed a "single employer" within the meaning of Section 4001 of ERISA.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended.

"*GAAP*" means United States generally accepted accounting principles, consistently applied in effect at the time in question.

"*Hazardous Substance*" means any pollutant, chemical, substance and any toxic, infectious, carcinogenic, reactive, corrosive, ignitable or flammable chemical, or chemical compound, or hazardous substance, material or waste, whether solid, liquid or gas, that is subject to regulation, control or Remediation under applicable Environmental Laws, including without limitation, any quantity of friable asbestos, urea formaldehyde foam insulation, PCBs, crude oil or any fraction thereof, all forms of natural gas, petroleum products or by-products or derivatives.

"*Intellectual Property*" means all foreign and domestic intellectual property rights, including all patents, patent applications, inventions (whether or not patentable), proprietary processes, technologies, discoveries, copyrightable and copyrighted works, domain names, trade dress, Names and all registrations and applications pertaining thereto and goodwill associated therewith; trade secrets, know-how, copyright registrations, databases and software, confidential technical information, and all documentation thereof.

- 32 -

"*Interval Rental*" means a short-term rental of a Timeshare Interval marketed and rented to the public by Seller or its Affiliates on behalf of the respective Timeshare Interval Owner.

"*Interval Rental Revenues*" means all revenues from Interval Rentals, together with any sales or other taxes thereon.

"*Interval Sale*" means the sale of a Timeshare Interval.

"*IRS*" means the Internal Revenue Service, a division of the United States Treasury Department, or any successor thereto.

"*Knowledge*" means, (a) when used in the phrase "knowledge of Seller," or "Seller's knowledge" and words of similar import, the actual knowledge of all of the current members of the Board of Directors of Seller or (b) when used in the phrase "knowledge of Purchaser" or "Purchaser's knowledge" and words of similar import the actual knowledge of Roxanne Passarella and Kevin Jones.

"*Law*" means any foreign or domestic law, statute, code, ordinance, rule, regulation, order, judgment, writ, stipulation, award, injunction, decree or arbitration award, policies, guidance, court decision, rule of common law or finding.

"*Liabilities*" mean any direct or indirect liability, indebtedness, obligation, commitment, expense, claim, deficiency, guaranty or endorsement of or by any Person of any type, whether accrued, absolute, contingent, matured, unmatured, liquidated, unliquidated, known or unknown.

"*Liens*" means any mortgage, pledge, lien, security interest, conditional or installment sale agreement, exaction, imposition, charge or other claims of third parties of any kind or nature.

"*Living Unit*" means a condominium unit at a Resort for which Seller has sold or will sell Timeshare Intervals.

"*Material Adverse Effect*" means changes, events or effects that are materially adverse to the business, condition (financial or otherwise) or results of operations of Seller, taken as a whole; provided, that the following, individually and in the aggregate, shall be excluded from the definition of Material Adverse Effect and from any determination as to whether a Material Adverse Effect has occurred: (A) any change, event or effects arising out of or resulting from changes in or affecting the (x) timeshare, travel or hospitality industries generally, (y) timeshare, travel or hospitality in Atlantic City, New Jersey, (z) the financial, banking, currency or capital markets in general, (B) any change, event or effect resulting from the entering into or public announcement of the transactions contemplated by this Agreement, including any impact thereof on relationships, contractual or otherwise, with any customer, supplier, distributor or employee, (C) any change, event or effect resulting from any act of terrorism, commencement or escalation of armed hostilities in the U.S. or internationally or declaration of war by the U.S. Congress, (D) the prospects of Seller, or the failure of Seller to meet any financial or other projections, (E) any change, event or effect resulting from the taking of any action contemplated by this Agreement, (F) any change, event or effect resulting from a change in Law, or GAAP, (G) any change, event or effect resulting from a weather-related or other force majeure event, (H) any change, event or effect resulting from any outbreak of illness or other public health-related event, (I) any change, event or effect caused by an act of the Party alleging the Material Adverse Effect, and (J) the commencement or continuation of the Bankruptcy Case or any action taken as required by the Bankruptcy Court.

"*Multiemployer Plan*" means a "multiemployer plan" as defined in Section 4001(A)(3) of ERISA.

"*Name*" means any trade name, trademark, service name or service mark.

"*Ordinary Course of Business*" shall describe any action taken by a Person if such action is consistent with such Person's past practices and is taken in the ordinary course of such Person's normal day to day operations.

- 33 -

"*Permitted Encumbrances*" means, with respect to Seller or the Timeshare Inventory, (i) Liens or Encumbrances for mechanics' and materialmen's Liens or Encumbrances not filed of record and charges assessments and other governmental charges not delinquent or which are currently being contested in good faith by appropriate proceedings or for which Seller shall have provided bond or other security satisfactory to the Title Insurer; (ii) Liens or Encumbrances for Property Taxes or Taxes not yet due and payable or being contested in good faith; (iii) Liens or Encumbrances in respect of judgments or awards with respect to which Seller shall in good faith currently be prosecuting an appeal or other proceeding for review and with respect to which Seller shall have secured a stay of execution pending such appeal or such proceeding for review; (iv) general real estate and tangible personal property Taxes and assessments for the year of the Closing and thereafter; (v) special Taxes and assessments payable and becoming a Lien after the Closing Date; (vi) Liens and Encumbrances created or approved by Purchaser; (vii) all restrictions, easements, reservations, leases, agreements, reversions, covenants and other matters of record which were caused by Seller that would not have a Material Adverse Effect on the ability to generate revenue at the Resorts as presently constructed and used by Seller; (viii) all matters disclosed by a Survey delivered to Purchaser and all other Survey defects which were caused by Seller that would not have a Material Adverse Effect on the ability to generate revenue at the Resorts as presently constructed and used by Seller; (ix) zoning and subdivision ordinances; (x) terms and conditions of licenses, permits and approvals for the Resorts and Laws of any Governmental Entity having jurisdiction over the Resorts; (xi) the Lease Documents and any exceptions described therein; and (xii) Liens or Encumbrances of BOC and Colebrook, as applicable, on the Acquired Assets.

"*Person*" means an individual, corporation, limited liability company, partnership, association, trust, unincorporated organization, other entity or "group" (as defined in Rule 13d-5(b)(1) under the Exchange Act).

"*Property Taxes*" means real, personal and intangible property Taxes.

"*Purchase Money Note*" means a purchase money mortgage note held by Seller to finance an Interval Sale in the Ordinary Course of Business and includes all such mortgages and notes pledged and/or assigned to the Receivables Lenders as collateral in connection with the Receivables Facilities, including, but not limited to, the Qualified Notes and Qualified Mortgages, and notes and mortgages, referenced and defined in the Colebrook Receivables Facility.

"*Receivables Facilities*" means, collectively, the BOC Receivables Facility and the Colebrook Receivables Facility.

"*Receivables Lenders*" means the lenders under the BOC Receivables Facility and the Colebrook Receivables Facility, collectively.

"*Remediation*" or "*Remediate*" means a cleanup or other method used to remove or contain a release of any Hazardous Substances at, on or under the Resorts, but only to the extent required under applicable Environmental Laws for the Resorts as it is currently being used as of the Execution Date.

"*Representatives*" means, with respect to either Party, its officers, directors, employees, financial advisors, attorneys, agents or other representatives.

"*Sale Documents*" means, collectively, this Agreement and the Personal Property Bill of Sale, the Bargain and Sale Deed, the Assignment and Assumption Agreements, the Acquired Intellectual Property Assignment, the FIRPTA Certificate, the Vehicle Bill of Sale and the Management Company Guarantees.

"*Sale Effective Date*" means on and after August 17, 2025.

"*Subsidiary*" means, with respect to either Party, any corporation or other organization, whether incorporated or unincorporated, of which (i) such Party or any other Subsidiary of such Party is a general partner or managing member or (ii) at least fifty percent (50%) of the securities or other equity interests having by their terms voting power to elect a majority of the board of directors or others performing similar functions

- 34 -

with respect to such corporation or other organization that is, directly or indirectly, owned or controlled by such Party or by any one or more of its Subsidiaries, or by such Party and one or more of its Subsidiaries.

"*Tax*" or "*Taxes*" shall mean any and all federal, state, local, foreign and other taxes, levies, fees, imposts, duties and charges of whatever kind imposed by any taxing authority (including any interest, penalties or additions to the tax imposed in connection therewith or with respect thereto), including, without limitation, taxes imposed on, or measured by, income, franchise, profits or gross receipts, and also ad valorem, value added, sales, use, service, real or personal property, capital stock, license, payroll, withholding, employment, social security, workers' compensation, unemployment compensation, utility, severance, production, excise, stamp, occupation, premium, windfall profits, transfer and gains taxes and customs duties.

"*Tax Code*" means the Internal Revenue Tax Code of 1986, as amended.

"*Tax Return*" shall mean returns, reports, information statements and other documentation (including any additional or supporting material) filed or maintained, or required to be filed or maintained, in connection with the calculation, determination, assessment, claim for refund collection of any Tax and shall include any amended returns required as a result of examination adjustments made by the IRS or other taxing authority.

"*Term Sheet*" means Exhibit 1 to the *Debtor's Motion Seeking Entry of an Order Approving a Settlement Pursuant to Federal Rule of Bankruptcy Procedure 9019 and 11 U.S.C. § 105(a) and Granting Related Relief* [Docket No. 249].

"*Timeshare Interval*" means a time allotment for a Living Unit, measured in weeks, during which the respective Timeshare Interval Owner has the right of exclusive usage of such Living Unit.

"*Timeshare Inventory*" means the inventory of unsold Timeshare Intervals and Whole Unit Condominiums collectively existing at the Resorts at any point in time.

"*Title Insurer*" means Stewart Title Insurance Company or such other nationally recognized title insurance company reasonably satisfactory to Purchaser.

"*Title Policy*" means, with respect to the Resorts, that certain owner's policy of title insurance or signed pro-forma to be issued by the Title Insurer for the benefit of Purchaser pursuant to the terms of the title commitment applicable to the Resorts, including customary endorsements to the Title Policy as requested by Purchaser in its reasonable discretion and available from the Title Insurer.

"*WARN Act*" means the Worker Adjustment and Retraining Notification Act of 1988 and any applicable analogous state and/or local Law.

"*Whole Unit Condominiums*" means certain condominium units in the Flagship, A Condominium, and the Atlantic Palace Condominium in which title is vested in the Seller and in which no Timeshare Intervals have currently been sold to third-party purchasers.

"*Withdrawal Liability*" means Liability that occurs as a result of a "complete withdrawal" or "partial withdrawal" from a Multiemployer Plan, as those terms are defined in Part I of Subtitle E of Title IV of ERISA.

12.2.      **Additional Definitions**. The following terms are defined elsewhere in this Agreement, as indicated below:

| Terms in Agreement | Cross Reference |
| --- | --- |
| Acquired Accounts Receivable | Section 1.1(b) |
| Acquired Assets | Section 1.1 |
| Acquired Books and Records | Section 1.1(g) |
| Acquired Claims | Section 1.1(f) |

- 35 -

| Terms in Agreement | Cross Reference |
|---|---|
| Acquired Contracts | Section 1.1(e) |
| Acquired Contract & Cure Schedule | Section 1.8 |
| Acquired Contract & Cure Update Schedule | Section 1.8 |
| Acquired Intellectual Property | Section 1.1(d) |
| Acquired Intellectual Property Assignment | Section 4.2(d) |
| Agreement | Preamble |
| Annual Financial Statements | Section 5.3 |
| Assignment and Assumption Agreements | Section 4.2(c) |
| Assumed Benefit Plan | Section 7.3(b) |
| Assumed Liabilities | Section 1.3 |
| Backup Bidder | Section 9.1(f) |
| Balance Sheet Date | Section 5.3 |
| Bankruptcy Case | Preliminary Statements |
| Bankruptcy Court | Preliminary Statements |
| Bargain and Sale Deed | Section 4.2(b) |
| Bid Procedures Motion | Section 3.1(a) |
| Bid Procedures Order | Section 3.1(b) |
| BOC Assignment and Assumption | Section 1.3(a) |
| Business | Preliminary Statements |
| Closing | Section 4.1 |
| Closing Cash Consideration | Section 2.1 |
| Closing Date | Section 4.1 |
| Colebrook Assignment and Assumption | Section 1.3(b) |
| Cure Amount | Section 1.8 |
| Designation Deadline | Section 1.8 |
| Disclosure Schedules | Article 5 |
| ERISA | Section 5.15(a) |
| Excluded Assets | Section 1.2 |
| Excluded Contracts | Section 1.2(a) |
| Excluded Claims | Section 1.2(e) |
| Excluded Liabilities | Section 1.4 |
| Execution Date | Preamble |

- 36 -

| Terms  in Agreement | Cross Reference |
| --- | --- |
| Financial Statements | Section 5.3 |
| FIRPTA Certificate | Section 4.2(e) |
| Governmental Approvals | Section 7.5(a) |
| Governmental Entity | Section 5.2(c) |
| Insurance Policies | Section 5.16 |
| Inspection | Section 7.4 |
| Interim Financial Statements | Section 5.3 |
| Labor Agreements | Section 5.14(a) |
| Labor Disruptions | Section 5.14(a) |
| Lease Documents | Section 5.7(c) |
| Leased Personal Property | Section 1.1(c) |
| Management Company | Section 4.4(f) |
| Management Company Guarantees | Section 4.4(f) |
| Material Contracts | Section 5.9 |
| Outside Date | Section 9.1(b) |
| Owned Personal Property | Section 1.1(c) |
| Owner's Title Affidavits | Section 4.2(g) |
| Personal Property | Section 1.1(c) |
| Personal Property Bill of Sale | Section 4.2(a) |
| Petition Date | Preliminary Statements |
| Purchaser | Preamble |
| Purchaser Plans | Section 7.3(c) |
| Resorts | Preliminary Statements |
| Resort Employees | Section 5.15(a) |
| Purchase Price | Section 2.1 |
| Purchase Price Allocation | Section 2.2 |
| Resort | Preliminary Statements |
| Retained Benefit Plan | Section 7.3(b) |
| Sale Order | Section 3.2 |
| Seller | Preliminary Statements |
| Seller Benefit Plans | Section 5.15(a) |
| Seller Intellectual Property | Section 5.8 |

69792/0001-51099708v2
8249685

| Terms in Agreement | Cross Reference |
|---|---|
| Seller Permits | Section 5.13 |
| Successful Bidder | Section 9.1(f) |
| Transferring Employee | Section 7.3(a) |
| Vehicle Bill of Sale | Section 4.2(f) |

### Article 13   MISCELLANEOUS

13.1.     **Governing Law; Jurisdiction**. This Agreement shall be governed by and interpreted and enforced in accordance with the laws of the State of New York without giving effect to the choice-of-law provisions thereof to the extent that the application of the laws of another jurisdiction would be required thereby. The Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes that may arise under this Agreement and in respect of the transactions contemplated hereby; *provided, however*, that in the event the Bankruptcy Court at any time declines to accept jurisdiction, each of the Parties hereby irrevocably (i) submits to the exclusive jurisdiction of the courts of the State of New Jersey and the federal courts of the United States located in New Jersey regarding any such claim or dispute; (ii) agrees that all claims and disputes shall be heard and determined in such courts; (iii) waives, to the fullest extent permitted by applicable Law, any objection that they may now or hereafter have to the venue of any such claim or dispute brought in such court or any defense of inconvenient forum for the maintenance of such claim or dispute; and (iv) agrees that a judgment in any claim or dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable Law.

13.2.     **Notices**. All notices, requests, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given when personally delivered; one (1) day after deposit with Federal Express or similar overnight courier service; upon transmission by electronic mail if a confirmation of transmission is received during normal business hours and, if not, the next Business Day after transmission; or three (3) days after being mailed by first class mail, return receipt requested. Notices, demands and communications to the Purchaser and Seller shall, unless another address is specified in writing, be sent to the addresses indicated below:

If to Purchaser:

AC Boardwalk Investments LLC
60 N. Maine Ave
Atlantic City, New Jersey 08401
Attention:  Roxanne Passarella; and
            Kevin Jones
Email:      roxpassarella@gmail.com; and
            kjones4212@yahoo.com

with a copy to:

Cooper Levenson, PA
1125 Atlantic Avenue, 3rd Floor
Atlantic City, New Jersey 08401
Telephone: (609) 572-7538
Attention: Eric A. Browndorf, Esq.
Email: ebrowndorf@cooperlevenson.com

69792/0001-51099708v2
8249685

If to Seller:                                        with a copy to:

Flagship Resort Development Corporation    60    Porzio, Bromberg & Newman, P.C.
North Maine Avenue                                 100 Southgate Parkway P.O. Box 1997
Atlantic City, New Jersey 08401                    Morristown, NJ 07962-1997
Attention:  Cherie Parks, CFO                      Attention: Warren J. Martin Jr., Esq. and
Email: cheriep@60north.net                         Christopher P. Mazza, Esq.
                                                   Email: wjmartin@pbnlaw.com and
                                                   cpmazza@pbnlaw.com


   If to the Receivables Lenders

   To BOC:

Holland & Knight, LLP,
811 Main St., Suite 2500
Houston, TX 77002
Attention: Anthony F. Pirraglia, Esq. and
Christopher A. Bailey, Esq.
E-mail: anthony.pirraglia@hklaw.com and
chris.bailey@hklaw.com

   To Colebrook:

Schenck, Price, Smith & King, LLP
220 Park Avenue
Florham Park, NJ 07932
Attention: Franklin Barbosa, Jr., Esq.
E-mail: fb@spsk.com

   13.3.      **Interpretation**. When a reference is made in this Agreement to Sections, Exhibits or Schedules, such reference shall be to a Section or Exhibit or Schedule of this Agreement unless otherwise indicated. All Exhibits and Schedules of this Agreement are incorporated herein by reference. The table of contents and headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. Whenever the words "include," "includes" or "including" are used in this Agreement they shall be deemed to be followed by the words "without limitation." The phrase "made available" in this Agreement shall mean that the information referred to has been made available if requested by the Party to whom such information is to be made available.

   13.4.      **Headings**. The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

   13.5.      **Entire Agreement**. This Agreement and all documents and instruments referred to herein constitute the entire agreement and supersede all prior agreements and understandings, both written and oral, among the Parties with respect to the subject matter hereof. Each Party agrees that, except for the representations and warranties contained in this Agreement and the schedules, certificates and other agreements delivered in accordance with this Agreement, neither Seller nor Purchaser makes any other representations or warranties, and each hereby disclaims any other representations and warranties made by itself or any of its respective Representatives or other representatives, with respect to the execution and delivery of this Agreement or the transactions contemplated hereby, notwithstanding the delivery or disclosure to any of them

- 39 -

or their respective representatives of any documentation or other information with respect to any one or more of the foregoing.

13.6.     **Severability**. If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of Law or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner to the end that transactions contemplated hereby are fulfilled to the extent possible.

13.7.     **Assignment**. Without the prior written consent of all of the Parties, neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by operation of Law (including, without limitation, by merger or consolidation) or otherwise.

13.8.     **Parties of Interest; No Third Party Beneficiaries**. This Agreement shall be binding upon and inure solely to the benefit of each Party and its respective permitted successors and assigns, and nothing in this Agreement, express or implied is intended to or shall confer upon any other Person any right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

13.9.     **Counterparts**. This Agreement may be executed digitally or by facsimile and/or in one or more counterparts, and by either Party in separate counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement.

13.10.    **Mutual Drafting**. Each Party has participated in the drafting of this Agreement, which each Party acknowledges is the result of extensive negotiations between the Parties. In the event of any ambiguity or question of intent arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

13.11.    **Amendment**. This Agreement may be amended by an instrument in writing signed on behalf of Purchaser and Seller and only with the consent of the Receivables Lenders, which consent shall not be unreasonably withheld.

13.12.    **Specific Performance**. Seller and Purchaser each acknowledges and agrees that the other Party would be damaged irreparably in the event any of the provisions of this Agreement are not performed in accordance with their specific terms or otherwise are breached. Accordingly, Seller and Purchaser each agrees that the other Party shall be entitled to an injunction or injunctions to prevent breaches of the provisions of this Agreement and to enforce specifically this Agreement and the terms and provisions hereof, in addition to any other remedy to which it may be entitled, at law or in equity. Each of the Parties hereby waives (i) any defenses in any action for specific performance, including the defense that a remedy at law would be adequate and (ii) any requirement under any Law to post a bond or other security as a prerequisite to obtaining equitable relief. The Parties' rights under this Section 13.12 shall terminate on the Closing Date except with respect to their rights relating to the enforcement of the terms and provisions of covenants and agreements requiring performance from and after the Closing Date.

13.13.    **Extension; Waiver**. At any time prior to the Closing, Purchaser, each of Seller and Purchaser by action taken or authorized by their respective board of directors or manager may, to the extent legally allowed (i) extend the time for or waive the performance of any of the obligations or other acts of the other Parties, (ii) waive any inaccuracies in the representations and warranties contained herein or in any document delivered pursuant herein and (iii) waive compliance with any of the agreements or conditions contained here. Any agreement on the part of a Party to any such extension or waiver shall be valid only if set forth in a written instrument signed on behalf of such Party.

- 40 -

13.14.  **Release**.  The Seller shall release the Purchaser, Kevin Jones, Roxanne Passarella, and the Management Company from all causes of action, claims, and liabilities as of the Closing Date of the Sale, with such release being effective as of the funding of the Purchaser Contribution in accordance with Section 8.3(d) of this Agreement.

*(signature page follows)*

69792/0001-51099708v2
8249685

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be signed by their respective duly authorized officers as of the Execution Date.

SELLER:

**Flagship Resort Development Corporation**

By: _____

Name: _____

Title: _____

PURCHASER:

**AC Boardwalk Investments LLC**

By: _____

Name: _____

Title: _____

GUARANTORS

**Boardwalk Management LLC, Marina Title Corp., First Resorts Management Company, BKRP LLC, and Fantasea Resorts Management Company, Inc., solely for purposes of the Management Company Guarantees**

By: _____

Name: _____

Title: _____